IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

LOUIS BRIAN OLESEN, II,
BARBARA OLESEN,
AMERICAN SHOOTERS SUPPLY, INC. and
GUNS, INC.,

               Plaintiffs,

        v.                          06-CV-0959FJS/DRH

JOHN MORGAN, Special Agent of
the Federal Bureau of Alcohol,
Tobacco, Firearms and Explosives,
Individually and in his official
capacity, U.S. DEPARTMENT OF JUSTICE,
BUREAU OF ALCOHOL, TOBACCO, FIREARMS
and EXPLOSIVES,

               Defendants.

---

## MEMORANDUM OF LAW ON BEHALF OF DEFENDANTS, JOHN MORGAN AND THE U.S. DEPARTMENT OF JUSTICE, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES IN SUPPORT OF SUBSTITUTION OF PARTY AND DISMISSAL

                              TERRANCE P. FLYNN
                              United States Attorney
                              Western District of New York

MARY E. FLEMING
Special Assistant U.S. Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
Attorney for Defendants
  Morgan and ATF
Bar Roll No. 514110

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . i

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PRELIMINARY STATEMENT  . . . . . . . . . . . . . . . . . . 2

III. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . 3

IV.  SUMMARY OF ARGUMENT  . . . . . . . . . . . . . . . . . . . 6

V.   LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 8

     A.   PLAINTIFFS' COMMON LAW TORT CLAIMS . . . . . . . . . 8

     POINT I:    THE UNITED STATES MUST BE SUBSTITUTED FOR
                 MORGAN AS PARTY DEFENDANT WITH RESPECT TO THE
                 THIRD, FOURTH AND FIFTH CAUSES OF ACTION . . . 8

     POINT II:   AS TO THE THIRD, FOURTH, FIFTH AND SIXTH CAUSES
                 OF ACTION, THE UNITED STATES IS THE ONLY PROPER
                 DEFENDANT AND THESE CLAIMS MUST BE DISMISSED
                 FOR LACK OF SUBJECT MATTER JURISDICTION  . . 10

     POINT III:  DISMISSAL OF THE PLAINTIFFS' COMPLAINT IS
                 WARRANTED BECAUSE THIS COURT LACKS PERSONAL
                 JURISDICTION OVER MORGAN AND ATF . . . . . . 12

     POINT IV:   THE COMMON LAW TORT CLAIMS ARE BARRED,
                 IN PART, BY THE STATUTE OF LIMITATIONS . . . 17

     POINT V:    THE FTCA ACTION IS BARRED BY THE
                 DISCRETIONARY FUNCTION EXCEPTION . . . . . . 20

          A.   Claims challenging ATF's decision to investigate
               Brian Olesen, or the manner in which the
               investigation was conducted, are barred by the
               discretionary function exception . . . . . . 20

          B.   The claim for negligent training and supervision
               is barred by the discretionary function
               exception  . . . . . . . . . . . . . . . . . 22

B.   PLAINTIFFS' BIVENS CLAIMS . . . . . . . . . . . .  24

POINT VI:    ATF, AS A FEDERAL AGENCY, IS NOT SUBJECT TO
             VICARIOUS LIABILITY FOR MORGAN'S ALLEGED
             CONSTITUTIONAL VIOLATIONS . . . . . . . .  24

POINT VII:   BARBARA JEAN OLESEN AND AMERICAN SHOOTERS SUPPLY
             DO NOT HAVE STANDING TO BRING THIS ACTION .  25

POINT VIII:  THE OFFICIAL CAPACITY CLAIMS ARE BARRED BY
             SOVEREIGN IMMUNITY . . . . . . . . . . . .  27

POINT IX:    PLAINTIFFS' CONSTITUTIONAL CLAIMS BASED UPON
             ALLEGED ACTS OCCURRING BEYOND THE THREE-YEAR
             LIMITATIONS PERIOD ARE BARRED . . . . . .  28

POINT X:     MORGAN IS ENTITLED TO QUALIFIED IMMUNITY . .  31

        A.   Fourteenth Amendment . . . . . . . . . . .  32

        B.   Fifth Amendment Substantive Due Process  . . .  33

V.  CONCLUSION  . . . . . . . . . . . . . . . . . . . .  34

ADDENDUM

# TABLE OF AUTHORITIES

## FEDERAL CASES

Adler v. Pataki, 185 F.3d 35 (2d Cir.1999). . . . . . . . . . 26

Albright v. Oliver, 510 U.S. 266 (1994) . . . . . . . . . . . 33

Altman v. Connally, 456 F.2d 1114 (2d Cir. 1972) (per curiam). 11

Alvarez-Sepulveda v. Commw. of Puerto Rico, 218 F. Supp. 2d 170 (D. P.R. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 27

Armstrong v. Sears, 33 F.3d 182 (2d Cir. 1994). . . . . . . . 13

Barrett v. Harwood, 189 F.3d 297 (2d Cir. 1999) . . . . . . . 32

Berkovitz v. United States, 486 U.S. 531 (1988) . . . . . . . 20

Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). . . . . 3, 6, 13, 24, 28, 29, 31

Butz v. Economou, 438 U.S. 478 (1978) . . . . . . . . . . . . 31

Eagleston v. Guido, 41 F.3d 865 (2d Cir. 1994). . . . . . 28, 29

FDIC v. Meyer, 510 U.S. 471 (1994). . . . . . . . . . . . . . 12

Ford v. Moore, 237 F.3d 156 (2d Cir. 2001). . . . . . . . . . 31

Friends of the Earth Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Guccione v. United States, 670 F. Supp. 527 (S.D.N.Y. 1987) . 18

Healy v. United States Postal Serv., 677 F.Supp. 1284 (E.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 11

Hightower v. United States, 205 F. Supp. 2d 146 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 24

Hylton v. Fed. Bureau of Prisons, 2002 WL 720605, at *2 (E.D.N.Y. Mar. 12, 2002). . . . . . . . . . . . . . . . . . . . 10

Ireland v. Suffolk County of New York, 242 F. Supp. 2d 178 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . 20

Jemmott v. Coughlin, 85 F.3d 61 (2d Cir. 1996). . . . . . . . 32

i

Johnson v. Smithsonian Inst., 189 F.3d 180 (2d Cir. 1999). 17, 18

Kelly v. United States, 924 F.2d 355 (1st Cir. 1991). . . . . 22

K.W. Thompson Tool Co. v. United States, 836 F.2d 721
(1st Cir. 1988) . . . . . . . . . . . . . . . . . . . . . 23

Kronisch v. United States, 150 F.3d 112 (2d Cir. 1998). . 18, 28

Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982) . . . . . . 32

Matsko v. United States, 372 F.3d 556 (3d Cir. 2004). . . . . 22

Morales v. United States, 38 F.3d 659 (2d Cir. 1994). . . . . 10

Morales v. United States, 1997 WL 285002 at *1
(S.D.N.Y. May 29, 1997) . . . . . . . . . . . . . . . . . 21

Moran v. City of New Rochelle, 346 F. Supp. 2d 507
(S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . 25, 26

Morris v. Lindau, 196 F.3d 102 (2d Cir. 1999) . . . . . . . 25

Motor Ave. Co. v. Liberty Indus. Finishing Corp., 885 F.Supp.
410 (E.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . 11

Nogueras-Cartagena v. United States, 172 F. Supp. 2d 296
(D. P.R. 2001). . . . . . . . . . . . . . . . . . . . . . 22

Nurse v. United States, 226 F.3d 996 (9th Cir. 2000). . . . . 22

Persaud v. McSorley, 275 F. Supp. 2d 490 (S.D.N.Y. 2003). . . 26

Polanco v. United States Drug Enforcement Admin., 158 F.3d 647
(2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . 28

Puccio v. Town of Oyster Bay, 229 F. Supp.2d 173
(E.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . 16

Robinson v. Overseas Military Sales Corp., 21 F.3d 502
(2d Cir. 1994). . . . . . . . . . . . . . . . . . . 24, 28

Salim v. Proulx, 93 F.3d 86 (2d Cir. 1996). . . . . . . . . 31

Saucier v. Katz, 533 U.S. 194 (2001). . . . . . . . . . . . 32

Scherer v. Balkema, 840 F.2d 437 (7th Cir. 1988). . . . . . 29

Simmons v. United States, 754 F. Supp. 274
(N.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . 17, 18

Singleton v. City of New York, 632 F.2d 185
(2d Cir. 1980). . . . . . . . . . . . . . . . . . . . . 29, 30

Sloan v. United States Dep't of Housing and Urban Dev., 236 F.3d
756 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . 22

Syms v. Olin Corp., 408 F.3d 95 (2d Cir. 2005). . . . . . . . 17

Tapia-Ortiz v. Doe, 171 F.3d 150 (2d Cir. 1999) . . . . . 17, 28

Tenenbaum v. Williams, 193 F.3d 581 (2d Cir. 1999). . . . . . 33

Tonelli v. United States, 60 F.3d 492 (8th Cir. 1995) . . . . 23

United States v. Gaubert, 499 U.S. 315 (1991) . . . . . . . . 20

United States v. Kubrick, 444 U.S. 111 (1979) . . . . . . . . 17

United States v. Mitchell, 463 U.S. 206 (1983). . . . . . . . 10

United States v. Sherwood, 312 U.S. 584 (1941). . . . . . . . 10

United States v. Smith, 499 U.S. 160 (1991) . . . . . . . . . 10

Wang v. United States, 2001 WL 1297793, at *4
(S.D.N.Y. Oct. 25, 2001). . . . . . . . . . . . . . . . . . . 21

Willingham v. County of Albany, 2006 WL 1979048, at *9
(N.D.N.Y. July 12, 2006). . . . . . . . . . . . . . . . . . . 32

## STATE CASES

Bankers Trust Co. of Cal., N.A. v. Tsoukas, 303 A.D.2d 343,
756 N.Y.S.2d 92, 94 (2d Dept. 2003) . . . . . . . . . . . . . 13

Feinstein v. Bergner, 48 N.Y.2d 234, 241, 422 N.Y.S.2d 356, 359
(1979). . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Raschel v. Rish, 69 N.Y.2d 694, 697, 512 N.Y.S.2d 22,
23 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## FEDERAL STATUTES

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1346(b)(1). . . . . . . . . . . . . . . . . . . . 8, 11

28 U.S.C. § 1367. . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2201. . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2401(b) . . . . . . . . . . . . . . . . . . . . . 17

28 U.S.C. § 2675. . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 2675(a) . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 2679. . . . . . . . . . . . . . . . . . . . . . . 7, 10

28 U.S.C. § 2679(a) . . . . . . . . . . . . . . . . . . . . . 10, 12

28 U.S.C. § 2679(b)(1). . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 2679(d) . . . . . . . . . . . . . . . . . . . . . 7

28 U.S.C. § 2679(d)(1). . . . . . . . . . . . . . . . . . . . 9

28 U.S.C. § 2679(d)(4). . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 2680(a) . . . . . . . . . . . . . . . . . . . . . 20, 23

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . 29

## FEDERAL RULES

Fed.R.Civ.P. 4(e) . . . . . . . . . . . . . . . . . . . . . . 13

Fed.R.Civ.P. 4(e)(1). . . . . . . . . . . . . . . . . . . . . 14

Fed.R.Civ.P. 4(i)(2)(A) . . . . . . . . . . . . . . . . . . . 16

Fed.R.Civ.P. Rule 12(b)(1). . . . . . . . . . . . . . . . . . 2, 6

Fed.R.Civ.P. Rule 12(b)(5). . . . . . . . . . . . . . . . . . 2, 17

Fed.R.Civ.P. Rule 12(b)(6). . . . . . . . . . . . . . . . . . 2

## FEDERAL REGULATIONS

28 C.F.R. § 15.2(a) . . . . . . . . . . . . . . . . . . . . . 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

LOUIS BRIAN OLESEN, II,
BARBARA OLESEN,
AMERICAN SHOOTERS SUPPLY, INC. and
GUNS, INC.,

                    Plaintiffs,

          v.                          06-CV-0959FJS/DRH

JOHN MORGAN, Special Agent of
the Federal Bureau of Alcohol,
Tobacco, Firearms and Explosives,
Individually and in his official
capacity, U.S. DEPARTMENT OF JUSTICE,
BUREAU OF ALCOHOL, TOBACCO, FIREARMS
and EXPLOSIVES,
                    Defendants.

---

### MEMORANDUM OF LAW ON BEHALF OF DEFENDANTS, JOHN MORGAN AND THE U.S. DEPARTMENT OF JUSTICE, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES IN SUPPORT OF SUBSTITUTION OF PARTY AND DISMISSAL

#### I.   INTRODUCTION

Defendants, John Morgan, Special Agent of the Bureau of

Alcohol, Tobacco, Firearms and Explosives, and the U.S.

Department of Justice, Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF"), by and through their attorney, Terrance P.

Flynn, United States Attorney for the Western District of New

York[1], Mary E. Fleming, Special Assistant United States Attorney,

of counsel, submit the following memorandum of law in support of

the defendants' motion to substitute the United States as

---

[1]The United States Attorney's Office for the Northern
District of New York has been recused from this case.

defendant for the defendant, John Morgan, as to the third, fourth
and fifth causes of action in plaintiffs' complaint, and to
dismiss these causes of action against the United States pursuant
to Fed.R.Civ.P. 12(b)(1) and 12(b)(5).  In addition, the
defendant, John Morgan, seeks an order of dismissal of the first
and second causes of action in plaintiffs' complaint pursuant to
Fed.R.Civ.P. Rule 12(b)(1), 12(b)(5) and 12(b)(6).  Finally, the
defendant, ATF, seeks dismissal of the sixth cause of action in
plaintiffs' complaint pursuant to Fed.R.Civ.P. Rule 12(b)(1).

## II.  **PRELIMINARY STATEMENT**

John Morgan ("Morgan") is employed as a Special Agent with
ATF in Albany, New York.  See, Affidavit of Mary E. Fleming,
Exhibit A-1, plaintiffs' Complaint, ¶ 9.[2]  Morgan is the Resident
Agent in Charge ("RAC") of the Albany Field Office, Albany, New
York.  Exhibit A-1, ¶ 9.  He has been sued by Louis Brian Olesen,
II, Barbara Olesen, American Shooters Supply, Inc., and Guns,
Inc. ("plaintiffs"), the owners and operators of a gun supply
store.  Exhibit A-1; ¶¶ 5-8.  Brian Olesen is a federal firearms
licensee doing business as Guns, Inc. in Rensselaer, New York.
Exhibit A-1, ¶ 5.  Barbara Jean Olesen, Brian's mother, is a
federal firearms licensee doing business as American Shooters

---

[2]     The defendants' Exhibits A and B have been filed
contemporaneously with this motion.

2

Supply in Albany.  Exhibit A-1, ¶ 6.  The plaintiffs allege
jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201, and <u>Bivens</u>
<u>v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>,
403 U.S. 388 (1971).  Exhibit A-1, ¶¶ 1-2.  As to their state law
claims, the Olesens allege supplemental jurisdiction under 28
U.S.C. § 1367.  Exhibit A-1, ¶ 3.

     For the reasons set forth herein, in the Affidavit of Mary
E. Fleming (Exhibit A) and the Declaration of Harry B. Pass
(Exhibit B) filed in this action, and the Certification of
Terrance P. Flynn, United States Attorney for the Western
District of New York (Exhibit A-3), substitution of the United
States as the proper defendant for Morgan with respect to the
common law tort claims (Exhibit A-1, third through fifth causes
of action) and dismissal of those claims is appropriate and
dismissal of the constitutional tort claims (Exhibit A-1, first
and second causes of action) is also appropriate.  The sixth
cause of action against ATF (Exhibit A-1) should also be
dismissed for lack of subject matter jurisdiction.

### III.  **STATEMENT OF FACTS**

     On August 8, 2006, plaintiffs, Louis Brian Olesen, II,
Barbara Olesen, American Shooters Supply, Inc., and Guns, Inc.,
the owners and operators of a gun supply store sued John Morgan

and the Bureau of Alcohol, Tobacco, Firearms and Explosives
("ATF").   Exhibit A-1.

On August 9 and 15, 2006, the plaintiffs attempted service
of the plaintiffs' complaint upon the defendants John Morgan and
ATF.   Exhibit A-2.

At no time prior to the service of plaintiffs' complaint did
the plaintiffs ever present an administrative tort claim to ATF.
Exhibit B.

On November 13, 2006, the United States Attorney for the
Western District of New York, Terrance P. Flynn, signed a
Certification that defendant, John Morgan, was acting within the
scope of his employment with respect to the matters alleged in
this complaint.   Exhibit A-3.

John Morgan ("Morgan") is employed as a Special Agent
with the Bureau of Alcohol, Tobacco, Firearms and Explosives
("ATF") in Albany, New York.   During the matters that form the
subject of this complaint, he served as the Resident Agent in
Charge ("RAC") of the Albany Field Office, Albany, New York.
Exhibit A-1, ¶ 9.

Brian Olesen ("Olesen") is a federal firearms licensee doing
business as Guns, Inc. in Rensselaer, New York.   Barbara Jean
Olesen, Brian's mother, is a federal firearms licensee doing
business as American Shooters Supply in Albany.   Exhibit A-1,
¶¶ 5-6.

4

This action arises out of the criminal investigation of Olesen and a former business partner, and specifically Morgan's oversight of the investigation as supervisor of the ATF Albany Field Office.  Exhibit A-1, ¶¶ 11-13.  ATF initiated its first criminal investigation when Olesen and his business partner became involved in a personal dispute in which both individuals alleged to ATF agents that the other had committed federal criminal and regulatory violations relating to the operation of their retail firearms shop.  Exhibit A-1, ¶14.  The investigation was accompanied by a full inventory of the shop undertaken by the ATF Industry Operations branch in Albany.  As a result of the personal dispute, and following the criminal investigation, the business was dissolved, and the firearms inventory liquidated.  Exhibit A-1, ¶¶ 21-22.

The ATF Albany Field Office initiated a second criminal investigation of Olesen when Olesen's mother applied for and received a federal firearms license shortly after Olesen withdrew his own application.  Exhibit A-1, ¶29.  The investigation did not result in a prosecution, and Olesen was later issued his own federal firearms license.  Exhibit A-1, ¶¶ 37-38.

5

### IV.  **SUMMARY OF ARGUMENT**

In the first and second causes of action in the complaint, plaintiffs have brought a claim against Morgan under <u>Bivens</u>, alleging that Morgan violated the following constitutional rights:  (1) their Fifth Amendment rights by interfering with Brian Olesen's efforts to obtain a Federal Firearms License and by depriving him of his property interest in firearms (Exhibit A-1, ¶¶ 43, 46, 50); (2) their First Amendment rights by retaliating against Brian Olesen for reporting firearms violations that were committed by his former business partner (Exhibit A-1, ¶ 44); and (3) their Fourth Amendment rights by directing other agents to conduct unlawful surveillance of Brian Olesen and by causing the agents to "unlawfully harass" him (Exhibit A-1, ¶ 45).  Pursuant to Fed.R.Civ.P. Rule 12(b)(1), 12(b)(5) and 12(b)(6), dismissal of these claims is warranted because the plaintiffs lack standing to bring the action, the action is brought beyond the three-year statute of limitations, ATF is not a proper party to these claims, the claims cannot be brought against Morgan in his official capacity, the plaintiffs lack personal jurisdiction over the defendants, and qualified immunity.

In the third, fourth and fifth causes of action, plaintiffs assert claims of intentional infliction of emotional distress, tortious interference with business relations and <u>prima facie</u>

6

tort against the defendant Morgan.  Exhibit A-1, ¶¶ 53-69.  The
United States of America should be substituted as the proper
party defendant in place of Morgan, pursuant to 28 U.S.C. §
2679(d), on the grounds that Morgan is an employee of ATF and was
acting within the scope of his federal employment at the time of
the matters alleged in the Complaint, and the plaintiffs'
exclusive remedy for a tort claim under such circumstances is a
suit against the United States under the Federal Tort Claims Act
("FTCA"), 28 U.S.C. § 2679 et seq.  The claims then must be
dismissed for lack of subject matter jurisdiction and for lack of
personal jurisdiction.

    Finally, the plaintiffs have asserted a cause of action
against ATF alleging that the agency (1) negligently failed to
properly train, supervise and monitor Morgan, and (2) condoned,
approved of, or was consciously indifferent to Morgan's conduct.
(Exhibit A-1, ¶¶ 71-74).  The plaintiffs also allege that ATF is
vicariously liable for Morgan's alleged acts (Exhibit A-1, ¶75).
These tort claims against ATF should also be dismissed for lack
of subject jurisdiction.  Accordingly, the defendants are
entitled to an order of dismissal of all claims against them.

7

## V.   LEGAL ARGUMENT

### A.   PLAINTIFFS' COMMON LAW TORT CLAIMS

#### POINT I

#### THE UNITED STATES MUST BE SUBSTITUTED FOR MORGAN AS PARTY DEFENDANT WITH RESPECT TO THE THIRD, FOURTH AND FIFTH CAUSES OF ACTION

In the third, fourth and fifth causes of action, plaintiffs allege that the defendant Morgan subjected them to intentional infliction of emotional distress (Exhibit A-1, ¶¶ 52-56), to tortious interference with business relations (Exhibit A-1, ¶¶ 57-63), and to prima facie tort (Exhibit A-1, ¶¶ 64-69).  To the extent these tort claims are asserted against Morgan, the United States must be substituted as the proper defendant.

Direct actions against federal employees for injury resulting from the alleged negligence or wrongful acts or omissions of such employees while acting within the scope of their employment are not permitted.  Instead, actions are permitted against the United States under the FTCA, 28 U.S.C. §§ 1346(b)(1), 2671-80, which provides in relevant part as follows:

> "The remedy against the United States ... for injury or loss of property ... arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages ..."

28 U.S.C. § 2679(b)(1).

8

Thus, if an individual deemed to be a federal employee is certified by the Attorney General or his designee as having acted within the scope of her office or employment, the action is deemed to be against the United States under the FTCA, and the United States must be substituted as the defendant.   28 U.S.C. § 2679(d)(1).   Section 2679(d)(1) provides as follows:

> "Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in the United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."

28 U.S.C. § 2679(d)(1).

The Attorney General has delegated his authority to certify that a federal employee was acting within the scope of his or her office or employment.   28 C.F.R. § 15.2(a).   Pursuant to such a delegation of authority, the United States Attorney for the Western District of New York has certified that John Morgan was acting within the scope of his employment at the time of the incidents alleged in the Summons and Complaint.   See Exhibit A-3. Following such a certification, the action lies only against the United States.   28 U.S.C. § 2679(d)(1).   The motion to substitute the United States of America as the proper party defendant with

9

respect to the third, fourth and fifth causes of action against
Morgan must, therefore, be granted.  28 U.S.C. § 2679.

Once the United States has been substituted as a party
defendant, "the suit 'shall proceed in the same manner as any
action against the United States filed pursuant to [the FTCA] and
shall be subject to the limitations and exceptions applicable to
those actions.'"  <u>United States v. Smith</u>, 499 U.S. 160, 166
(1991) (<u>quoting</u>, 28 U.S.C. § 2679(d)(4)).

## POINT II

### AS TO THE THIRD, FOURTH, FIFTH AND SIXTH CAUSES OF ACTION, THE UNITED STATES IS THE ONLY PROPER DEFENDANT AND THESE CLAIMS MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

Where a plaintiff seeks to recover for an act or omission of
an employee of a United States agency under the FTCA, only the
United States is a proper defendant.  <u>Hylton v. Fed. Bureau of
Prisons</u>, 2002 WL 720605, at *2 (E.D.N.Y. Mar. 12, 2002); <u>see</u> 28
U.S.C. 2679(a).  The United States may not be sued unless it
consents to be sued by explicitly waiving its sovereign immunity.
<u>United States v. Sherwood</u>, 312 U.S. 584, 586 (1941); <u>Morales v.
United States</u>, 38 F.3d 659, 660 (2d Cir. 1994).  Such a waiver is
a jurisdictional prerequisite to obtaining relief.  <u>United States
v. Mitchell</u>, 463 U.S. 206, 212 (1983).  Pursuant to the FTCA, the
United States has waived immunity for any injury or loss of
property "caused by the negligent or wrongful act or omission of

10

any employee of the Government while acting within the scope of his or her employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

However, the FTCA requires the filing of an administrative claim with the relevant federal agency before commencing an action in federal court.  28 U.S.C. § 2675(a).  Plaintiffs fail to allege compliance with the administrative procedures under the FTCA which, in their case, entails submission of an administrative claim to ATF.  28 U.S.C. § 2675(a).  See Exhibit A-1;, see also Altman v. Connally, 456 F.2d 1114 (2d Cir. 1972) (per curiam) (complaint deficient for failing to present claim to the appropriate federal agency and a final disposition of the claim by that agency, as required by 28 U.S.C. § 2675); 55 Motor Ave. Co. v. Liberty Indus. Finishing Corp., 885 F.Supp. 410, 416 (E.D.N.Y. 1994) (since notice of claim requirements under FTCA are jurisdictional, allegations of presentment of claim to appropriate agency are necessary in complaint) (citing Healy v. United States Postal Serv., 677 F.Supp. 1284 (E.D.N.Y. 1987) (tort claim dismissed without prejudice where plaintiff failed to allege presentation of claim to agency).  Moreover, the Declaration of Harry B. Pass, Chief, Administrative Programs Division, ATF, confirms that no administrative claim was filed by

11

the plaintiffs.  <u>See</u>, Exhibit B.  Therefore, this Court is
without jurisdiction to hear the third, fourth, fifth and sixth
causes of action in plaintiffs' complaint.

In addition, plaintiffs name ATF as a defendant in the
caption to the complaint and allege that ATF is vicariously
liable with respect to these common law tort claims.  Exhibit A-
1, ¶ 75.  Under the FTCA, 28 U.S.C. § 2679(a), the "authority of
any federal agency to sue and be sued in its own name shall not
be construed to authorize suits against such federal agency on
claims which are cognizable under [the FTCA]."  Therefore, "if a
suit is cognizable under . . . the FTCA, the FTCA remedy is
exclusive and the federal agency cannot be sued in its own name,
despite the existence of a sue-and-be-sued clause."  <u>FDIC v.
Meyer</u>, 510 U.S. 471, 476 (1994) (internal citations omitted).
Thus, to the extent the plaintiffs alleged common law tort claims
against ATF, those claims may only be construed as an arising
under the FTCA, and the United States is the only proper party-
defendant.

## POINT III

### DISMISSAL OF THE PLAINTIFFS' COMPLAINT IS WARRANTED BECAUSE THIS COURT LACKS PERSONAL JURISDICTION OVER MORGAN AND ATF

Plaintiffs have sued John Morgan in his individual capacity
for damages resulting from his alleged unconstitutional conduct

12

while acting under color of federal law pursuant to <u>Bivens</u>.
Under these circumstances, proper service must be made in
accordance with Fed.R.Civ.P. 4(e).  <u>Armstrong v. Sears</u>, 33 F.3d
182, 186 (2d Cir. 1994).  The burden is on the plaintiffs to
prove by a preponderance of the evidence that jurisdiction over
the defendant was obtained by proper service of process.  <u>Bankers</u>
<u>Trust Co. of Cal., N.A. v. Tsoukas</u>, 303 A.D.2d 343, 756 N.Y.S.2d
92, 94 (2d Dept. 2003).

Fed.R.Civ.P. Rule 4(e) provides:

> (e) Service Upon Individuals Within a
> Judicial District of the United States.
> Unless otherwise provided by federal law,
> service upon an individual from whom a waiver
> has not been obtained and filed, other than
> an infant or an incompetent person, may be
> effected in any judicial district of the
> United States:
>
> (1) pursuant to the law of the state in which
> the district court is located, or in which
> service is effected, for the service of a
> summons upon the defendant in an action
> brought in the courts of general jurisdiction
> of the State; or
> (2) by delivering a copy of the summons and
> of the complaint to the individual personally
> or by leaving copies thereof at the
> individual's dwelling house or usual place of
> abode with some person of suitable age and
> discretion then residing therein or by
> delivering a copy of the summons and of the
> complaint to an agent authorized by
> appointment or by law to receive service of
> process.

Thus, service upon an individual from whom a waiver has not been
obtained and filed may be effected pursuant to the law of the

13

state in which the District Court is located, or by personally
serving the defendant or by leaving a copy of the pleading with a
person of suitable age and discretion at defendant's dwelling,
house or usual place of abode.  Fed.R.Civ.P. 4(e)(1).

C.P.L.R. § 308(2) is similar to Rule 4(e), but it permits
substituted service at an individual's place of business.
C.P.L.R. § 308(2) provides:

> Personal service upon a natural person.
>
> Personal service upon a natural person shall
> be made by any of the following methods:
>
> (2) by delivering the summons within the
> state to a person of suitable age and
> discretion at the actual place of business,
> dwelling place or  usual place of abode of
> the person to be served and by either mailing
> the summons to the person  to be served at
> his or her last known residence or by mailing
> the summons by first  class mail to the
> person to be served at his or her actual
> place of business in an envelope bearing the
> legend "personal and confidential" and not
> indicating on the  outside thereof, by return
> address or otherwise, that the communication
> is from an attorney or concerns an action
> against the person to be served, such
> delivery and mailing to be effected within
> twenty days of each other; proof of such
> service shall be filed with the clerk of the
> court designated in the summons within twenty
> days of either such delivery or mailing,
> whichever is effected later; service shall be
> complete ten days after such filing; proof of
> service shall identify such person of
> suitable age and discretion and state the
> date, time and place of service.

14

The relevant provision of C.P.L.R. § 308(2) mandates a two-step process:  first, the summons must be delivered to "a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served"; second, a copy of the summons must be either "mailed to the person to be served at his or her last known residence or mailed to the person's actual place of business in an envelope bearing the legend 'personal and confidential' and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served."  C.P.L.R. § 308(2).

Jurisdiction is not acquired pursuant to C.P.L.R. § 308(2), unless plaintiffs have strictly complied with both the delivery and mailing requirements.  Feinstein v. Bergner, 48 N.Y.2d 234, 241, 422 N.Y.S.2d 356, 359 (1979).  In the case at bar, delivery of the Summons and Complaint to Special Agent Neeley at Morgan's actual place of business complied with the first requirement of C.P.L.R. § 308(2).  However, the second step required mailing of the Summons and Complaint to Morgan at either his actual place of business or at a last known address.  The Affidavits of Service (Exhibit A-2), establish that the required mailing did not occur.

Notice of litigation received by means other than those authorized by statute cannot serve to bring a defendant within the jurisdiction of the court.  Id. at 241.  In Feinstein,

15

despite the fact that defendant received actual notice of the
suit, the New York Court of Appeals held that the purported
service was ineffective because the "plaintiff failed to comply
with the specific mandates of C.P.L.R. 308." Feinstein, 48
N.Y.2d at 241, 422 N.Y.S.2d at 359-60.  See also, Raschel v.
Rish, 69 N.Y.2d 694, 697, 512 N.Y.S.2d 22, 23 (1986)("when the
requirements for service of process have not been met, it is
irrelevant that defendant may have actually received the
documents").  Similarly, in Puccio v. Town of Oyster Bay, 229 F.
Supp.2d 173 (E.D.N.Y. 2002), the court determined that service
was defective when the mailing requirement had not been fulfilled
in circumstances identical to those in the case at bar.  In
Puccio, while a Summons and Complaint were delivered to a person
of suitable age and discretion at defendant's place of business,
the Affidavit of Service did not indicate that the mailing
requirement had been fulfilled.  Accordingly, the motion to
dismiss was granted.  Id. at 176.

Moreover, in suits against a federal agency such as ATF,
Fed. R. Civ. P. 4(i)(2)(A) provides that service is effected by
serving the United States Attorney General and United States
Attorney as prescribed by Rule 4(i)(1) and by also sending a copy
of the summons and complaint by registered or certified mail to
the agency.  Here, the affidavits of service do not reflect that
the plaintiffs sent a copy of the complaint and summons to the

16

agency by registered or certified mail. <u>See</u> Exhibit A-2.

Therefore, service upon both Morgan and ATF was defective, and

the plaintiffs' complaint should be dismissed pursuant to

Fed.R.Civ.Rule 12(b)(5).

**POINT IV**

**<u>THE COMMON LAW TORT CLAIMS ARE BARRED,</u>**
**<u>IN PART, BY THE STATUTE OF LIMITATIONS</u>**

Pursuant to 28 U.S.C. § 2401(b), "[a] tort claim against the

United States shall be forever barred unless it is presented in

writing to the appropriate Federal agency within two years after

such claim accrues . . . ." Failure to submit a claim within the

two year limitations period will deprive the district court of

subject matter jurisdiction over the plaintiff's action. <u>See</u>

<u>Johnson v. Smithsonian Inst.</u>, 189 F.3d 180, 189 (2d Cir. 1999)

(citing <u>United States v. Kubrick</u>, 444 U.S. 111, 117-18 (1979));

<u>Tapia-Ortiz v. Doe</u>, 171 F.3d 150, 152 (2d Cir. 1999). The

purpose of the statute of limitations is to "encourage prompt

presentation of claims against the government." <u>Simmons v.</u>

<u>United States</u>, 754 F. Supp. 274, 277 (N.D.N.Y. 1991). "The

burden is on the plaintiff to plead and prove compliance with

[section] 2401(b)." <u>Johnson</u>, 189 F.3d at 189.

"The date on which an FTCA claim accrues is determined as a

matter of federal law." <u>Syms v. Olin Corp.</u>, 408 F.3d 95, 107 (2d

Cir. 2005). "Ordinarily, a plaintiff's FTCA claim accrues at the

17

time of injury." <u>Kronisch v. United States</u>, 150 F.3d 112, 121
(2d Cir. 1998). However, "where [a] plaintiff would reasonably
have difficulty discerning the fact or cause of injury at the
time it was inflicted, the so-called 'diligence-discovery rule of
accrual' applies." <u>Kronisch</u>, 150 F.3d at 121. Under this rule,
a claim under the FTCA accrues "either at the time of the injury
or when the plaintiff has, or with reasonable diligence should
have, discovered the facts critical to his or her injury,
whichever is earlier." <u>Johnson</u>, 189 F.3d at 189; <u>see also</u>
<u>Simmons</u>, 754 F. Supp. at 277-78. "Discovery of the 'critical
facts' of injury and causation is not an exacting requirement,
but requires only knowledge of, or knowledge that could lead to,
the basic facts of the injury." <u>Kronisch</u>, 150 F.3d at 121
(quoting <u>Guccione v. United States</u>, 670 F. Supp. 527, 536
(S.D.N.Y. 1987)). "A plaintiff need not know each and every
relevant fact of his injury or even that the injury implicates a
cognizable legal claim." <u>Id</u>. (quoting Guccione, 670 F. Supp. at
536).

     Here, many of the alleged unlawful acts occurred between the
winter and spring of 2003[3], including (1) the alleged initiation
of a frivolous investigation (Exhibit A-1, ¶ 19), (2) Morgan's
alleged attempt to persuade a state supreme court judge to deny

---

     [3]   Plaintiffs' complaint was filed in the Northern
District of New York on August 8, 2006.

Brian Olesen's application for a state pistol dealer's permit
(Exhibit A-1, ¶ 20), (3) Morgan's alleged involvement in
directing the assets of B&J Shooting Supply to be surrendered to
an auctioneer (Exhibit A-1, ¶¶ 21, 22), (4) the alleged
unconstitutional search of B&J Shooting Supply (Exhibit A-1, ¶
24), and (5) Morgan's alleged interference with Brian Olesen's
first attempt to obtain a federal firearms license (Exhibit A-1,
¶ 26).  The complaint does not allege that Brian Olesen was
unable to discover the fact or cause of his injury at the time of
these alleged events.  Rather, the complaint suggests that Brian
Olesen formed a belief no later than the spring of 2003 that he
was the target of a personally motivated criminal investigation
by ATF (Exhibit A-1, ¶ 19).  Although the complaint references
additional wrongful acts occurring on a continuing basis up until
the filing of the complaint, Brian Olesen was aware of his basic
injury (the alleged commencement of an unlawful investigation and
the unlawful interference with his attempt to obtain a federal
firearms license) within the two-year limitations period.
Accordingly, to the extent the plaintiffs' common law tort claims
are based upon the above-referenced acts, those claims are barred
by the statute of limitations.

19

**POINT V**

**THE FTCA ACTION IS BARRED BY THE
DISCRETIONARY FUNCTION EXCEPTION**

**A.   Claims challenging ATF's decision to investigate Brian
Olesen, or the manner in which the investigation was
conducted, are barred by the discretionary function
exception**

The discretionary function exception precludes government
liability for "[a]ny claim based upon . . . the exercise or
performance or the failure to exercise or perform a discretionary
function or duty on the part of a federal agency or an employee
of the Government, whether or not the discretion involved be
abused." See 28 U.S.C. § 2680(a).  The Supreme Court has
articulated a two-part test that governs application of the
discretionary function exception.  See Berkovitz v. United
States, 486 U.S. 531, 536 (1988).  First, a court must consider
"whether the action is a matter of choice for the acting
[Government] employee."  Berkovitz, 486 U.S. at 536.  Second, the
court must conclude that the choice was based upon a
"considerations of public policy."  Id. at 537.  Conduct covered
by the discretionary function exception is not limited to the
policy or planning levels of the Government, but extends to those
day-to-day decisions made at an operational level.  See United
States v. Gaubert, 499 U.S. 315, 325 (1991); see also Ireland v.
Suffolk County of New York, 242 F. Supp. 2d 178, 186 (E.D.N.Y.
2003).

20

The plaintiffs challenge ATF's decision to conduct a criminal investigation of Brian Olesen and allege that the decision was personally motivated.  Such decisions made by law enforcement officers in conducting an investigation to determine whether to prosecute are protected by the discretionary function exception.  See Wang v. United States, 2001 WL 1297793, at *4 (S.D.N.Y. Oct. 25, 2001) (citing Morales v. United States, 1997 WL 285002, at *1 (S.D.N.Y. May 29, 1997)).  Although the discretionary function exception may not apply to actions that are "sufficiently separable" from the decision to prosecute, those actions are limited to "the kind of wrongful conduct that is designed to corrupt the fairness of a prosecution."  Wang, 2001 WL 1297793, at *4.  Conversely, the exception specifically applies as a bar where the alleged conduct involves investigatory actions based upon improper motive or a lack of probable cause, such as the plaintiffs allege in the present case.  See id. ("the discretionary function exception is indifferent to the government actor's motivation").

The plaintiffs also challenge several investigative steps taken by ATF in the course of the investigation:  including surveillance (Exhibit A-1, ¶ 31(b)), the monitoring of telephone calls (Exhibit A-1, ¶31(a)), the execution of search warrants (Exhibit A-1, ¶ 24), and the issuance of subpoenas (Exhibit A-1, ¶ 31(e)).  However, the "sifting of evidence, the weighing of its

21

significance, and the myriad other decisions made during

investigations plainly involve elements of judgment and choice."

Sloan v. United States Dep't of Housing and Urban Dev., 236 F.3d

756, 762 (D.C. Cir. 2001).  Since decisions concerning criminal

investigations "are at the core of law enforcement activity" the

handling of an investigation "is the type of 'policy-rooted

decision making that section 2680(a) was designed to safeguard.'"

Nogueras-Cartagena v. United States, 172 F. Supp. 2d 296, 318 (D.

P.R. 2001) (quoting Kelly v. United States, 924 F.2d 355, 362

(1st Cir. 1991)).

### B.    The claim for negligent training and supervision is barred by the discretionary function exception

In their sixth cause of action, the plaintiffs allege that

ATF failed to properly "recruit, screen, hire, monitor,

supervise, and train its employees," including Morgan.  Exhibit

A-1, ¶¶ 70-71.

Claims arising out of the alleged negligent selection,

supervision, and training of government employees are barred by

the discretionary function exception.  See Matsko v. United

States, 372 F.3d 556, 558, n.6 (3d Cir. 2004) (such claims "would

not be within the FTCA's coverage"); Nurse v. United States, 226

F.3d 996, 1001-02 (9th Cir. 2000) (challenges to United States

Customs officials' "allegedly negligent and reckless employment,

supervision and training . . . fall squarely within the

22

discretionary function exception"); <u>Tonelli v. United States</u>, 60
F.3d 492, 496 (8th Cir. 1995) ("[i]ssues of employee supervision
and retention generally involve the permissible exercise of
policy judgment and fall within the discretionary function
exception"); <u>K.W. Thompson Tool Co. v. United States</u>, 836 F.2d
721, 727-28 (1st Cir. 1988) (FTCA suit alleging a failure to
train and supervise Environmental Protection Agency employees was
barred by the discretionary function exception).

The hiring and training of ATF personnel involves a
balancing of "competing objectives," such as the agency's ability
to operate and carry out its goals in a cost-effective manner,
retain a diverse and skilled workforce, and recognize and
accommodate the individual abilities and needs of its employees.
<u>See</u> <u>Tonelli</u>, 60 F.3d at 496. The plaintiffs contend that ATF
should have selected, supervised, and trained its agents in a
different manner. This is the sort of "judicial second-guessing
that Congress intended to avoid." <u>Id</u>. at 496. Accordingly, the
claim is barred by 28 U.S.C. § 2680(a).

## B.   **PLAINTIFFS' BIVENS CLAIMS**

### **POINT VI**

## **ATF, AS A FEDERAL AGENCY, IS NOT SUBJECT TO VICARIOUS LIABILITY FOR MORGAN'S ALLEGED CONSTITUTIONAL VIOLATIONS**

The plaintiffs allege that ATF is vicariously liable for Morgan's alleged unlawful conduct.  Exhibit A-1, ¶ 75.  However, while the United States has waived its immunity with respect to common law tort claims, it has not waived immunity from liability for constitutional claims.  Under sovereign immunity, "an action for damages will not lie against the United States absent consent."  Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994).  "The doctrine of sovereign immunity clearly precludes a Bivens action against . . . a federal agency or the United States."  Hightower v. United States, 205 F. Supp. 2d 146, 154 (S.D.N.Y. 2002).  "Such an action can be brought only against federal agents in their individual capacities."  Hightower, 205 F. Supp. 2d at 155.  Therefore, to the extent the plaintiffs allege that ATF is vicariously liable for Morgan's alleged constitutional violations, such claims are not actionable against ATF and the United States.

24

## POINT VII

### BARBARA JEAN OLESEN AND AMERICAN SHOOTERS SUPPLY
### DO NOT HAVE STANDING TO BRING THIS ACTION

The plaintiffs in this action include Brian Olesen, his
mother Barbara Jean Olesen, American Shooters Supply, Inc, and
Guns, Inc.   The complaint alleges that American Shooters Supply
is owned by Barbara Jean Olesen, and that Brian Olesen is an
employee.   Exhibit A-1, ¶¶ 5, 6.   The complaint alleges that
Brian Olesen is the owner and operator of Guns, Inc.   Exhibit A-
1, ¶ 5.

Before a plaintiff's constitutional claims can be addressed,
the plaintiff must first satisfy the following standing
requirements: "(1) that he 'has suffered an injury in fact that
is (a) concrete and particularized and (b) actual or imminent,
not conjectural or hypothetical; (2) [that] the injury is fairly
traceable to the challenged action [ ]; and (3) [that] it is
likely, as opposed to merely speculative, that the injury will be
redressed by a favorable decision.'"   <u>Friends of the Earth Inc.
v. Laidlaw Envtl. Servs.</u>, 528 U.S. 167, 180 (2000)).

Ordinarily, one does not have standing to bring
constitutional claims to "vindicate the rights of a third party."
<u>Morris v. Lindau</u>, 196 F.3d 102, 113 (2d Cir. 1999).   In a civil
rights action, "individuals have no standing to assert [ ] claims
to vindicate the rights of third parties."   <u>Moran v. City of New</u>

25

Rochelle, 346 F. Supp. 2d 507, 512 (S.D.N.Y. 2004). In this case, the complaint alleges that Brian Olesen was the sole target of Morgan's alleged wrongful acts. There are no allegations that Barbara Jean Olesen was the subject of any alleged constitutional violations. Therefore, Barbara Olesen does not have standing to bring this action.

Notably, the plaintiffs have alleged a First Amendment retaliation claim. The Second Circuit has held that although a plaintiff generally cannot assert constitutional claims of retaliation against speech by another individual, an exception has been made for a "spouse's claim that adverse action was taken solely against that spouse in retaliation for conduct of the other spouse." Adler v. Pataki, 185 F.3d 35, 44 (2d Cir.1999); see also Persaud v. McSorley, 275 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) (holding that a wife who received a trafficking ticket because of statements made to the police officer by her husband had standing to bring a First Amendment claim based upon suppression of her husband's speech). This exception has been extended to parents and their children. See Moran, 346 F. Supp. 2d at 512-13. However, it does not apply in the present case. First, the complaint does not allege that any adverse action was taken specifically against Barbara Olesen. The complaint does not allege that Barbara Olesen was the subject of Morgan's alleged wrongful acts. Instead, the complaint repeatedly states

26

that Morgan's conduct was directed solely at Brian Olesen.
Second, Brian Olesen is able to, and has, asserted his own First
Amendment right.

For the same reason, American Shooters Supply and Guns, Inc.
also lack standing.  See <u>Alvarez-Sepulveda v. Commw. of Puerto
Rico</u>, 218 F. Supp. 2d 170, 175 (D. P.R. 2002) (recognizing that a
corporation may be considered "a person" for purposes of a
constitutional tort action, but holding that a corporation did
not suffer any deprivation of constitutionally protected rights
in connection with the arrest of its employees and, therefore,
did not have standing to bring a section 1983 claim).  Absent any
showing that the corporations were subjected to constitutional
violations, Brian Olesen is the only proper plaintiff in this
action.

**POINT VIII**

**THE OFFICIAL CAPACITY CLAIMS ARE BARRED BY
SOVEREIGN IMMUNITY**

Although the caption to the complaint identifies Morgan as a
defendant in both his official and individual capacities, the
plaintiffs allege throughout the complaint that Morgan violated
their constitutional rights while acting strictly in his official
capacity as an ATF agent.  Exhibit A-1, ¶¶ 13, 17-21 40.  An
action against a federal law enforcement officer in his or her
official capacity constitutes an action against the United

27

States, and is barred by sovereign immunity, unless such immunity

has been waived.  See Robinson v. Overseas Military Sales Corp.,

21 F.3d 502, 510 (2d Cir. 1994).  The Supreme Court, in Bivens,

recognized that officers may be sued in their personal

capacities.  However, Bivens does not imply a waiver of sovereign

immunity with respect to official capacity claims.  See Robinson,

21 F.3d at 510.  Accordingly, the plaintiffs' official capacity

claims are barred by sovereign immunity and should be dismissed

for lack of subject matter jurisdiction.

### POINT IX

### PLAINTIFFS' CONSTITUTIONAL CLAIMS BASED UPON ALLEGED ACTS OCCURRING BEYOND THE THREE-YEAR LIMITATIONS PERIOD ARE BARRED

The statute of limitations for a Bivens action arising in

New York is three-years.  See Tapia-Ortiz v. Doe, 171 F.3d 150,

151 (2d Cir. 1999); Kronisch v. United States, 150 F.3d 112, 123

(2d Cir. 1998); see also Polanco v. United States Drug

Enforcement Admin., 158 F.3d 647, 653 (2d Cir. 1998) (noting that

the statute of limitations for a Bivens action is governed by the

state law limitations period for personal injury actions).

Although state law provides the relevant limitations period,

federal law determines when the cause of action accrues.

Kronisch, 150 F.3d at 123 (quoting Eagleston v. Guido, 41 F.3d

865, 871 (2d Cir. 1994)).  Under federal law, an action "accrues

when the plaintiff 'knows or has reason to know' of the harm."
Eagleston, 41 F.3d at 871.

The plaintiffs allege numerous wrongful acts, which they
characterize as part of Morgan's "continuing campaign of malice
and retaliation against Brian Olesen that continues to date."
Exhibit A-1, ¶ 16.  In a Bivens action involving allegations of
separate acts forming a conspiracy, the accrual period "runs
separately from each overt act that is alleged to cause damage to
the plaintiff[s] . . . . [and] plaintiffs may recover only for
the overt acts [ ] that they specifically alleged to have
occurred within the [ ] limitations period."  Scherer v. Balkema,
840 F.2d 437, 439 (7th Cir. 1988) (internal citations omitted);
accord Singleton v. City of New York, 632 F.2d 185, 192 (2d Cir.
1980) (concluding that in an action brought under 42 U.S.C. §
1983, a plaintiff's attempt to "characterize separate wrongful
acts as having been committed in furtherance of a conspiracy . .
. does not postpone accrual of claims based on individual
wrongful acts").

Here, several of the wrongful acts alleged in the complaint
occurred beyond the three year limitations period, including:

(1) Morgan's alleged initiation of a "frivolous criminal
investigation" of Brian Olesen in the "winter and spring
[of] 2003" (Exhibit A-1, ¶ 19);

29

(2) Morgan's alleged attempt to persuade a state supreme court judge to deny Brian Olesen's application for a state pistol dealer's license in "winter and spring [of] 2003" (Exhibit A-1, ¶ 20);

(3) Morgan's alleged unconstitutional interference with Brian Olesen's attempt to obtain a federal firearms license, which allegedly prevented the license application from being processed and granted and which occurred between February and June 2003 (Exhibit A-1, ¶¶ 25- 26).

Brian Olesen knew about the alleged wrongful acts when they occurred or shortly after. For purposes of accrual, "the crucial time . . . is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." Singleton, 632 F.2d at 192. The fact that additional alleged injuries occurred within the limitations period did not toll the running of the statute. The allegation of a "continuing campaign of malice and retaliation" that has continued to the present "does not postpone the accrual of causes of action arising out of [ ] separate wrongs." Id.

The alleged acts occurred, and Olesen was aware of his injury, more than three years before the filing of this action. Therefore, to the extent some of the constitutional claims are based upon these alleged wrongful acts, the claims are barred by the statute of limitations. They include: (1) the Fifth

30

Amendment claim based upon the alleged interference with Brian
Olesen's application for a federal firearms license and the
alleged loss of his firearms (Exhibit A, ¶¶ 43, 46); and (2) the
First Amendment claim based upon the commencement of the first
criminal investigation (Exhibit A, ¶ 44).

## POINT X

### MORGAN IS ENTITLED TO QUALIFIED IMMUNITY

It is well-settled that federal law enforcement officers
sued under Bivens may assert the defense of qualified immunity.
See Butz v. Economou, 438 U.S. 478, 506-08 (1978). To succeed on
a claim of qualified immunity, the defendant "must show that no
reasonable jury, viewing the evidence in the light most favorable
to the [p]laintiff, could conclude that the defendant's actions
were objectively unreasonable in light of clearly established
law." Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001). A
defendant's "actions are objectively reasonable if 'officers of
reasonable competence could disagree on the legality of the
defendant's actions.'" Ford, 237 F.3d at 162 (quoting Salim v.
Proulx, 93 F.3d 86, 92 (2d Cir. 1996) (internal citations
omitted)). The doctrine of qualified immunity "is intended to
strike a fair balance between (1) the need to provide a realistic
avenue for vindication of constitutional guarantees . . . and (2)
the need to protect public officials who are required to exercise

31

their discretion and the related public interest in encouraging the vigorous exercise of official authority." Jemmott v. Coughlin, 85 F.3d 61, 66 (2d Cir. 1996) (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court held that when considering the qualified immunity issue, the first question is whether the alleged facts demonstrate that an official's conduct violated a constitutional or statutory right. 533 U.S. 194, 201 (2001). If not, then no further review is necessary. See Saucier, 533 U.S. at 201. If, however, a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established." Id. In determining whether the right was clearly established, the "dispositive inquiry" is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id.

## A. **Fourteenth Amendment**

The plaintiffs allege violations of the Fourteenth Amendment. Exhibit A-1, ¶¶ 43-45. The Fourteenth Amendment "is violated only 'by conduct that may be fairly characterized as state action.'" Barrett v. Harwood, 189 F.3d 297, 301 (2d Cir. 1999) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982)); see also Willingham v. County of Albany, 2006 WL 1979048, at *9 (N.D.N.Y. July 12, 2006) (slip copy). The

32

"plaintiff must show that a person acting under color of any state statute, regulation, custom or usage deprived [the] plaintiff of a right secured by the Constitution." Barrett, 189 F.3d at 301. The plaintiffs do not allege that Morgan was acting under color of state law, but instead assert that he "was acting under color of federal authority in his official position as a Special Agent of [ATF]." Exhibit A-1, ¶ 40. Accordingly, the plaintiffs have not stated a cognizable claim under the Fourteenth Amendment.

**B.    Fifth Amendment Substantive Due Process**

The plaintiffs allege that Morgan's alleged conduct was "an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement and so shocking to the conscience as to be a violation of [ ] substantive Due Process." Exhibit A-1, ¶ 50.

The Second Circuit has held that if "a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" Tenenbaum v. Williams, 193 F.3d 581, 599 (2d Cir. 1999) (quoting Albright v. Oliver, 510 U.S. 266, 273 (1994)). Here, the plaintiffs have alleged several claims expressly governed by the First and Fourth Amendments, and the procedural due process

33

protections of the Fifth Amendment.  Because the claims are

governed by these definitive provisions of the Constitution, they

may not be analyzed under substantive due process.  Therefore,

plaintiffs' substantive due process claim should be dismissed.


## V.   CONCLUSION

For the reasons set forth above, Morgan's motion to dismiss

the first and second causes of action should be granted.  In

addition, the motion to substitute the United States as defendant

in the place of John Morgan as to the third, fourth, fifth causes

of action should be granted, and for the reasons set forth

herein, the third, fourth, fifth and sixth causes of action

should be dismissed for lack of subject matter and personal

jurisdiction.

**DATED:** December 15, 2006

                         Respectfully submitted,

                         TERRANCE P. FLYNN
                         United States Attorney


BY:    s/ Mary E. Fleming
       MARY E. FLEMING
       Special Assistant U.S. Attorney
       Western District of New York
       138 Delaware Avenue
       Buffalo, New York 14202
       Attorney for Defendants
         Morgan and ATF
       Bar Roll No. 514110


34

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

LOUIS BRIAN OLESEN, II,
BARBARA OLESEN,
AMERICAN SHOOTERS SUPPLY, INC. and
GUNS, INC.,

                Plaintiffs,

        v.                                  06-CV-0959FJS/DRS

JOHN MORGAN, Special Agent of
the Federal Bureau of Alcohol,
Tobacco and Firearms, Individually
and in his official capacity,
U.S. DEPARTMENT OF JUSTICE,
BUREAU OF ALCOHOL, TOBACCO and
FIREARMS and EXPLOSIVES,

                Defendants.

---

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2006, I electronically filed the foregoing **MEMORANDUM OF LAW ON BEHALF OF DEFENDANTS JOHN MORGAN AND THE UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES IN SUPPORT OF MOTION FOR SUBSTITUTION OF PARTY AND DISMISSAL DATED DECEMBER 15, 2006,** with the Clerk of the District Court using its CM/ECF system, which would then electronically notify the following CM/ECF participants on this case:

    William J. Dreyer, Esq.

                                 _s/Diane E. Carlsen_
                                 DIANE E. CARLSEN
                                 Legal Assistant

# ADDENDUM

Westlaw.

Not Reported in F.Supp.2d                                                                        Page 1
Not Reported in F.Supp.2d, 2002 WL 720605 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Briefs and Other Related Documents
Hylton      v.      Federal      Bureau      of
PrisonsE.D.N.Y.,2002.Only the Westlaw citation is
currently available.

United States District Court, E.D. New York.
Michael Angelo HYLTON, Plaintiff,
v.
FEDERAL BUREAU OF PRISONS, Metropolitan
Detention Center, and Warden Dennis Hasty,
Defendant.
**No. CV 00-5747(RR).**

March 11, 2002.

Michael Angelo Hylton, Elmira Correctional Facility,
Elmira, Plaintiff, pro se.
Honorable Alan Vinegrad, United States Attorney,
Eastern District of New York, Brooklyn, By Sharon
L. Volckhausen, Assistant U.S. Attorney, for
Defendants.

Memorandum and *ORDER*
RAGGI, District J.
*1 Michael Angelo Hylton was convicted before this
court on July 14, 2000, having pleaded guilty to one
count of receiving stolen bank funds. *See United
States v. Hylton,* CR 98-241(RR). The court
sentenced Hylton to twelve-months' imprisonment to
run consecutive to a twelve-year New York State
sentence for robbery. Hylton, who did not appeal his
federal conviction, is presently incarcerated at Elmira
Correctional Facility, where he is serving his state
sentence.

A liberal reading of Hylton's complaint suggests that
he now sues the Federal Bureau of Prisons, the
Metropolitan Detention Center ("MDC"), and MDC
Warden Dennis Hasty pursuant to both the Federal
Torts Claims Act, 28 U.S.C. § § 1346(b), 2671-80
(1993, 1994) ("FTCA"), and the United States
Constitution, *see Bivens v. Six Unknown Named
Agents,* 403 U.S. 388 (1971), for injuries sustained
while a pre-trial detainee at the MDC. This is one of
three lawsuits that Hylton has filed with this court
since his federal conviction, all seeking damages for
alleged wrongs occurring in federal custody. *See
Hylton v. Fortier,* CV 00-6308(RR); *Hylton v. U.S.
Marshal "Debbie",* CV 00-6673.[FN1]

FN1. In *Fortier,* the court awaits Hylton's
response to defendants' motion to dismiss. In
*U.S. Marshal "Debbie",* the parties are
pursuing discovery.

Defendants now move for dismissal of Hylton's
constitutional claim against the Bureau of Prisons,
the MDC, and Warden Hasty. They also move for
partial dismissal of the FTCA claim, asserting that
the United States must be substituted for the named
defendants.    Having     carefully    reviewed    the
submissions of the parties, this court grants
defendants' motion in its entirety, but without
prejudice to Hylton moving formally to amend his
*Bivens* claim, which motion must be accompanied by
the proposed amended pleadings and a memorandum
of law addressing certain issues discussed herein.

*Factual Background*

On June 1, 2000, plaintiff Michael Angelo Hylton
used a shower located in the two-man cell in which
he was housed in the MDC Special Housing Unit
("SHU"). Because the shower had no shower
curtains, water routinely escaped onto the cell floor.
Nonetheless, there were no floor mats to prevent the
inmates from slipping. When exiting the shower,
Hylton slipped on the wet floor and hit his face
against a wall, cracking one of his back teeth. The
MDC medical staff temporarily repaired his tooth the
same day. Later, when Hylton was incarcerated at
Fort Dix Federal Correctional Institute, his tooth was
permanently repaired.[FN2]

FN2. Neither party advises the court when
this occurred.

Hylton asserts that sometime prior to his accident, he
filed an administrative complaint about the lack of
shower curtains and floor mats in the SHU cells. Not
receiving any response, he raised the issue with MDC
Captain Betler, who told him that his administrative
complaint was a waste of time because no mats or
shower curtains would be put in prisoner cells.

Hylton further states that after his accident, he also
filed an administrative complaint about the
circumstances giving rise to his accident, to which he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 720605 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

received no response. After being transferred to state custody, he wrote the warden of MDC about the status of his complaint, but received no reply.

### Discussion

### I. *Federal Torts Claims Act*

**\*2** Although Hylton initially sued the Bureau of Prisons, the MDC, and Warden Hasty pursuant to the FTCA for negligence in connection with his June 1, 2000 accident, all parties agree that such a claim can only be maintained against the United States. *See* 28 U.S.C. § 2679(a); *Mignogna v. Sair Aviation, Inc.,* 937 F.2d 37, 40 (2d Cir.1991). Accordingly, plaintiff's complaint is deemed amended to name the United States as a defendant in the FTCA claim. The FTCA claim is hereby dismissed as against the Bureau of Prisons, the MDC, and Warden Hasty for lack of subject matter jurisdiction.

### II. *Bivens Claim*

Hylton further sues the defendants pursuant to *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, for violating his constitutional rights in connection with his June 1, 2000 accident and the subsequent treatment of his injuries. The claim is deficient in several respects.

First, a *Bivens* claim can only be brought against a federal employee in his individual capacity. It cannot be maintained against the United States, its agencies, or its employees in their official capacities. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994). Thus, Hylton's *Bivens* claim against the Bureau of Prisons, the MDC, and Warden Hasty in his official capacity must be dismissed, and his proposal to proceed against the United States alone must be denied.

Further, to the extent Hylton sues Warden Hasty in his individual capacity, his *Bivens* claim must also be dismissed since, as Hylton concedes in his reply papers, Hasty was not the MDC warden at the time of the facts alleged. *See Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987) (to state *Bivens* claim, plaintiff must allege personal involvement of defendant in violation); *accord Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir.2000).

In nevertheless opposing total dismissal of his *Bivens*

action, Hylton seeks leave to amend to clarify his constitutional claim. Because Hylton has failed to submit a proposed amended pleading or even to identify whom he would sue pursuant to *Bivens,* the court can neither grant nor deny this application on the present record. It grants Hylton thirty days from this order to submit his proposed amended pleading as well as papers addressing a procedural question relating to his claim.

Specifically, Hylton is asked to clarify his exhaustion of administrative remedies under the Prison Litigation Reform Act, 42 U .S.C. § 1997e(a) (Supp.2001) ("PLRA"). That statute provides that "[n]o action shall be brought with respect to prison conditions ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *See Porter v. Nussle,* ____ U.S. ____, 2202 WL 261683, at \*10 (Feb. 26, 2002) (holding that statute's reference to "prison conditions" applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong"). Although Hylton insists that he did exhaust administrative remedies, the present record is devoid of any documentation indicating that plaintiff did pursue the specific four-step procedure established by the Bureau of Prisons. 28 C.F.R. § 542.10 (2001); *see Funches v. Reish,* 97 Civ. 7611, 1998 WL 695904, at \*2 (S.D.N.Y. Oct. 5, 1998) (Sand, J.) (detailing four-step procedure: (1) inmate must first seek informal resolution of complaint; (2) if no resolution achieved, prisoner may submit written request for relief on designated form to warden; (3) if request denied, inmate has twenty days to file appeal with Bureau of Prisons Regional Director; (4) upon adverse determination by Regional Director, inmate has thirty days to appeal to Bureau of Prisons General Counsel). Defendants have apparently searched computerized indices at the Bureau of Prisons that track inmate grievances and found none relating to Hylton's June 1, 2000 accident. They have, however, located Hylton's administrative tort claim for $20,000, dated June 8, 2000. Tort claims, however, are not subject to the same four-part administrative procedure that must be exhausted to pursue other claims. *See* 28 C.F.R. § § 542.10, 542.12, 543.30 (2001). A prisoner need only file an administrative tort claim with the Bureau of Prisons Regional Office. *See* 28 C.F.R. § 543.31(c) (2001). Denial of that claim constitutes the final administrative action. *See* 28 C.F.R. § 543.32(6) (2001). Thus, it is entirely possible that Hylton exhausted his administrative remedies for purposes of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 720605 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

the FTCA without exhausting remedies pursuant to the PLRA for purposes of filing a *Bivens* claim. *See generally Funches v. Reish,* 1998 WL 695904, *7-9 (finding FTCA claim exhausted, but not *Bivens* claim). Thus, if Hylton wishes to amend his complaint to pursue a *Bivens* action, he must show that he exhausted the Bureau of Prisons four-part procedure for resolving grievances either by producing copies of his filing or by submitting a detailed affidavit indicating the actions taken to comply with all four steps of the administrative process.

*3 Even if Hylton can clear the procedural hurdle of the PLRA, he is cautioned that his pursuit of an amended *Bivens* action depends on his ability to plead both the objective and subjective components of any Eighth Amendment claim of cruel and unusual punishment.[FN3] *See Hudson v. McMillian,* 503 U.S. 1, 8 (1992).

> FN3. Because Hylton was a sentenced state prisoner when he was transferred to the MDC to face federal charges, the parties agree that the Eighth Amendment applies to his *Bivens* claim about the conditions of his confinement and medical treatment. *See Laza v. Reish,* 84 F.3d 578, 580 (2d Cir.1996).

The objective component is contextual. *Id.* Thus, when a claim challenges a prisoner's conditions of confinement-as in Hylton's case, where he challenges the conditions under which he was required to shower-a showing of "extreme deprivation[ is] required." *Id.* at 9. This is because "routine discomfort" is considered inherent in the fact of incarceration. *Id.* Thus, "only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave" to give rise to an Eighth Amendment claim. *Id.* (citations omitted). To meet this high objective standard, Hylton must plead more than the fact that he was injured in a shower accident. He must plead circumstances-for example, recurring serious injuries to prisoners using MDC showers-sufficient to support an inference that the challenged conditions were so obviously hazardous as to constitute cruel and unusual punishment.

As for Hylton's complaint about delay in the permanent repair of his cracked tooth, the Eighth Amendment does not mandate that prisoners "have unqualified access to health care." *Id.* Thus, Hylton must plead facts showing that the temporary repair of

his tooth at the MDC was so obviously insufficient to protect him from "death, degeneration or extreme pain" that "a condition of urgency" existed requiring more expeditious permanent correction of his condition. *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

To then satisfy the subjective component of an Eighth Amendment claim, Hylton must show that whatever individual he names as a *Bivens* defendant acted with deliberate indifference to the serious prison condition causing his injury. *See Wilson v. Seiter,* 501 U.S. 294, 299 (1991) (holding that Eighth Amendment requires an "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment"); *c.f. Branham v. Meachum,* 77 F.3d 626, 631 (2d Cir.1996) (holding that allegations of various prison restraints was not enough, by itself, to suggest that officials acted with deliberate indifference to plaintiff's health and safety). This requires, at a minimum, that Hylton plead a defendant's knowledge of the serious condition or medical problem at issue, an awareness of the risk of grave harm presented by the situation, an ability to take action to remedy the situation, and a failure to do so. *See Farmer v. Brennan,* 511 U.S. 825, 837-38, 844 (1994).

*Conclusion*

For the reasons stated, the court dismisses with prejudice Hylton's FTCA claim as against the Bureau of Prisons, the MDC, and Warden Dennis Hasty, and substitutes the United States as the sole defendant. The court further dismisses with prejudice Hylton's *Bivens* claim against the Bureau of Prisons, the MDC, and Warden Hasty for injuries arising out of an accident on June 1, 2000 and the dental care afforded thereafter. Hylton is, however, granted thirty days from the date of this order to submit a proposed amendment to his *Bivens* claim, provided he also demonstrates that he has complied with the exhaustion requirements of the PLRA. Hylton is advised that, even if he does not submit a proposed *Bivens* amendment, his FTCA claim will go forward as against the United States.

*4 SO ORDERED.

E.D.N.Y.,2002.
Hylton v. Federal Bureau of Prisons
Not Reported in F.Supp.2d, 2002 WL 720605 (E.D.N.Y.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 720605 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

Briefs and Other Related Documents (Back to top)

• 1:00CV05747 (Docket) (Sep. 22, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2001 WL 1297793 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Wang v. U.S.S.D.N.Y.,2001.Only the Westlaw
citation is currently available.
United States District Court, S.D. New York.
Cheng Yong WANG and Xingqi Fum a/k/a "Frank
Fu," Plaintiffs,
v.
UNITED STATES of America Defendant.
**No. 01 CIV. 1326(HB).**

Oct. 25, 2001.

Gerald J. McMahon, New York, NY, for plaintiffs.
Mary Jo White, U.S.Atty., S.D.N.Y., for Neil S.
Binder, Asst. U.S.Atty., S.D.N.Y., for U.S.

OPINION & ORDER

BAER, District J.
*1 Cheng Yong Wang and Xingqi Fum (collectively,
"plaintiffs") asserted claims of false arrest and
malicious prosecution under the Federal Tort Claims
Act, 28 U.S.C. § 1346 and 2671, et seq. ("FTCA"),
in connection with their 1998 arrests for their alleged
role in a conspiracy to sell human organs of executed
Chinese prisoners for transplantation into private
medical clients. Defendant United States of America
(the "government") moves to dismiss plaintiffs'
claims for lack of subject matter jurisdiction and for
failure to state a claim upon which relief can be
granted, pursuant to Rules 12(b)(1) and 12(b)(6) of
the Federal Rules of Procedure. For the reasons
discussed below, the government's motion is granted
in part and denied in part.

BACKGROUND

In deciding a motion to dismiss for failure to state a
claim upon which relief can be granted, the court
"must accept the material facts alleged in the
complaint as true." Cohen v. Koenig, 25 F.3d 1168,
1172 (2d Cir.1994).

In May 1997, Cheng Yong Wang ("Wang"), a former
public prosecutor in China, entered the United States
under a B1 visa. Later that year, in an effort to extend
his visa Wang sought immigration advice and was
referred to Paul Risenhoover who purported to be a
qualified immigration attorney. Risenhoover, who

was not in fact an attorney, nonetheless submitted an
application on Wang's behalf which was
subsequently denied. Prior to submitting the
application Risenhoover had asked Wang to join an
organization founded by Risenhoover, the Pacific
Lighthouse Mission ("PLM"), whose aims included
the overthrow of the Chinese Government When
Wang declined to join PLM Risenhoover stated that
the visa application would fail. The connections, if
any, between Risenhoover's representations and the
denial of Wang's visa application are unclear.

In December 1997 or January 1998, Risenhoover
proposed that Wang meet with "Dr. Hong," a
Chinese doctor from a dialysis center in Aruba who
was interested in procuring Chinese organs for
implantation in his wealthy patients. Risenhoover
suggested that Wang could apply for a visa through
the Netherlands, of which Aruba is a colony, if he
provided the requested assistance to Dr. Hong.[FN1]
Between February 6, 1998 and February 20, 1998,
Risenhoover and/or Dr. Hong spoke with Wang
several times about the proposal. On February 12,
1998, Dr. Hong, who was in fact Harry Wu ("Wu"), a
political activist who had several times testified
before the United States Congress on various human
rights issues, including organ transplantation from
Chinese prisoners and his experience as a prisoner in
China, contacted FBI Special Agent Jill Marangoni
("Marangoni") and advised her of his conversations
with Wang. Wu also told Marangoni that he was
scheduled to meet Risenhoover and Wang the
following day to discuss and sign a contract, drafted
by Risenhoover and Wu, whereby Wang agreed to
procure organs from China for patients of the Aruba
dialysis center. [FN2] Following this conversation with
Marangoni the government met with Wu and learned
from Risenhoover's attorney, Carlyle Hatfield, that
Risenhoover might have worked for an unnamed U.S.
intelligence agency. Risenhoover then traveled to
New York where he entered into a cooperation
agreement with the FBI. Pursuant to this agreement,
the FBI recorded telephone conversations between
Risenhoover and Wang. As the conversations were in
Chinese, Risenhoover provided translations to the
FBI.

> FN1. I presume, though the Complaint does
> not say, that the visa would be for travel to
> the United States, and not to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1297793 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Netherlands.

> FN2. The Complaint doesn't state whether the contract was signed, but the decision Judge Batts dismissing the indictment states that a draft contract was signed on February 13, 1998. *United States v. Wang*, 98 Cr. 199, 1999 U.S. Dist. LEXIS 2913 (S.D.N.Y.1999).

**\*2** On February 19, 1998, Risenhoover invited Wang to a meeting in a Manhattan hotel and instructed Wang to bring his American representative, Xingqi Fum, a/k/a Frank Fu ("Fu"). The meeting, which occurred the following day, included Risenhoover, Wang, Fu and FBI Special Agent Joseph Kuhns ("Kuhns") who was posing as a board member of the Aruba dialysis center. Risenhoover led the meeting, and at one point presented Wang with $5,000 to pay for one cornea. Wang declined the money, stating that he had not yet investigated the possibility of acquiring organs, and would not do so until his return to China. Wang and Fu were arrested upon leaving the meeting.

Although Wang and Fu were scheduled for trial on February 1, 1999, the court dismissed the indictment because the government's case depended entirely upon evidence provided by Risenhoover, who had left the country and was unavailable for trial, and whose credibility was seriously in doubt given his fraudulent immigration practices, other alleged criminal activities involving the sale of organs, and political animus against China. *See United States v. Wang*, 98 Cr. 199, 1999 U.S. Dist. LEXIS 2913 (S.D.N.Y.1999). Further, the court was concerned that the government had both refused to produce *Brady* information about Risenhoover to defendants until ordered to do so and had made no effort to remain in contact with Risenhoover or take steps to ensure his availability for trial.[FN3] In July 1999, after Risenhoover's return to the United States, the Court reinstated the indictment but adhered to its earlier decision to exclude the tape recordings in which Risenhoover had participated and the statements by Wang relating to Fu. The government filed an appeal of the evidentiary decisions, but following an interview with Wang by prosecutors and the FBI recommended that an order of *nolle prosequi* be filed.

> FN3. Under *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to

guilt or punishment. *Id.* at 87. This duty covers not only exculpatory material, but also information that could be used to impeach a key government witness. *See Giglio v. United States*, 405 U.S. 150, 154 (1972).

Plaintiffs filed suit in this Court on February 22, 2001, asserting false arrest and malicious prosecution under the FTCA and seeking $12 million in damages.

## DISCUSSION

The FTCA does not create new causes of action; instead, it "serves to convey jurisdiction when the alleged breach of duty is tortious under state law, or when the Government has breached a duty under federal law that is analogous to a duty of care recognized by state law." *Medina v. United States*, 259 F.3d 220 (4th Cir.2001). Here, plaintiffs have brought the common law claims of malicious prosecution and false arrest under the FTCA against the government. [FN4] The government moves to dismiss the malicious prosecution claims on two grounds, lack of subject matter jurisdiction and failure to state a claim. Specifically, the government argues that the "intentional tort" and "discretionary function" exceptions apply to bar the Court's subject matter jurisdiction over the malicious prosecution claims, and that the complaint fails to adequately plead two elements of malicious prosecution, namely lack of probable cause to commence an action against the plaintiffs and malice.

> FN4. Nonetheless, for simplicity's sake I will refer to common law claims brought pursuant to the FTCA as "FTCA claims."

**\*3** The government seeks to dismiss the false arrest claims on the sole ground that the plaintiffs failed to timely file an administrative claim with respect thereto, as required by the FTCA.

Dismissal is appropriate only where "it appears beyond doubt that plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## A. Malicious Prosecution-Lack of Jurisdiction

In support of their malicious prosecution claim, plaintiffs allege that "[t]here was no probable cause

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1297793 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

for plaintiffs to be arrested or prosecuted" and that the government "through its agents, acted in this proceeding with malice in that they deliberately perpetrated the wrongful conduct for political and ideological reasons." Compl., ¶ ¶ 57-58. Although plaintiffs do not identify which "government" actors committed the alleged wrongs, only four actors were participants in the events: (1) the Assistant United States Attorneys ("AUSAs") who prosecuted, and later dismissed, the case; (2) the investigators, principally FBI agents Marangoni and Kuhns; (3) the informants, Wu and Risenhoover; and (4) the Justice Department and other policy making bodies of the federal government. In order to analyze the government's motion to dismiss the malicious prosecution claims, the Court must consider independently each of the above actors, whose respective activities are differently treated under the FTCA.

### 1. Prosecutors

The first set of actors whose conduct allegedly gives rise to the malicious prosecution claims are the prosecutors; however, for the reasons discussed below their conduct cannot support a FTCA claim.

The FTCA waives the federal government's immunity from tort liability with respect to certain negligent and wrongful acts of its employees and grants federal courts subject matter jurisdiction over actions commenced within its terms, subject to certain limitations. Under the terms of the FTCA, the Court has subject matter jurisdiction over claims of malicious prosecution *only* where the alleged conduct is that of "investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h) (the so-called "intentional tort exception" to the waiver of immunity).[FN5] Because a prosecutor is not acting as an "investigative or law enforcement officer" when he or she decides to prosecute, or for that matter declines to prosecute, the Court does not have jurisdiction under the FTCA over intentional tort claims arising from such decisions. *See Bernard v. Clifford,* 25 F3d 98, 104 (2d Cir.1994) (dismissing malicious prosecution claim); *Gray v. Bell,* 712 F.2d 490, 513 (D.C.Cir.1983).

> FN5. The intentional tort exception bars all claims "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference

with contract rights." 28 U.S.C. § 2680(h).

Moreover, there is a second, independent provision of the FTCA which precludes this Court's jurisdiction over claims arising from a prosecutor's decision to indict and prosecute-the so-called "discretionary function exception." This FTCA provision excludes from the waiver of sovereign immunity "any claim based upon ... the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused.*" 28 U.S.C. § 2680(a) (emphasis supplied). Designed "to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort," *United States v. S.A. Empressa Viacao Aerea Rio Grandense,* 467 U.S. 797, 814 (1984), the discretionary tort exception applies when the challenged acts (1) involve an element of judgment of choice, and (2) are based on considerations of public policy. *See United States v. Gaubert,* 499 U.S. 315, 322-23 (1991).

*4 It is well settled that the discretionary tort exception encompasses a prosecutor's decision to prosecute, even if that decision constitutes an abuse of prosecutorial discretion. *See Morales v. United States,* 94 civ. 4865, 1997 U.S. Dist. Lexis 7422, *2 (S.D.N.Y.1997) (the FTCA "bars all claims of malicious prosecution against government prosecutors who, in their discretion, decide to prosecute and individual..."); *Gray,* 712 F.2d at 513 ("[p]rosecutorial decisions as to whether, when and against whom to initiate prosecution are quintessential examples of government discretion in enforcing criminal law, and, accordingly, courts have uniformly found them to be immune under the discretionary function exception"). In sum, the AUSAs' decision to prosecute Wang and Fu falls within the exception, and plaintiffs' allegations that the prosecutors were motivated by "political and ideological reasons," Compl., ¶ ¶ 57-58, do not change that result.

### 2. The Investigators

The second set of actors featured in the Complaint are the investigators, principally Marangoni and Kuhns. With respect to malicious prosecution claims, the discretionary function exception bars claims of malicious prosecution against government "investigative and law enforcement agents aiding in the investigation to whether to prosecute." *Morales v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1297793 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

*United States*, 94-cv-4865, 1997 U.S. Dist. Lexis 7422, at *2 (S.D.N.Y.1997); *accord Gray*, 712 F.2d at 516. However, the "exception does not protect investigative and law enforcement agents from such claims where the actions of those agents are 'sufficiently separable' from the 'protected discretionary decision' to prosecute." *Morales v.* 1997 U.S. Dist. Lexis 7422, at *2.

While courts have struggled to articulate clear rules for identifying conduct that is "sufficiently separable," as a general rule a false arrest, without more, does not give rise to a malicious prosecution claim. *Cf. Morales v.* 1997 U.S. Dist. Lexis 7422, at *3 (arrest without probable cause and obstruction of justice by giving false and misleading testimony in retribution for interference with the DEA's undercover surveillance operation gives rise to a malicious prosecution claim). To be actionable as malicious prosecution, the investigator's conduct must be independent or quasi-independent from the non-actionable decision to prosecute and must constitute the kind of wrongful conduct that is designed to corrupt the fairness of a prosecution. *Cf. id.; Tri-State Hosp. Supply Corp.,* 142 F.Supp. at 100-101 (lying to bring about a prosecution gives rise to a FTCA claim); *Moore v. Valder,* 65 F.3d 189 (D.C.Cir.1995) (disclosure of grand jury testimony to third parties is "sufficiently separable"). For that reason, allegations based on the "quality of the investigation" generally do not give rise to FTCA claims. *See Pooler v. United States,* 787 F.2d 868, 871 (3d Cir.1986).

Here, the only wrongful conduct that plaintiffs have specifically ascribed to the investigators was their arrest for ideological reasons and without probable cause; and, while both allegations are troubling, neither gives rise to a cognizable malicious prosecution claim. First, the discretionary function exception is indifferent to the government actor's motivation, *see* 28 U.S.C. § 2680(a); second, the only wrongful conduct attributed to the investigators were the arrests of Wang and Fu, which for the reasons discussed above is not sufficient to state a FTCA claim for malicious prosecution; and third, under plaintiffs' own theory of the case the arrests are inextricably tied to the decision to prosecute, and therefore cannot constitute "sufficiently separable" acts. Indeed, the gravamen of plaintiffs' complaint is that for rather ill-defined political reasons the government coordinated its various agencies to target and prosecute Wang and Fu. The arrests by the FBI was merely one of many sequential steps in an orchestrated political campaign.

*5 The complaint could be read to suggest that the investigators should not have relied upon informants, or should not have done so to such a degree. However, the decision to use informants, like Risenhoover and Wu, is a discretionary function, *see Doe v. United States,* 58 F.3d 494, 501 (9th Cir.1995); *Ostera v. United States,* 769 F.2d 716, 718 (11th Cir.1985), and an unreasonable dependence upon unreliable informants is similarly protected from liability. *See Pooler,* 787 F.2d at 871. Further, it is worth noting that the FBI did not solicit or recruit Risenhoover and Wu to act as informants or play an active role in running the sting; indeed the complaint alleges that the FBI did not learn of the conspiracy to sell human organs until Wu telephoned Marangoni on February 12, 1998, after the alleged conspiracy had already taken form.

### 3. The Informants

Because the FTCA conveys jurisdiction only for claims against government employees, the government is accountable in tort for the acts of Risenhoover and Wu only to the extent that they were acting as employees of the United States. *See* 28 U.S.C. § 2679(b)(1). "Employees" is defined to be "persons acting on behalf of a federal agency," *id.,* and includes persons acting as agents of the government. *See B & A Marine Co., Inc. v. American Foreign Shipping Co., Inc.,* 23 F.3d 709, 713 (2d. Cir.1994); *Alvarez-Machain v. United States,* 99 civ. 56762, 2001 U.S.App. Lexis 20150, *28 (9th Cir.2001) ("[l]aw enforcement officers cannot escape liability by recruiting civilians to do their dirty work"). Although the Court's research suggests that this issue-when is an informant an agent for FTCA purposes-has been the subject of few decisions, it is clear that an agency relationship arises only when the government exercises significant control over the informants. *See Socialist Workers Party v. Atty. Gen. of the United States,* 642 F.Supp. 1357, 1423 (S.D.N.Y.1986) (finding that the informants were agents of the FBI); *Alvarez-Machain,* 2001 U.S.App. Lexis 20150, *29-30 (civilian was an agent, in part because civilian had no individual interest in his conduct other than "currying favor with the DEA agents in hopes that they would reward him").

Here, the complaint does not allege that either Risenhoover or Wu were acting as agents for the government, or that the government directed or supervised their activities, or in fact that they played any role in their activities before Risenhoover met

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1297793 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

with the FBI and entered into a cooperation agreement on or about February 17, 1998. Even after that date, the government's alleged role was limited to listening in on two telephone calls between Risenhoover and Wang, sending agent Kuhns to attend the February 20th meeting run by Risenhoover, and arresting Wang and Fu at the end of that meeting. Indeed, the complaint suggests that the government's role began late in the sting (which had been designed to achieve Risenhoover's and Wu's personal political objectives) and was largely passive; Wu and Risenhoover proposed the plan to Wang, drafted a contract setting forth his role in the conspiracy and only later contacted Marangoni.

*6 Plaintiffs point to several factual allegations that they believe adequately plead governmental control, but without success. The alleged facts that Risenhoover had a prior relationship with an unspecified intelligence agency, *see* Compl. ¶ 12(f), is of no moment for two reasons. First, the allegation is made in conclusory form and without suggestion that there was any relationship between the events of this case and that alleged prior relationship. Second, in her decision dismissing the indictment against Wang and Fu, Judge Batts found that the alleged relationship with the unnamed intelligence agency ended in 1992, well prior to any of the allegations in the complaint in this case, and further stated that there was no evidence that such a relationship existed apart from Risenhoover's statement. *Wang*, U.S. Dist. Lexis 2913, at *96-97; *see Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir.2000) (courts evaluating motions to dismiss for lack of subject matter jurisdiction "may resolve the disputed jurisdictional fact issues by reference to evidence outside the pleadings"). Plaintiffs also allege that Wu met with the government on November 3, 1997 following his appearance on the ABC television program "Prime Time Live" regarding trafficking in organs from executed Chinese prisoners, but there is no reason to believe that the meeting in any way concerned Wang or Fu. More importantly, as set forth in the Declarations of Jill Marangoni, Michael Porzio and AUSA Marcia Isaacson, the only money Wu received from the government was reimbursement for his travel expenses incurred in connection with his trip to New York to meet with the FBI and the United States Attorneys' Office. That money amounted to $259.30. "No other payments were made to Mr. Wu by the FBI during any time in which I was involved with the FBI's surveillance of Cheng Yong Wang and Frank Fu." Declaration of Jill Marangoni, dated June 19, 2001, ¶ 3.

### 4. Justice Department & Other Government Agencies

To the extent that the Complaint alleges a political animus by the federal government, writ large, to embarrass the Chinese Government or for some other political purpose, it is not sufficient to sustain a FTCA claim for malicious prosecution. As stated elsewhere in this decision, the decision to prosecute and the reasons for doing so are protected by the discretionary function exception. *See* 28 U.S.C. § 2680(a). Further, general allegations about the "government" as a whole, without reference to specific conduct, are not sufficient to establish jurisdiction. *See Johnson v. United States*, 788 F.2d 845, 854 (2d Cir.1986) (a complaint brought under the FTCA must allege facts enabling the court to look beneath the language in the complaint to determine the substance of the claim").

For the reasons discussed above, the Court does not have jurisdiction over the malicious prosecution claim and the government's motion to dismiss that claim is granted.[FN6]

> FN6. I need not and do not reach the government's argument that plaintiffs failed to state a claim a malicious prosecution.

### B. False Arrest-Lack of Jurisdiction

*7 For a court to have jurisdiction over a FTCA claim, a plaintiff must have presented his or her claim to an administrative agency within two years of the claim's accrual. 28 U.S.C. § 2401(b). Although this Court applies New York's law of false arrest and its statute of limitations, federal law determines when the statute of limitations begins to run. Wang and Fu were arrested on February 28, 1998 and did not file their administrative complaints until March 1, 2000. Consequently, if the false arrest claims accrued at the time of their arrests, the statute of limitations has already run and the claims are forfeit. If, however, the claims accrued only when the criminal prosecution came to an end, they would be timely since Judge Batts did not sign the *nolle prosequi* until November 2, 1999, less than two years before Wang and Fu filed their administrative complaints. Under the rule set forth in *Covington v.. City of New York*, 171 F.3d 117, to determine when a false arrest claim accrues the Court considers whether the prosecution could have obtained a conviction without using evidence tainted by the false arrest. If so, the claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1297793 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

accrues at the time of arrest. If not, the arrest accrues when the prosecution ends.[FN7] *See id.*

> FN7. A civil false arrest claim does not exist as long as there is a pending criminal prosecution based on evidence obtained from that arrest. To find otherwise would risk inconsistent civil and criminal judgments. Until a claim exists, it has not accrued. On the other hand, where the prosecution does not depend upon evidence obtained from the false arrest, there is no risk of inconsistent judgments; thus the claim exists at the time of arrest and immediately accrues. *C.f. Covington v. City of New York,* 171 F.3d 117.

While reasonably straightforward in theory, the *Covington* rule poses significant practical problems in application. The record before the Court does not disclose why the criminal case against Wang and Fu was dismissed, nor does it shed any light on what, if any, evidence was seized at the time of arrests or the importance of such evidence to the prosecution's case. Indeed, even if the Court had been apprised of all the paper evidence in the case and its origins, the determination of whether the criminal prosecution might have proceeded in the absence of evidence obtained pursuant to the alleged illegal arrests would hardly be a mere mechanical exercise. *See Hall v. City of New York,* 99 Civ. 979, 2001 U.S. Dist. LEXIS 13569, *12-14 (S.D.N.Y.2001). Put another way, under *Covington,* to determine whether the statute of limitations ran on a civil false arrest claim the court is obliged, it seems to me, to imagine how the prosecution might have ended had the evidence obtained pursuant to the arrest been suppressed. Here, I do not even know what evidence was obtained as a result of the Wang and Fu's arrest. Thus, I am constrained to deny the government's motion to dismiss. *See Felton v. Maines Cash & Carry, Inc.,* 00 civ. 239, 2001 U.S. Dist. Lexis 1118 (N.D.N.Y.2001) (denying motion to dismiss because the record "does not make clear what evidence was relied on in the prosecution of Plaintiff, or how that evidence was obtained").

## CONCLUSION

For the reasons discussed above, the government's motion to dismiss is granted as to the malicious prosecution claim, and denied without prejudice as to the false arrest claim. Further, if what I will

characterize as the *Covington* problem can be addressed on papers it should be accomplished by or before November 26, 2001. The parties should work out a schedule to their liking such that the briefs from both sides, assuming any opposition, reach Chambers on or before the above mentioned date.

**\*8 SO ORDERED**

S.D.N.Y.,2001.
Wang v. U.S.
Not Reported in F.Supp.2d, 2001 WL 1297793 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:01cv01326 (Docket) (Feb. 22, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 13
Slip Copy, 2006 WL 1979048 (N.D.N.Y.)
**(Cite as: Slip Copy)**

N.D.N.Y.,2006.
Willingham v. County of Albany
Slip Copy, 2006 WL 1979048 (N.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 4136362 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Reply (Dec. 6, 2005) Original Image of this Document (PDF)

• 2005 WL 4136361 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum of Law in Support of their Motion for Summary Judgment and in Opposition to Defendants Jamie Gilkeys and Tyler Trice's Cross-Motion for Summary Judgment and Defendants County of Albany's and Albany County Board of Electio ns' Cross-Motion for Summary Judgment Dismissing the Third and Fourth Causes of Action Set Forth in the Second Amended Complaint Pursuant to Rule 56 (Nov. 29, 2005) Original Image of this Document (PDF)

• 2005 WL 4136359 (Trial Motion, Memorandum and Affidavit) Defendant County of Albany and Albany County Board of Elections Memorandum in Support of its Cross Motion for Summary Judgment Dismissing the Third and Fourth Causes of Action Set Forth in the Second Amended Complaint Pursuant to Rule 56; and in Oppo sition to Plaintiffs' Motion for Summary Judgment Returnable November 17. 2005 (Oct. 31, 2005) Original Image of this Document (PDF)

• 2005 WL 4136360 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment (Oct. 31, 2005) Original Image of this Document (PDF)

• 2005 WL 4136358 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment (Sep. 30, 2005) Original Image of this Document (PDF)

• 2005 WL 4136357 (Trial Pleading) Answer to Second Amended Complaint (Apr. 8, 2005) Original Image of this Document (PDF)

• 2005 WL 4136356 (Trial Pleading) Answer to Second Amended Complaint (Mar. 30, 2005) Original Image of this Document (PDF)

• 2005 WL 4136355 (Trial Pleading) Second Amended Complaint (Mar. 15, 2005) Original Image of this Document (PDF)

• 2005 WL 4136354 (Trial Motion, Memorandum and Affidavit) Defendant County of Albany and Albany County Board of Elections Reply Memorandum in Support of its Motion for Summary Judgment Dismissing the Complaint Pursuant to Rule 56 (Mar. 7, 2005) Original Image of this Document (PDF)

• 2005 WL 4136304 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendant County of Albany and Albany County Board of Elections' Motion for Summary Judgment (Feb. 28, 2005) Original Image of this Document (PDF)

• 2005 WL 4131678 (Trial Motion, Memorandum and Affidavit) Defendant County of Albany and Albany County Board of Elections Memorandum in Support of its Motion for Summary Judgment Dismissing the Complaint Pursuant to Rule 56 (Jan. 18, 2005) Original Image of this Document (PDF)

• 2004 WL 4000629 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Memorandum in Support of their Motion for a Default Judgment against and Severance of Defendants Jestin Williams, Michael Brown, Dennis Bagley, Joyce Love, and Alexander Mchugh (Sep. 7, 2004) Original Image of this Document (PDF)

• 2004 WL 4000628 (Trial Motion, Memorandum and Affidavit) Defendants Albany Housing Authority and Steven Longo's Memorandum of Law in Opposition to Plaintiffs' Motion (Aug. 26, 2004) Original Image of this Document (PDF)

• 2004 WL 4000627 (Trial Pleading) Defendants Answer to First Amended Complaint (May 14, 2004) Original Image of this Document (PDF)

• 2004 WL 4000626 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Support of their Motion for A Temporary Restraining Order and Preliminary Injunction (Apr. 14, 2004) Original Image of this Document (PDF)

• 2004 WL 4000625 (Trial Pleading) Answer to First Amended Complaint (Apr. 12, 2004) Original Image of this Document (PDF)

• 2004 WL 4000624 (Trial Pleading) Answer (Apr. 9, 2004) Original Image of this Document (PDF)

• 2004 WL 4000623 (Trial Pleading) First Amended Complaint (Apr. 6, 2004) Original Image of this Document (PDF)

• 2004 WL 4000622 (Trial Pleading) Complaint (Apr. 2, 2004) Original Image of this Document (PDF)

• 1:04cv00369 (Docket) (Apr. 2, 2004)

• 2004 WL 4020408 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendant County of Albany and Albany County Board of Elections' Motion for Summary Judgment (Feb. 28, 2004) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2006 WL 1979048 (N.D.N.Y.)
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
Willingham          v.          County          of
AlbanyN.D.N.Y.,2006.Only the Westlaw citation is
currently available.
United States District Court,N.D. New York.
Wanda WILLINGHAM; Lucille McKnight; Ward
DeWitt; David Reid; Deborah Williams-Muhammad;
Ashley Perez; Coleman Hughes; Donna Robinson;
Rodney Davis; Stephanie Davis; David Young;
Albany County Branch of the National Association
for the Advancement of Colored People; Arbor Hill
Concerned Citizens Neighborhood Association;
Aaron Mair; Maryam Mair; Anne Pope; and Mark
Mishler, Plaintiffs,
v.
COUNTY OF ALBANY; Albany County Board of
Elections; Jamie Gilkey; Tyler Trice; and Dyann
Parker, Defendants.
**No. 04-CV-369 (DRH).**

July 12, 2006.

Gibson, Dunn & Crutcher LLP, Mitchell A. Karlan,
Esq., of counsel, New York, NY, DerOhannesian &
DerOhannesian, Paul DerOhannesian II, Esq., of
counsel, Albany, NY, for Plaintiffs.
Kristina A. Burns, Esq., Albany County Attorney,
Napierski, Vandenburgh & Napierski, L.L.P.,
Thomas J. O'Connor, Esq., Shawn T. Nash, Esq., of
counsel, Albany, NY, for Defendants County of
Albany and Albany County Board of Elections.
Hacker & Murphy, LLP, Thomas D. Buchanan, Esq.,
of counsel, Latham, NY, for Defendants Gilkey and
Trice.
Dyann Parker, Albany, NY, Defendant Pro Se.

**MEMORANDUM-DECISION AND ORDER**
DAVID R. HOMER, U.S. Magistrate Judge.
*1 Plaintiffs, fifteen individuals and two community
organizations, brought this action seeking declaratory
and injunctive relief plus attorneys' fees and costs
against the County of Albany and its Board of
Elections (collectively the "County"), Jamie Gilkey
("Gilkey"), Tyler Trice ("Trice"), and Dyann Parker
("Parker"); and others who are no longer part of the
case.[FN1] Plaintiffs contend in four causes of action
that the defendants conspired to deprive them of their
constitutional and statutory rights by abusing the
absentee ballot process in Albany County in violation

of the First and Fourteenth Amendments, 42 U.S.C. §
1983, and the Voting Rights Act of 1965, 42 U.S.C. §
1973 et seq ('VRA"). Presently pending are the
following motions for summary judgment pursuant to
Fed.R.Civ.P. 56:

> FN1. Defendants Albany Housing Authority
> and Steven Longo resolved the claims
> against them by agreeing to the entry of a
> consent judgment. Docket No. 55. A default
> judgment was entered against five other
> individual defendants and they were severed
> from the case. Docket No. 58.

1. Plaintiffs' motion against Gilkey and Trice on all
claims (Docket No. 100);
2. The County's cross-motion [FN2] as to two causes of
action (Docket No. 102); and

> FN2. See subsection II(B)(1) infra.

3. The motion of Gilkey and Trice as to all claims
(Docket Nos. 103, 104 [FN3]).

> FN3. It appears that a duplicate copy of the
> motion of Gilkey and Trice (Docket No.
> 103) was inadvertently filed as Docket No.
> 104.

For the reasons which follow, plaintiffs' motion is
denied, the County's cross-motion is granted, and the
motions of Gilkey and Trice are granted in part and
denied in part.

**I. Background**

The claims in this case follow from two earlier cases,
one in this Court and the other in Albany County
Supreme Court. In 2003, certain plaintiffs in this case
commenced an action challenging a redistricting plan
for the Albany County Legislature as violating the
VRA. That challenge succeeded and resulted in an
order for a special election. See Arbor Hill
Concerned Citizens Neighborhood Ass'n v. County of
Albany, 357 F.3d 260 (2d Cir.2004). The special
primary election was scheduled for March 2, 2004

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and the special general election was scheduled for
April 27, 2004.

Gilkey was employed by the Albany Housing
Authority ("AHA") as an employment liaison officer
in the Wage Center. Gilkey also served as a
Democratic Party ward leader and the campaign
manager for two candidates for the Albany County
Legislature in the special election. Trice was also
employed by the AHA as a grant implementation
assistant. Leading up to the special primary election
on March 2, 2004, Gilkey obtained blank applications
for absentee ballots. Gilkey, Trice, and others
brought applications to residents of the two districts
in which his candidates were seeking nomination in
the special primary. Those districts included
apartment buildings operated by the AHA.

Under New York law, an individual may vote as an
absentee voter if he or she will be absent from the
county at the time of the election or is disabled, either
permanently or temporarily, from appearing at the
designated polling place on the day of the election.
N.Y. Elec. Law § 8-400(1) (McKinney 1998).
Applications for absentee ballots are made to the
voter's county-of-residence Board of Elections on
forms designated by that board. _Id. at_ § 8-400(2). An
applicant may direct that an absentee ballot be mailed
or delivered "to any person designated for such
purpose in writing by him, at the office of the
board...." _Id._ at § 8-406.

**\*2** From the evidence proffered on these motions, it
appears that Gilkey principally approached residents
of the Townsend Park Homes on Central Avenue in
Albany prior to the March 2004 special primary
election. Townsend Park is an eighteen-story building
operated by the AHA with approximately 158, one-
bedroom apartments available to qualifying low-
income senior and disabled individuals. Saunders
Decl. (Docket No. 113(2)) at ¶ 2. The residents are
predominantly African-American. _Id._ The building is
designated as a polling place and residents may vote
in the building. _Id._ at ¶ 13. The building is kept
locked and is accessible only to residents, their
guests, and AHA personnel. _Id._ at ¶ 3.

Prior to the primary election, Gilkey submitted
numerous absentee ballot applications to the County
Board of Elections ("Board").[FN4] The applications
were signed by the voters, asserted various reasons
for needing to vote by absentee ballot, and in many
instances directed that the absentee ballot be held by
the Board for Gilkey for delivery to the voter. Tr. of
Gilkey Testimony at _DeWitt_ Hr'g (Docket No.

100(2), Ex. D) ("Gilkey _DeWitt_ Tr.") at 188. Gilkey
submitted approximately 160 applications to the
Board, which rejected approximately thirty and
issued approximately 130 absentee ballots to Gilkey.
_Id._ at 218. Most of those ballots were completed,
signed, and submitted to the Board for the March 2
primary. _Id._

> FN4. Absentee ballot applications obtained
> from voters by Trice or others were
> delivered to Gilkey for submission to the
> Board. Gilkey lived across the street from
> the Board's offices. Tr. of Gilkey Testimony
> at _DeWitt_ Hr'g (Docket No. 100(2), Ex. D)
> at 186-88.

Wanda Willingham, Lucille McKnight, and Ward
DeWitt, plaintiffs in this action, then commenced an
action in Albany County Supreme Court challenging
the primary results in the three districts in which they
were candidates based on the absentee ballot
activities of Gilkey and Trice. A hearing on these
allegations was held on March 17 and 18, 2004
during which Gilkey testified. _See_ Gilkey _DeWitt_ Tr.
As a result of that hearing, the parties stipulated that
the results in two of the three challenged districts
would be accepted but that a new special primary
election would be held in Albany County Legislature
District 3, where Willingham was a candidate and the
one most affected by Gilkey's activities. _DeWitt_
Settlement Tr. (Docket No. 100(2), Ex. E) at 4-6.

This action followed.

## II. Discussion

### A. Legal Standard

A motion for summary judgment may be granted if
there is no genuine issue as to any material fact if
supported by affidavits or other suitable evidence and
the moving party is entitled to judgment as a matter
of law. The moving party has the burden to show the
absence of disputed material facts by informing the
court of portions of pleadings, depositions, and
affidavits which support the motion. Fed.R.Civ.P.
56(c); _Celotex Corp. v. Catrett,_ 477 U.S. 317, 323
(1986). Facts are material if they may affect the
outcome of the case as determined by substantive
law. _Anderson v. Liberty Lobby,_ 477 U.S. 242, 250
(1986). All ambiguities are resolved and all
reasonable inferences are drawn in favor of the non-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*3** The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

### B. Preliminary Issues

#### 1. The County's "Cross-Motion"

Within the deadline for filing dispositive motions, plaintiffs moved for summary judgment against Gilkey and Trice but made no such motion as to either the County or Parker. The County then filed a "cross-motion" opposing plaintiffs' motion for summary judgment on their due process and equal protection claims under § 1983 to the extent that plaintiffs contend that Gilkey and Trice conspired with the County and seeking summary judgment against plaintiffs on their VRA and right of association claims. Plaintiffs contend that the County's cross-motion is improper since plaintiffs made no motion against the County.

In support of their motion against Gilkey and Trice, plaintiffs contend, *inter alia,* that the element of those claims requiring that Gilkey and Trice acted "under color of state law" has been demonstrated by their conspiring with the County to deprive plaintiffs of their constitutional rights. Pls. Mem. of Law (Docket No. 100(28) at 13-15. If plaintiffs prevail on this argument against Gilkey and Trice, such a holding will arguably become the law of the case or at least persuasive authority against the County's denial of this element of plaintiffs' claims. *See United States v. Thorn,* 446 F.3d 378, 383 (2d. Cir.2006) ("The law of the case doctrine counsels against revisiting ... prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons...."). The County would potentially be prejudiced in its subsequent litigation of this case by foreclosing its opposition to plaintiffs' contention that the defendants acted "under color of state law." Given the County's stake in the

outcome of this issue, then, its arguments in opposition to plaintiffs' motion against Gilkey and Trice on this ground will be considered.

Plaintiffs correctly note that the County's cross-motion as to plaintiffs' VRA and right of association claims were improperly cast and filed as a cross-motion rather than as a regular motion filed within the deadline for such motions. The only consequence of this choice, however, was to limit plaintiffs' time to respond. *Compare* N.D.N.Y.L.R. 7.1(b)(1) (granting seventeen days to file a response to a motion), *with* N.D.N.Y.L.R. 7.1(c) (granting eleven days to file a response to a cross-motion). Here, plaintiffs were granted additional time to respond, obviating any prejudice, and did in fact file a response. *See* Stipulation/Order filed Nov. 29, 2005 (Docket No. 112); Pls. Reply (Docket No. 113). Accordingly, the County's cross-motion will be considered in all respects.

#### 2. Gilkey and Adverse Inferences

**\*4** Gilkey testified at length under oath on March 17-18, 2004 during the *DeWitt* hearing in state court. *See* Docket No. 100(3), Ex. D. At his deposition in this case on January 28, 2005, Gilkey asserted his Fifth Amendment privilege against self-incrimination in declining to answer various questions. Gilkey Dep. Tr. (Docket No. 100(3), Ex. F) at 11-29. Plaintiffs contend that they are entitled to an adverse inference from Gilkey's refusal to answer those questions. Defs. Mem. of Law at 11-12.

A party testifying in a civil proceeding retains the right under the Fifth Amendment to refuse to answer questions if the answers might tend to incriminate him or her, but an adverse party may then be entitled to have the trier of fact " 'draw a negative inference from the invocation of that right.' " *Wechsler v. Hunt Health Sys., Ltd.,* No. 94 Civ. 8294(PKL), 2003 WL 21998980, at \*2 (S.D.N.Y. Aug. 22, 2003) (quoting *Baxter v. Palmigiano,* 425 U.S. 308, 318-20 (1976)); *see also Brink's, Inc. v. City of New York,* 717 F.2d 700, 710 (2d Cir.1983). Any inference drawn from the invocation of the privilege must be reasonable under the circumstances. *See Brink's, Inc.,* 717 F.2d at 710. Thus, on these motions, Gilkey's invocation of his Fifth Amendment privilege during his deposition will permit whatever negative inferences are reasonable under the circumstances in favor of plaintiffs.

The circumstances presented here, however, include

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 1979048 (N.D.N.Y.)
**(Cite as: Slip Copy)**

not only Gilkey's invocation of his privilege during his deposition but also his unrestricted testimony during the *DeWitt* hearing. The purpose underlying the allowance of an adverse inference in civil cases is equitable, not punitive, and serves to vitiate the prejudice to the party denied discovery by invocation of the privilege. *See United States v. 4003-05 5th Ave.,* 55 F.3d 78, 82-83 (2d Cir.1995). In those instances where Gilkey answered a question during the *DeWitt* hearing, plaintiffs have not been denied discovery as to an answered question and no basis exists for an adverse inference against Gilkey. Therefore, plaintiffs are entitled to adverse inferences from Gilkey's invocation of his Fifth Amendment privilege only to the extent that the questions to which he asserted the privilege were not otherwise answered during his testimony in the *DeWitt* hearing.

The question remains, however, whether any adverse inference from Gilkey's invocation of the privilege is limited to Gilkey or should also be applied against Trice, the County, or both. In *LiButti v. United States,* 107 F.3d 110 (2d Cir.1997), the Second Circuit held that where a non-party declines to answer questions at a deposition in a civil case on the basis of the Fifth Amendment privilege against self-incrimination, adverse inferences may be drawn against a party associated with the witness depending on the circumstances of the particular case. *Id.* at 120-21. The court identified "a number of non-exclusive factors" to guide this determination, including the nature of the relevant relationships, the degree of control over the non-testifying witness, the compatibility of the interests between the non-testifying witness and the party, and the role of the non-testifying witness in the litigation. *Id.* at 123-24. However, "[w]hether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *Id.* at 124.

**\*5** *LiButti* concerned the invocation of the privilege by a non-party witness where the court found that such invocation merited an adverse inference against a party. However, the rationale and analysis of *LiButti* have equal application to a case, as here, where a party invokes the privilege and the question presented is whether the party's invocation merits application of an adverse inference against other parties. At least one district court has followed *LiButti* in determining whether to apply an adverse inference from a party's invocation of the privilege against another party. *See John Paul Mitchell Sys. v.*

*Quality King Distrib., Inc.,* 106 F.Supp.2d 462, 471 (S.D.N.Y.2000). Accordingly, the *LiButti* factors will be considered in determining whether any adverse inference drawn against Gilkey from his invocation of the privilege at his deposition should also be applied against Trice, the County, or both.

As to Trice, his relationship with Gilkey appears to have been close politically and through their employment by the AHA, and their interests have remained intertwined leading up to and continuing through this litigation. Gilkey played a critical role in the events giving rise to this action. There is no evidence that Trice exercised any control over Gilkey's actions, but it appears throughout the underlying events and the course of this litigation that Trice has accepted and followed Gilkey's leadership and actions and joined with Gilkey. *See* Trice Dep. Tr. (Docket No. 100(3), Ex. G) at 58-59 (Trice accompanied Gilkey to solicit absentee ballot applications at Gilkey's request), 79-80 (same); Trice Aff. at ¶ 43 (same); Answers (Docket Nos. 24, 76) (Gilkey and Trice assert joint defenses). Accordingly, under all of the circumstances presented here, imputing adverse inferences from Gilkey's invocation of the privilege to Trice appears trustworthy and any adverse inferences found applicable against Gilkey here will, therefore, also be applied against Trice.

As to the County, however, Gilkey and the Board had no formal or informal relationship. Even viewing the evidence on these motions in the light most favorable to plaintiffs, the Board simply acquiesced in Gilkey's conduct. The weight of the evidence demonstrates at worst that the Board failed to investigate or prevent Gilkey's absentee ballot abuses, not that it directed or joined in any such actions. Moreover, there is no evidence on these motions that the interests of Gilkey and the County are or were aligned in any significant way. Therefore, while, as noted, Gilkey played a central role in the events of this case, any adverse inferences from his invocation of the privilege are insufficiently reliable when considered against the County and any such inferences will not be applied against the County.

### C. Plaintiffs' Constitutional Claims

Plaintiffs' first, second, and fourth causes of action all seek recovery under § 1983 alleging deprivations of their Fourteenth Amendment rights to due process and equal protection of the law and their First Amendment right of association.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1979048 (N.D.N.Y.)
**(Cite as: Slip Copy)**

Page 5

### 1. State Action

**\*6** Like the Fourteenth Amendment, § 1983 proscribes deprivations of rights resulting from state action. _Rendell-Baker v. Kohn,_ 457 U .S. 830, 838 (1982); _see also United States v. Int'l Bhd. of Teamsters,_ 941 F.2d 1292, 1295 (2d Cir.1991) ("Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' "). Thus, to prevail against Gilkey and Trice on a claim under § 1983, plaintiffs must demonstrate that these defendants acted "under color of state law." Plaintiffs assert that they have demonstrated state action by Gilkey and Trice here in either of two ways. First, plaintiffs contend that Gilkey and Trice conspired with the County. Second, plaintiffs contend that this element is satisfied by the employment of Gilkey and Trice by the AHA.

### a. Conspiracy with the County

To determine whether the state action requirement has been demonstrated, a court must first identify "the specific conduct of which the plaintiff complains." _Am. Manufacturers Mut. Ins. Co. v. Sullivan,_ 526 U.S. 40, 51 (1999) (internal quotation marks omitted); _Tancredi v. Metro. Life Ins. Co.,_ 316 F.3d 308, 312 (2d Cir.2003). When a private individual or entity is sued under § 1983, the evidence must demonstrate that the conduct in question is "fairly attributable" to the state. _Am. Manufacturers Mut. Ins. Co.,_ 526 U.S. at 50. "Conduct that is ostensibly private can be fairly attributed to the state only if there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." _Tancredi,_ 316 F.3d at 312- 13 (internal quotation marks omitted) (quoting _Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,_ 531 U.S. 288, 295 (2001) and _Jackson v. Metro. Edison Co.,_ 419 U.S. 345, 351 (1974)).

State action is demonstrated where a state actor has delegated a public function to a private party, exercised "coercive power" over a private party, was "entwined in [the] management or control" of a private party, or provided "significant encouragement, either overt or covert," to a private party, or where a private party willingly acted as a joint participant with the state or was controlled by the state. _Tancredi,_ 316 F.3d at 313 (citations and internal quotation marks omitted). However, approval by the state of otherwise private conduct which occurs within the scope of the state's governmental functions does not suffice to recast otherwise private conduct as state action "where the initiative comes from [the private entity] and not from the State and the state has not put its own weight on the side of the proposed practice by ordering it." _Id._ (citations and internal quotation marks omitted). Thus, mere acquiescence in or approval of private conduct by a state actor will not transform that private conduct into state action. _Id._

**\*7** The specific conduct of which plaintiffs complain here are the abuses of the absentee ballot applications and votes by Gilkey and Trice. The determination of state action on plaintiffs' first theory necessarily focuses on the conduct of the County. Plaintiffs contend that the County conspired with and aided Gilkey and Trice based on the following evidence:
- Leading to the March 2, 2004 special primary election and for years prior thereto, the Board provided unlimited numbers of blank absentee ballot applications to Gilkey and Trice, received completed applications from them, made arrangements for Gilkey and Trice to pick up absentee ballots at the Board office for delivery to voters, and received and counted absentee ballots from Gilkey and Trice which were invalid for various reasons.
- The Board allowed Gilkey unsupervised access to absentee ballots and applications, both blank and completed.
- During his deposition, Gilkey declined to answer whether Trice or any employee or representative of the Board assisted him in the process of altering absentee ballot applications. Plaintiffs urge that an adverse inference be drawn from this invocation of privilege that Trice and employees or representatives of the Board in fact assisted Gilkey in altering absentee ballot applications. Pls. Mem. of Law (Docket No. 100(28)) at 13-15 (citing record bases for contentions); Pls. Reply Mem. of Law (Docket No. 113(8)) at 7-11 (same).

As to this evidence, the provision of bland absentee ballot application forms to Gilkey and Trice is irrelevant as absentee ballot application forms were available to the public at large without restriction, including on the County's website. _See_ <www .albanycounty.com/ uploaded Files/absentee(1).pdf> (visited July 11, 2006). Therefore, the fact that the Board may have made blank applications available to Gilkey and Trice carries no probative value. The record also includes evidence that the Board

processed applications and issued ballots for voters whose applications stated false reasons for needing to vote as an absentee and, directions on multiple applications that the ballots should be held for Gilkey, and handwriting on such notations different from that of the voters.

Viewing this evidence in the light most favorable to plaintiffs, there is little question that the Board had sufficient cause to question and investigate the validity of those applications. *See* N.Y. Elec. Law § 8-402(2) (authorizing a board to order an investigation of an application for an absentee ballot to be conducted either by the board or by a state or county agency). In fact, the processing of applications for ballots for the March 2, 2004 special primary was halted temporarily by a Board employee when questions arose about the legitimacy of fifty to seventy-five applications delivered to the Board by Gilkey, but the two Board commissioners [FN5] determined that the applications should be processed. Rogowshi Dep. Tr. (Docket No. 100 (3), Ex. K) at 39-41. However, state law required the Board to permit absentee voters to designate a third-party to receive and deliver their ballots and required the Board to process and count absentee ballots which met the requirements of state law. *See* N.Y. Elec. Law § 8-406. Plaintiffs have offered no evidence that the County violated any laws, regulations, or policies. *See Marks v. Stinson,* No. Civ. A. 93-6157, 1994 WL 146113, at *3 (E.D.Pa. Apr. 26, 1994) (holding that Pennsylvania law did not permit a board of elections to deliver an absentee ballot to a third-party designee).

> FN5. A board of elections exists in each county outside New York City (which has one board for its five counties) to oversee the registration of voters and the conduct of elections. Each county board is comprised of two commissioners, one from each of the major political parties. N.Y. Elec. Law art. 2 (McKinney 1998 & Supp.2006).

*8 No evidence has been proffered that Gilkey or Trice conspired with any particular Board employee or representative, conferred with any Board employee or representative about their absentee ballot activities, or were directed or controlled in any way regarding their absentee ballot activities by any Board employee or representative. Thus, while it may appear on this record that in the exercise of its discretionary duties, the Board should have investigated the legitimacy of the absentee ballot

applications delivered by Gilkey and Trice, there has been no evidence presented that the County exercised any degree of control over the activities of Gilkey or Trice or did anything other than merely acquiesce in those activities by processing applications and ballots. In fact, the Board rejected up to one-quarter of the applications submitted by Gilkey for the March 2 special primary. *See Gilkey DeWitt* Tr. at 189-90, 218, 285-92 (Gilkey submitted approximately 160-90 applications and received back approximately 130 ballots). Therefore, as to the County, even viewing the evidence in the light most favorable to plaintiffs, plaintiffs have failed to establish state action on their first theory.

As to Gilkey and Trice, however, there remains the question whether any adverse inferences from Gilkey's invocation of his Fifth Amendment privilege suffice to establish or raise questions of fact as to the County's conduct. During his deposition, Gilkey declined to answer sixty questions on privilege grounds. Gilkey Dep. Tr. at 11, 12, 19-36. Of those, there are five that would support adverse inferences that the County was complicit in the activities of Gilkey and Trice:
Q Have you ever obtained from any employee or representative of the Albany County Board of Elections blank absentee ballots?
Q Have you at any time obtained access to voting records from the Albany County Board of Elections when its offices were closed?
Q Have you at any time accessed from the Albany County Board of Elections the original absentee application of any voter?
Q Have you at any time made changes to the original absentee ballot application of any voter after it was filed with the Albany County Board of Elections?
Q At any time have employees or representatives of the Albany County Board of Elections assisted you in the process of altering the absentee ballot application of any voter?

Gilkey Dep. Tr. at 28, 31-33.

In the *DeWitt* case, Gilkey testified at length about absentee ballot applications and the submission of those applications to the Board. However, the central issue at that hearing was whether and how many absentee ballots were improperly cast and counted, not whether the Board was complicit in any of Gilkey's activities. Therefore, while questions to Gilkey during the hearing adverted to the Board, and while Gilkey's answers occasionally referred to contacts with the Board and others in the course of his absentee ballot activities, Gilkey was never

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                    Page 7
Slip Copy, 2006 WL 1979048 (N.D.N.Y.)
(Cite as: Slip Copy)

directly questioned along the lines of the five questions listed above such that plaintiffs should reasonably have elicited answers to those questions during the *DeWitt* hearing.

\*9 Thus, adverse inferences against Gilkey and Trice from Gilkey's invocation of his Fifth Amendment privilege in response to those five questions are appropriate on these motions. The adverse inferences reasonably to be drawn are that the Board improperly provided Gilkey with blank absentee ballots, afforded him access to Board records after business hours, improperly afforded access to filed absentee ballot applications, allowed him to alter absentee ballot applications after they had been filed, and assisted Gilkey in altering absented ballot applications. Considered together with the other evidence, these inferences suffice to demonstrate that the Board joined with Gilkey and Trice knowingly to direct and facilitate their activities.

This evidence is not without contradiction in the record, however. For example, Gilkey and Trice refute any direction, facilitation, or participation by the Board in their activities. *See* Gilkey *DeWitt* Tr. at 269; Trice Aff. (Docket No. 104(2)) at ¶ 17. Accordingly, questions of fact and credibility on this issue preclude summary judgment for either plaintiffs or Gilkey and Trice. Their respective motions on this ground are denied.

### b. AHA Employment of Gilkey and Trice

In their reply and opposition papers, plaintiffs contend in the alternative that the state action requirement is satisfied by the employment of Gilkey and Trice by AHA during their absentee ballot activities. Pls. Reply Mem. of Law (Docket No. 113(8)) at 5-7. This requires a determination whether "there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' " *Brentwood Acad.*, 531 U.S. at 295 (quoting *Jackson*, 419 U.S. at 351); *Tancredi*, 316 F.3d at 312-13. The requirement for "under color of state law" under § 1983 and for state action under the Fourteenth Amendment are identical. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982). The determination of state action rests on the unique facts of each case. *Brentwood Acad.*, 531 U.S. at 296.

Here, plaintiffs have proffered the following evidence. During the period prior to the March 2 special primary, Gilkey was employed by the AHA

as an employment liaison officer under a state subsidy attempting to match AHA residents with available jobs. Gilkey Dep. Tr. at 8-9; Longo Dep. Tr. (Docket No. 100(3), Ex. U) at 38-39. During the same period, Trice was also employed by AHA in a position which, *inter alia,* required him to assist AHA residents in finding employment. Trice Dep. Tr. (Docket No. 100(3), Ex. G) at 29-31.[FN6] In those positions, Gilkey and Trice had access to AHA facilities and contact with AHA residents as government employees. Townsend Park was kept locked at all times and was accessible only to residents, their guests, and AHA employees. Saunders Decl. at ¶ 3. Thus, Gilkey gained entrance to Townsend Park by virtue of his AHA employment. Finally, on February 15, 2004, Gilkey was encountered on the tenth floor of Townsend Park by a tenants' association officer during a visit to solicit absentee ballot applications. *Id.* at ¶ ¶ 5-7. Gilkey falsely stated that he was sent by AHA to repair a leak. *Id.* at ¶ ¶ 7-8. The police were called, but before they arrived, Michael Brown, an Albany City Councilman and a defaulting defendant in this case, appeared. The police arrived, Brown spoke to them, and Gilkey was allowed to leave without being charged and without any report being filed.[FN7] *Id.* at ¶ ¶ 9-12.[FN8]

> FN6. Trice also served as an officer of an AHA tenants' association. Plaintiffs appear to contend that this position constituted government employment for purposes of the state action analysis. *See* Pls. Reply Mem. of Law at 5-6. There is no evidence, however, that the tenants' association was a public rather than a private entity and, therefore, Trice's position with that association will not be considered as a public position.

> FN7. A few days prior to the March 2 special primary, Trice and Gilkey requested permission from the tenants' association to enter the building, but their request was denied. Saunders Decl. at ¶ ¶ 14-15.

> FN8. At his deposition, Gilkey asserted his Fifth Amendment privilege in declining to answer "[h]ave you used your position at [AHA] to obtain information about residents for political purposes?" Gilkey Dep. Tr. at 25. Such invocation warrants an adverse inference against Gilkey and Trice that Gilkey had in fact used his AHA employment to obtain information to

facilitate his absentee ballot activities.

**\*10** If this evidence is credited, it may reasonably be concluded that the AHA employment of Gilkey and Trice was intertwined with their absentee ballot activities in significant respects. In particular, a fact-finder could conclude that Gilkey and Trice gained access to AHA facilities by virtue of their employment, either their actual employment or feigned employment, and from the assistance by Brown in his capacity as a city councilman. These activities of Gilkey and Trice, assisted by Brown, were undertaken under color of law and could reasonably persuade a trier of fact that these actions provided a sufficiently close nexus between the conduct complained of here by plaintiffs and governmental entities.

Gilkey and Trice deny that their employment with AHA played any significant role in their activities. *See, e.g.,* Trice Aff. (Docket No. 1033)) at ¶ ¶ 9-11. For example, most of the absentee ballots collected were from non -AHA residents. *Id.* at ¶ 33. AHA employment was unnecessary for Gilkey and Trice to gain entry to AHA facilities. Longo Dep. Tr. at 15-18. Thus, viewing the evidence in the light most favorable to Gilkey and Trice, there is insufficient evidence to demonstrate the requisite close nexus between Gilkey and Trice and their employment or other governmental entities and their absentee ballot activities. Thus, these conflicts leave questions of fact regarding plaintiffs' proof of state action on this theory and compel denial of the motions of both plaintiffs and of Gilkey and Trice on this ground.

This holding does not alter the determination that plaintiffs have failed to raise a question of material fact as to its right of association claim asserting state action against the County. First, as discussed *supra* in subsection (a), plaintiffs have failed to show that the actions of Gilkey and Trice may be fairly attributed to the County. Second, there has been no showing by plaintiffs that the County knowingly assisted in any way the use by Gilkey and Trice of their AHA employment to facilitate their absentee ballot activities. Finally, plaintiffs have failed to demonstrate that the County participated in any conspiracy with Gilkey or Trice such that the use of AHA employment by Gilkey and Trice might be attributed to the County.

Accordingly, for the reasons stated above, plaintiffs' motion as to the County, Gilkey, and Trice is denied, the County's motion on this ground as to the fourth cause of action alleging denial of plaintiffs' right of

association is granted, and the motions of Gilkey and Trice on this ground are denied.

## 2. Merits

The existence of questions of material fact as to the state action element of plaintiffs' constitutional claims against Gilkey and Trice compel denial of plaintiffs' motion for summary judgment on those claims. These claims will be considered, therefore, solely on the motion of Gilkey and Trice on the due process and equal protection claims and as to Gilkey, Trice, and the County as to the right of association claim. In considering defendants' motions as to those claims, the evidence must be viewed in the light most favorable to plaintiffs as the opposing parties. *See* subsection II(A) *supra.*

### a. Due Process

**\*11** Plaintiffs first cause of action alleges that defendants deprived them of their Fourteenth Amendment right to due process of law. Gilkey and Trice seek summary judgment on that claim on the ground that their conduct did not rise to the level of a constitutional violation.

The right to vote serves as a fundamental guarantee to all citizens of their democratic participation in all matters of their governance. *Shannon v. Jacobowitz,* 394 F.3d 90, 93 (2d Cir.2005) (citing cases). Impairments of that right are prohibited by the Due Process Clause if caused by the intentional conduct of government officials. *Id.* at 94. Permitting ballots to be counted when cast by individuals not qualified to vote under governing law or in a manner not authorized by governing procedures impairs the due process rights of all who cast legitimate votes by diluting the effect of those votes. *See Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 98 (2d Cir.2005); *Marks,* 1994 WL 146113, at \*30. Viewing the evidence in the light most favorable to plaintiffs here, there exists at least a question of fact whether the conduct of Gilkey and Trice caused ballots to be counted which had been cast by means not authorized by state law.

The central inquiry, however, focuses not only on the conduct alleged to have impaired the rights of voters such as plaintiffs here but on the intent of the state actors. The centrality of the inquiry on intent is illustrated by two recent Second Circuit cases, both arising in the Northern District. In *Shannon,* one

candidate and voters in a town election sued a county board of elections under § 1983 alleging that their due process rights were violated when voting machines malfunctioned. The candidate alleged that he was denied votes cast for him and the voters alleged that their ballots had not been counted. The district court granted summary judgment to the plaintiffs and defendants appealed. The Second Circuit reversed, holding that while plaintiffs may in fact have been harmed when the voting machines malfunctioned, plaintiffs had failed to demonstrate that defendants had acted intentionally to cause the harm. *Shannon,* 394 F.3d at 94-97.

In *Hoblock,* voters in the 2004 special election at issue in this case sued the Board under § 1983 alleging a deprivation of their due process rights by the Board's refusal to count certain absentee ballots. The district court granted plaintiffs' motion for a preliminary injunction requiring the Board to tally the absentee ballots in question and defendants appealed. The Second Circuit affirmed issuance of the injunction, holding that plaintiffs had sufficiently demonstrated that the Board acted intentionally by first sending absentee ballots to the voters and then refusing to count them. 422 F.3d at 97-98 ("The key question is whether the Board's actions in sending absentee ballots to the plaintiff voters and then refusing to count them is 'intentional state conduct directed at impairing a citizen's right to vote.' ") (quoting *Shannon,* 394 F.3d at 96).

**\*12** Thus, the central issue presented here by the motions of Gilkey and Trice is whether plaintiffs have offered evidence sufficient to conclude that, as state actors, they acted intentionally with respect to the absentee ballot abuses. Obtaining absentee ballot applications, soliciting voters to complete those applications, asserting false reasons on the applications, delivering the applications to the Board, and receiving back the ballots for the voters all constituted intentional acts by Gilkey and Trice. There has been offered no evidence that either Gilkey or Trice took any action here by accident or through mere negligence.

Accordingly, viewed in the light most favorable to plaintiffs, the evidence is sufficient to raise a triable issue of fact whether Gilkey and Trice deprived plaintiffs of their due process rights. The motions of Gilkey and Trice as to the first cause of action are denied.

**b. Equal Protection**

In their second cause of action, plaintiffs allege that defendants deprived them of their Fourteenth Amendment right to the equal protection of the laws in violation of § 1983. Plaintiffs contend that defendants' conduct denied their right to equal protection by "dilut[ing] the influence of the non-absentee voters' votes by increasing the number of completed ineligible absentee ballots" and by "dilut[ing] the influence of eligible absentee voters' votes by preventing some absentee voters from ever receiving their ballots." Pls. Reply Mem. of Law at 15. Gilkey and Trice seek summary judgment on this claim on the ground that plaintiffs have failed to prove any racially discriminatory intent. Defs. Mem. of Law at 18-21.

The Equal Protection Clause generally protects individuals from state action which causes them to be treated differently from others similarly situated. *See Deegan v. City of Ithaca,* 444 F.3d 135, 146 (2d Cir.2006). "Uneven or erroneous application of an otherwise valid statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.' " *Powell v. Power,* 436 F.2d 84, 88 (2d Cir.1970) (quoting *Snowden v. Hughes,* 321 U.S. 1, 8 (1944)). Thus, an equal protection claim requires proof that an identifiable group was treated differently and that such treatment was both intentional and unreasonable. *See Gelb v. Bd. of Elections,* 224 F.3d 149, 154 (2d Cir.2000). The Equal Protection Clause does in fact protect against discrimination based on race, but it is intentional differential treatment, not simply racially discriminatory motivation, which is required to be shown. There can be a denial of equal protection without proof of a racially discriminatory motive. Therefore, the motion of Gilkey and Trice on this ground is denied.

**c. Right of Association**

In their fourth cause of action,[FN9] plaintiffs allege that defendants deprived them of their First Amendment right of association in violation of § 1983 by denying them the right to vote for candidates of their choice. Pls. Mem. of Law at 23-24. The County, Gilkey, and Trice seek summary judgment on the grounds that the right does not extend to voting in primaries and that plaintiffs have failed to demonstrate any association involving the named plaintiffs with which defendants interfered. County Mem. of Law at 9-12; Gilkey/Trice Mem. of Law (Docket No. 114) at 7-8.

FN9. This cause of action was added in the second amended complaint. *See* Second Am. Compl. at ¶¶ 106-08.

*13 The First Amendment itself is silent as to any right of association. However, the Supreme Court has recognized that such a right exists independent of but derived from the guarantees of speech, press, assembly, and petition in the First Amendment. *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460 (1958). The right protects the associational activities of both individuals and groups. *Republican Party of Conn. v. Tashjian,* 770 F.2d 265, 276-77(2d Cir.1985). As to individuals, the right protects against government intrusion "that select group of intimate relationships and bonds that cultivate shared ideals and beliefs" such as marriage, cohabitation, and parenting. *Id.* at 277 (citing cases). Constitutional protection is accorded these activities and others characterized by "smallness, the intensity of the affiliation, the depth of the commitment and the commonality of beliefs and ideals." *Id.* at 277 n. 21. Such activities merit constitutional protection because of "[t]he emotional enrichment individuals draw from their affiliations with others[ ] and the overriding tendency of individuals to frame their identity by reference to a particular group...." *Id.* at 277 n. 20.

There is no question that the right of association protects the right of an individual to affiliate with a political party, group, or candidate of his or her choice "manifested by contributing money to, or working for, the candidate's campaign, or supporting the candidate in the election.". *Republican Party,* 770 F.2d at 277 (citing *Buckley v. Valeo,* 424 U.S. 1 (1976)). Defendants contend here, however, that plaintiffs' claim on this ground must fail because there is no evidence that any plaintiff was associated in any way with any particular candidate or group with which the activities of Gilkey and Trice interfered. In opposition, plaintiffs assert that one plaintiff's absentee ballot was completed by Gilkey and Trice for a candidate not of his choice and that other voters were misled and intimidated into voting for candidates supported by Gilkey and Trice. Plaintiffs have presented no evidence that party affiliation, candidacy for office, or work on behalf of any candidate was impaired by the activities of Gilkey and Trice.

Therefore, the issue presented is whether interference with the act of voting, without more, constitutes an infringement of the right of association. *Republican*

*Party* compels the conclusion that it does not. As that decision makes clear, the right essentially protects the relationship of an individual to another person or group and activities encompassed within that relationship. Viewing the evidence in the light most favorable to plaintiffs, no relationship between any plaintiff whose vote was affected by the activities of Gilkey and Trice and any candidate or group was affected in any way except for the activity of voting. Plaintiffs have demonstrated no relationship of any plaintiff to any candidate or group having the "intensity", "depth of commitment" or "commonality of beliefs and ideals" recognized as elements of an association protected by the First Amendment. *Republican Party,* 770 F.2d at 277 n. 21. At most, plaintiffs have demonstrated that in an election, voters with no demonstrated relationship to a group or candidate were impeded in casting their ballots for candidates of their choice, not that the activities of Gilkey and Trice impeded their participation in, advocacy for, or support of any particular group or candidate. *Id.* at 277.

*14 Voting, of course, constitutes one activity which may manifest support for a group or candidate. However, voters may cast their ballots for particular candidates in particular elections for many reasons. They may wish to support the positions and ideals of a group or candidate or they may simply opt to cast their ballots for a group or candidate for other reasons not evidencing any relationship, including protest against an opposing group or candidate, choosing a candidate for personal characteristics, or even for no reason at all. In short, the act of voting may afford evidence of the type of relationship protected by the right of association, but while the right to vote is protected by other constitutional provisions, *see* subsections (a) and (b) *supra,* the act of voting alone, without more, cannot suffice to establish the kind of relationship protected under the First Amendment.

Plaintiffs have offered no evidence of any relationship protected by the right of association other than the act of voting. Accordingly, the County, Gilkey, and Trice are entitled to summary judgment on this claim.

### 3. VRA

In their third cause of action, plaintiffs contend that defendants intimidated, threatened, and coerced voters to sign absentee ballots and applications. Gilkey and Trice contend that plaintiffs have failed to demonstrate that Gilkey and Trice were motivated by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

racial discrimination as required by the VRA and that in any event plaintiffs have failed to demonstrate that defendants intimidated, threatened, or coerced any voter. The County contends that plaintiffs have failed to demonstrate that any County employee or representative acted with the requisite knowledge and intent.

As enacted in 1965, the VRA constitutes a "comprehensive scheme to eliminate racial discrimination in the conduct of public elections." *Powell*, 436 F.2d at 86. Section 11(b) of the VRA provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce ... any person for voting ... or ... for urging or aiding any person to vote...." 42 U.S.C. § 1973i(b). This provision does not protect voters against inadvertent or technical violations of voting procedures but against conduct intended to "intimidate, threaten, or coerce." *Id.; see Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir.1985); *Pincham v. Ill. Judicial Inquiry Bd.*, 681 F.Supp. 1309, 1317 (N.D.Ill.1988).

While the purpose of the VRA was to eliminate racial discrimination in voting, § 11(b) of the act does not explicitly require proof that racial discrimination motivated the intimidation, threats, or coercion.[FN10] Thus, a plain reading of § 11(b) refutes the contention of Gilkey and Trice that proof of racial discrimination as a motive must be shown to establish a claim under this provision. *See Hayden v. Pataki*, 449 F.3d 305, 314 (2d Cir .2006) (noting that statutory interpretation first requires examination of the language of the statute itself). Moreover, the legislative history of that section supports this plain reading. The House report on § 11(b) states that "[t]he prohibited acts of intimidation need not be racially motivated; indeed, unlike 42 U.S.C.1971(b) (which requires proof of a 'purpose' to interfere with the right to vote), no subjective purpose or intent need be shown." H.R.Rep. No. 89-439, at 30 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2462. Research has revealed no cases directly deciding this issue. Accordingly, given the plain language and the legislative history of § 11(b), the contention of Gilkey and Trice that this section requires proof that they were motivated by racial discrimination must be rejected.

> FN10. Plaintiffs have proffered no evidence to support a claim that Gilkey and Trice were motivated by racial discrimination. Gilkey is white, but Trice is African-

American and the candidates whom Gilkey and Trice supported in the March 2004 special primary election were both African-American. *See* Trice Aff. (Docket No. 103(2)) at ¶¶ 24-25.

**\*15** Gilkey and Trice also contend that even viewing the evidence in the light most favorable to plaintiffs, no evidence has been adduced to support plaintiffs' claim that Gilkey and Trice intimidated, threatened, or coerced any voter. Gilkey and Trice contend that their actions constituted an effort to "empower" voters to exercise their right to vote, not to intimidate or coerce voters to cast ballots for particular candidates or not to vote at all. Plaintiffs contend that whatever the avowed purpose, "the effect of such action was to intimidate[ ], threaten[ ] and coerce[ ] minority voters." Pls. Reply Mem. of Law at 16. In opposition to defendants' motion, plaintiffs rely on the testimony of three voters and adverse inferences from Gilkey's invocation of his Fifth Amendment privilege.

In the light most favorable to plaintiffs, plaintiff Ashley Perez testified that prior to the March 2 special primary, he was visited at his home by Gilkey and two others. He was told that he could vote more conveniently by absentee ballot, agreed to do so, and watched as Gilkey completed a ballot at Perez's direction. *DeWitt* Hr'g Tr. at 32-53; *see also* Perez Letter (Docket No. 100 (3), Ex. B). However, Perez offered no evidence that Gilkey or anyone else ever threatened him in any way or even that he ever felt intimidated or coerced. *DeWitt* Hr'g Tr. at 32-33, 45 (stating as to one individual accompanying Gilkey that "[h]e did not coerce me.").

Plaintiff Deborah Williams-Muhammad testified that she was already registered with the Board as a permanent absentee ballot voter because of a disability, she was visited at home by Gilkey and Trice before the March 2 special primary, they persuaded her that she needed to file a separate absentee ballot application for the special primary election, she signed an application for them, and she later learned that contrary to her wishes and direction, the absentee ballot had been delivered to Gilkey. *Id.* at 54-71; Trice Dep. Tr. at 111-19; *see also* Williams-Muhammad Letter (Docket No. 100(3), Ex. A). However, Williams-Muhammad's dealings in this regard were all through her personal care assistant and she never spoke directly to Gilkey or anyone associated with him. *DeWitt* Hr'g Tr. at 58-62, 66-68. Moreover, like Perez, Williams-Muhammad offered no testimony suggestive of any acts constituting

Slip Copy
Slip Copy, 2006 WL 1979048 (N.D.N.Y.)
(Cite as: Slip Copy)

Page 12

intimidation, threats, or coercion.

Finally, plaintiff Christine Hughes declares that prior to the March 2 special primary, an African-American male came to her apartment in an AHA building regarding an absentee ballot for her disabled husband, but Hughes refused to admit him to her apartment. Hughes Decl. (Docket No. 100(3), Ex. A). The same man returned later that day with a ballot for her husband, who marked the ballot for a candidate for whom he did not wish to vote because the man told them that their preferred candidate "had not been doing anything for the people down here lately." *Id.* at ¶ 4. Hughes "felt scared and pressured" by the man. *Id.* A white male came to her home later that day to pick up the absentee ballot, was told another had already done so, and was never admitted to Hughes' apartment. *Id.* at ¶ 5. The absentee ballot application directed the Board to "hold for Dennis Bagley," not Gilkey. *Id.* at ¶ 6.[FN11] First, while Hughes declares that she felt scared and pressured, she specifies no acts by the unidentified man which could fairly constitute intimidation, threats, or coercion. Second, there is no evidence in the record that the solicitation of the Hughes application was attributable to Gilkey or Trice.

> FN11. The absentee ballot applications of both Perez and Williams-Muhammad contained notations directing the Board to hold the ballots for Gilkey. *DeWitt* Hr'g Tr. at 50 (Perez), 252 (Williams-Muhammad). Therefore, while neither Perez nor Williams-Muhammad identified Gilkey as the person who solicited the absentee ballot applications, the notations on the applications linked Gilkey to the solicitations of those applications.

**\*16** Thus, while the evidence offered by these three witnesses would fairly support a finding that Gilkey and Trice misinformed, defrauded, tricked, or deceived these individuals, they provide no sufficient basis for a finder of fact to conclude that Gilkey or Trice committed any acts of compulsion as required to prove intimidation, threats, or coercion.

Plaintiffs' VRA claim may survive defendants' motions on this ground, then, only if Gilkey's assertion of his Fifth Amendment privilege affords a sufficient adverse inference to create a question of fact. Plaintiffs have not referred to any particular questions to Gilkey at his deposition which would support an adverse inference in this regard. A review of the transcript of Gilkey's deposition reveals that while Gilkey invoked his privilege as to questions concerning Perez and Williams-Muhammad,[FN12] none of the questions inquired about matters related to intimidating, threatening, or coercing them or any other voter. *See* Gilkey Dep. Tr. at 23-25. Accordingly, no adverse inferences may be drawn against Gilkey and Trice from Gilkey's refusal to answer questions during his deposition which would support plaintiffs' VRA claim. Defendants' motions on this ground are granted.

> FN12. Gilkey was not directly asked any questions about Hughes.

In the alternative, the County also seeks summary judgment on the VRA claim on the ground that there has been no evidence presented that the County participated in any way in the conduct of Gilkey or Trice giving rise to the claim of intimidation, threats, and coercion. The County is correct. Even assuming that the conduct of Gilkey and Trice described herein rose to the level of a violation of § 1973i(b), there has been no evidence proffered that the County participated in that conduct in any way or that it even knew or should have known of that conduct. Therefore, the County is entitled to summary judgment on the VRA claim on this ground as well.

### III. Conclusion

For the reasons stated above, it is hereby

**ORDERED** that:

1. Plaintiffs' motion for summary judgment (Docket No. 100) is **DENIED** in all respects;

2. The County's cross-motion for summary judgment (Docket No. 102) is **GRANTED,** and judgment shall enter for the County as to plaintiffs' third (VRA) and fourth (right of association) causes of action; and

3. The motions of Gilkey and Trice for summary judgment (Docket Nos. 103 and 104) are **GRANTED** as to plaintiffs' third (VRA) and fourth (right of association) causes of action as to which judgment shall enter in favor of Gilkey and Trice, and **DENIED** as to plaintiffs first (due process) and second (equal protection) causes of action.

**IT IS SO ORDERED.**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.