Westlaw.

Not Reported in F.Supp.2d, 2007 WL 1220578 (N.D.N.Y.)
**(Cite as: 2007 WL 1220578 (N.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Arthur and Gail **COWARD**, Plaintiffs,
v.
Michael **GILROY**, Individually and in his Official
Capacity as Family Care Coordinator for the New
York State Office of Mental Retardation and Devel-
opment Disabilities, et. al., Defendants.
**No. 3:05-CV-285.**

April 24, 2007.

Ronald R. Benjamin, Office of Ronald R. Ben-
jamin, Binghamton, NY, for Plaintiffs.

David B. Roberts, Michael G. McCartin, Stephen
M. Kerwin, Office of Attorney General, Albany,
NY, for Defendants.

*DECISION and ORDER*

THOMAS J. McAVOY, Senior United States Dis-
trict Judge.

**\*1** Plaintiffs Arthur and Gail Coward commenced
the instant action pursuant to 42 U.S.C. § 1983
arising out of the revocation of their operating cer-
tificate to provide assisted living for mentally re-
tarded adults. Presently before the Court is Defend-
ants' motion for summary judgment pursuant to
FED. R. CIV. P. 56 seeking dismissal of Plaintiffs'
Complaint.

**I. FACTS**

The Cowards were family care home operators who
participated in the New York State Office of Men-
tal Retardation and Developmental Disabilities
("OMRDD") program to provide assisted living for
mentally disabled adults. In the summer of 2004,

three mentally disabled adults, known as
"consumers," resided with the Cowards.

In August 2004, Gail Coward and Defendant De-
borah Curry, an OMRDD nurse, differed over what
treatment one of the consumers, PV, should receive
for breast cancer. At a consultation, PV's doctor ex-
plained the pros and cons of a mastectomy versus a
lumpectomy. Curry advocated for a mastectomy
while Gail Coward believed that a lumpectomy was
the best course of action. PV's father was informed
of the doctor's recommendation and a second con-
sultation was arranged. This second consultation
was with a doctor in the same office as the first.
The Cowards voiced their concerns over obtaining
a consultation with a doctor in the same office as
the first. As a result, an appointment was arranged
with a doctor in a different office. At the second
consultation on August 30, 2004, Gail Coward as-
serted that "no ones [sic] going to hack and slash
her [PV] because she's mentally retarded." Pl Ex.
B, Casey's Notes, at 6. After this consultation, Kar-
en Casey, PV's OMRDD case worker, visited the
Cowards at their home regarding PV's upcoming
surgery. Gail Coward again voiced her concern
about a mastectomy.

PV's father decided that PV should have a lumpec-
tomy. Caseworker Casey's notes and Nurse Curry's
deposition testimony indicate that PV's father's de-
cision was made on the Cowards' recommendation.
Pl.Ex. W, Curry Testimony, at 78. The surgery was
originally scheduled for September 7, 2004, but res-
cheduled for September 21, 2004. Caseworker Ca-
sey's notes for September 3, 2004 indicate the date
change occurred because September 6, 2004 was a
holiday and pre-operation work was necessary the
day before the surgery. Pl.Ex. B, Casey Notes, at 9.
The Cowards contest this entry and believe that it
was inserted after September 9, 2007.

On September 21, 2004, PV underwent a lumpec-
tomy. During the lumpectomy, PV's doctors con-
cluded that a mastectomy was required due to the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1220578 (N.D.N.Y.)
**(Cite as: 2007 WL 1220578 (N.D.N.Y.))**

spread of PV's cancer. The doctors, therefore, performed a mastectomy.

On September 7, 2004, one of the Coward's other consumers, KC, called 911 from the Broome-Tioga Association for Retarded Citizens ("ARC") Center. During this 911 telephone call, KC complained that Gail Coward had subjected him to psychological abuse. Quain Decl., at ¶ 4. These statements included "I've been threatened ..."; "They cursing me and threatening me last night;" and "She [Gail Coward] said, she don't want to take care of my black ass, cause I'm black and I'm this and that and the other and she threatened me." Def. Ex. A, Quain Decl., Transcript of KC's 911 call, at 1. The ARC staff reported this call to Nurse Curry. Nurse Curry informed her supervisor, Defendant Joseph Mahon. The Cowards contend that Curry or the ARC should have contacted them first about the call. According to KC's psychiatrist, KC suffers from schizoaffective disorder and mental retardation and that his statements and actions are not always based on reality. *See* Pl.Ex. A, Papastrat Aff., at ¶ 32-35.

**\*2** Shortly after the call, Defendant Patricia McDonnell, Director of the Broome Developmental Disabilities Service Office ("Broome DDSO"), started an investigation into whether to revoke the Coward's's operating certificate. McDonnell temporarily suspended their license until the end of the investigation. McDonnell Decl., ¶ 8. Defendant Teresa Quain carried out the investigation on behalf of OMRDD. The three consumers in the Cowards' home were temporarily removed while the investigation was carried out. McDonnell Decl., ¶ 13.

In an October 6, 2004 administrative hearing, the Cowards challenged the temporary removal action of the OMRDD. An independent hearing officer found the temporary license suspension proper. *Id.* at ¶ 14.

Thereafter, McDonnell commenced proceedings to revoke Plaintiffs' license. The stated basis for the revocation was (1) KC's 911 call; (2) corroboration

of the allegations by another consumer; (3) Arthur Coward giving a psychotropic medication to a consumer without first notifying Broome DDSO personnel as required; (4) PV's father's corroboration of an allegation of physical abuse by the Cowards' daughter and failure of the Cowards to report the incident; and (5) the Cowards' refusal to interview a second time with the investigator in violation of their obligation under 14 NYCRR § 687.8(c). McDonnell Decl., at ¶ 15; *see also* Quain Decl., Def. Ex. C.

On November 4, 2004, OMRDD notified the Cowards and their counsel of OMRDD's intent to revoke the operating license. Plaintiffs were advised that they had 30 days to request a hearing to oppose this decision. The Cowards did not timely request a hearing. On December 15, 2004, McDonnell issued a decision revoking the Cowards's operating certificate.

Plaintiffs then filed this action pursuant to 42 U.S.C. § 1983 asserting that OMRDD's investigation was pursued in retaliation for the exercise of their First Amendment rights concerning PV's medical treatment. Second Amend. Compl., ¶ 63.[FN1] Defendants now move for summary judgment pursuant to FED.R.CIV.P. 56 seeking dismissal of the complaint.

> FN1. Plaintiffs also asserted due process claims which were dismissed by decision and order dated August 24, 2005, familiarity with which is presumed.

**II. STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedures governs motions for summary judgment. It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1220578 (N.D.N.Y.)
**(Cite as: 2007 WL 1220578 (N.D.N.Y.))**

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. V. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v.. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). With this standard in mind, the Court will address Defendants' motion.

### III. DISCUSSION

**\*3** To state a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) "that some person has deprived him of a federal right" and (2) "that the person who has deprived him of that right acted under color of state ... law." *Gomez v. Toledo,* 446 U.S. 635, 640 (1980) (citing *Monroe v. Pape,* 365 U.S. 167, 171 (1961)); *see also Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993). Defendants do not dispute that they are state actors for purposes of this suit. Defendants claim that plaintiffs' speech is not constitutionally protected and that, even if it is, there is no causal relationship between this speech and the actions taken against Plaintiffs' license. Defendants McDonnell, Sudano, and Zibell also claim. that they are entitled to absolute im-

munity.[FN2] All other defendants claim qualified immunity.

> FN2. Sidano and Zibell are government employees who acted as OMRDD's attorneys during the administrative proceedings against the Cowards.

Under certain circumstances, speech by public employees or government contractors receives less constitutional protection than that made by private citizens. *See Garcetti v. Ceballos,* 126 S.Ct 1951, 1957-58 (2006); *see also Board of County Comm'rs v. Umbehr,* 518 U.S. 668, 677-79 (1996) (applying the "existing framework for government employee cases to independent contractors" for the purpose of analyzing First Amendment retaliation claims). Therefore, the first issue here is whether the Cowards may be considered to be public employees or government contractors.

The Cowards were licensed operators of an adult home for mentally retarded adults governed by the OMRDD. Second Amend. Compl. ¶ 18; *see also* 14 N.Y.C.R.R. § 687.4 (2006) (providing requirements for certification of family care home). Under this license, OMRDD has the right to investigate and monitor the Cowards' home to protect consumers and enhance the quality of care in these facilities. *See* 14 N.Y. MENT HYG. § 13.07; 14 N.Y.C.R.R. §§ 624 .2, 687.7 (2006). As licensed operators, New York State imposed "duties and responsibilities" including providing for the "medical and health needs of residents." 14 N.Y.C.R.R. § 87.8; *see also* 14 N.Y.C.R.R. §§ 687.2, 687.8. The OMRDD places the "consumers" into the residential homes of the licensed operators. Def. and Pl. Statement of Material Fact, ¶ 3. Accordingly, Plaintiffs as operators of these homes, receive compensation from OMRDD. See Amend. Compl. ¶ 30; *see also* 14 N.Y.C.R.R. § 87.12. Further, the Cowards contend they "suffered an adverse employment action" as a result of their speech. Pl. Mem. Opp. Summary Judg., at p. 29. They also state that "the primary source of the income were the proceeds they received from caring for the consumers who resided

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1220578 (N.D.N.Y.)
(Cite as: 2007 WL 1220578 (N.D.N.Y.))

in their home." Amend. Compl., ¶ 30 (Dkt. No. 40). Their position as licensed operators of an adult home may be analogized to that of public employees or independent contractors of the state. *See Umbehr,* 518 U.S. at 677-79; *see also Claim of Curran,* 145 A.D.2d 759, 759-60 (3rd Dept.1988)("[F]amily care provider[s] ... enter[ ] into a contract with OMRDD."); *Harris v. State,* 117 A.D.2d 298, 301 (2d Dept.1986) ( [A] private person directly involved in the care of a state's client is ... essentially a contract service provider."). The Cowards were contractors, or family care providers, for the OMRDD. Similar to *Umbehr,* Plaintiffs allege that the government terminated their operating license in retaliation for their speech criticizing the defendants. *Id.* at 671.

**\*4** In its recent decision in *Garcetti v. Ceballos,* 126 S.Ct. 1951 (2006), the Supreme Court provided a two-step analysis to determine the constitutional protection given to speech of a public employee or independent contractor. *Id.* A court must first determine whether the employee spoke as a citizen on a matter of public concern or if the employee spoke pursuant to his official duties. *Id.* If he spoke pursuant to his official duties, then the employee has no First Amendment cause of action. If he spoke as a citizen on a matter of public concern, then the possibility of a First Amendment claim arises. *Id.* at 1958; *Skehan v. Village of Mamaroneck,* 465 F.3d 96, 106 (2006). The court must then determine if the speech is protected. *Skehan,* 465 F.3d at 106.

If Plaintiffs' speech had been part of their official duties, the First Amendment would not extend to protect it. *Garcetti,* 126 S .Ct. at 1960; *Skehan,* 436 F.3d at 105. The Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.; see also Healy v. City of N.Y. Dep't of Sanitation,* 2006 WL 3457702, 04-CV-7344, *5 (S.D.N.Y. Nov. 22, 2006) (granting summary judgment because plaintiff's

own complaint alleged speech made "[a]s part of his duties). In their Second Amended Complaint, the Cowards suggest that 14 N.Y.C.R.R. § 87.8 mandated their speech as part of their official duties as home care providers. *See* Second Amend. Compl. ¶ 84-85; *see also* Pl. Mot. Of Law, at p. 26 ("... in obtaining an operating certificate, the Cowards assumed an obligation to foster PV's health, comfort, care and attention as part of their duties under the law."). Indeed, under New York State regulations, the Cowards had certain obligations towards their consumers including the provision of "adequate and humane care for all clients residing in the family care home." 14 N.Y.C.R.R. § 687 .8(f). Similarly, the Cowards were required to "contribute toward the development and implementation of the client's total plan of care," *id.* at 687.8(j); *see also* 14 N.Y.C.R.R. § 87.8(B) ("The family care provider shall participate ... in planning treatment for each resident."). This included providing "for the medical and health needs of the residents" by, among other things, "arranging for routine and emergency medical ... care." 14 N.Y.C.R.R. § 87.8(d)(3). Plaintiffs' speech concerning the most appropriate medical care for one of its consumers was in connection with their obligation to provide care to their consumers. Accordingly, they were speaking as part of their official duties and their speech is not protected. *See Williams v. Dallas Ind. Sch. Dist.,* 480 F.3d 689 (5th Cir.2007).

Assuming, *arguendo,* Plaintiffs were speaking as private citizens, Plaintiffs still must establish a First Amendment violation to succeed on a § 1983 retaliation claim. To establish a First Amendment violation in a 42 U.S.C. § 1983 claim, Plaintiffs must prove "that [they] engaged in protected speech, and that the speech was a substantial or motivating factor in an adverse decision taken by the defendant[s]." *Beechwood Restorative Care Ctr. v. Leeds,* 436 F.3d 147, 152 (2d. Cir.2006) (discussing requirements of First Amendment retaliation claim involving the revocation of a nursing home's operating certificate) (citing *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998)); *see also Skehan,* 465

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2007 WL 1220578 (N.D.N.Y.)
(Cite as: 2007 WL 1220578 (N.D.N.Y.))

F.3d at 106 (2006) ("[T]o establish a First Amendment retaliation claim, plaintiffs must prove that: (1) they engaged in constitutionally protected speech because they spoke as citizens on a matter of public concern; (2) they suffered an adverse employment action; and (3) the speech was a "motivating factor" in the adverse employment decision.")

*5 The Cowards assert that their speech concerning PV's medical treatment is protected because it addressed a matter of public concern. Under the First Amendment, speech that constitutes a matter of public concern is speech that relates to " 'any matter of political, social, or other concern to the community.' " *Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003) (quoting *Connick v. Myers,* 461 U.S. 138, 146 (1983)). The determination of whether speech relates to a matter of public concern is a question of law for the court, and must be "determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. at 148; *Gronowski v. Spencer,* 424 F.3d 285, 292 (2d Cir.2005). To make this determination, the court should focus on the motive of the speaker. *Lewis v. Cowen,* 165 F.3d 154, 163-64 (2d Cir.1999).

The Cowards assert that their speech is protected public speech because it centered around the care and promotion of the health of mentally disabled adults. Pl. Mem. Opp. Summary Judg. at 25-26 (citing N.Y. CONST., art. XVII, § 3; NY MEN. HYG. LAW § 31.03(b)(1) and (2); *DiMarco v. Rome Hosp. & Murphy Mem. Hosp.,* 1991 U.S. Dist. LEXIS 16603 at *22 (NDNY 1991)). Specifically, the Cowards assert "complaints about patient care ... would be a matter of public concern such that they would be constitutionally protected by the first amendment." *Id.* at 26 (quoting *DiMarco,* 1991 U.S. Dist. LEXIS 16603 at *22). However, Plaintiffs reliance on *Dimarco* is misplaced. In *DiMarco,* the plaintiff, a doctor, had shared numerous concerns with the New York State Department of Health regarding the conduct and medical judgment of his colleagues and the nursing staff and the overall practices and management of the defendant hospital. *DiMarco,* 1991 WL 336000, *1-2 (N.D.N.Y 1991). The speech in that case was wide-reaching and dealt with his patients' well-being, the general workings of the hospital, and the community's interest in quality care. The court also judged the speech not to be based on the plaintiff's own personal concerns, but that of his patients and the community. *Id.* at *8; *see also Paradis v. Montrose Memorial Hosp.,* 157 F.3d 815, 818 (10th Cir.1998) (nurse's complaints that doctor only treated patients based on their ability to pay and practicing without a license constituted public speech); *Arnold v. Oklahoma County Bd. Of County Comm'rs,* 77 F.3d 492, 1996 WL 84125, *4 (10th Cir.1996) (unpublished) (pharmacist's statement regarding filling of prescription was protected speech because it indicated improper medical treatment); *Springer v. Henry,* 2004 WL 2127172, *11 (D.Del.2004) (public health care provider's speech on a psychiatric center's dangerous conditions and practices that could lead to suicides and escapes constituted protected public speech addressing an issue of concern for the community).

The instant situation is readily distinguished from *DiMarco, Paradis, Springer,* and *Arnold* considering the content, form, and context of the speech. The Cowards' speech is not constitutionally protected because it does not address an issue of general concern for the public at large. Rather, the speech concerned only whether PV should have a lumpectomy or mastectomy, an isolated, private matter not a public concern. The speech was made during ongoing discussions with PV's doctor over what course of treatment should be pursued for PV's cancer. It occurred only in the doctor's office and in conversations with PV's caseworker, nurse, and father. *See Connick,* 461 U.S. at 147-48; *Dudzik v. City of New York,* 2003 WL 203226, *7 (S.D.N.Y.2003) (noting that plaintiff's choice of forum is a relevant contextual factor; *but see Ezekwo v. N.Y. City of Health & Hosps. Corp.,* 940 F.2d 775, 781 (2d Cir.1991) (stating that a private forum

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1220578 (N.D.N.Y.)
**(Cite as: 2007 WL 1220578 (N.D.N.Y.))**

choice rather than a public forum choice rather than a public forum does not alter the first amendment analysis) (citing *Givhan v. Western Consolidated School Dist.,* 439 U.S. 410, 414 (1979)).

*6 "[T]he mere fact that one or two comments could be construed broadly to implicate matters of public concern does not alter the general nature of [the] statements." *Ezekwo,* 940 F.2d at 781. Like the speech made in *Ezekwo,* the Cowards' statements made were specific and personal in nature and related to their own beliefs and the situation of one of their consumers. *Id.,* at 781 (holding that memorandums written by a Medical Resident describing lack of proper supervision, poor management, and failure of physicians to arrive at lectures on time were private complaints not matters of public concern). Unlike the speech in *Beechwood,* where the nursing home operator continually wrote long public letters advocating changes to Department of Health policy, the Cowards only spoke on one specific private matter. *Beechwood,* 436 F.3d at 150, 152 (holding speech protected by First Amendment because of its public nature). There is no evidence here of formal complaints or complaints concerning systemic concerns thereby bringing their speech into the realm of public concern.

The Cowards' speech and its purpose resemble the speech described in *McGuire v. Warren,* 404 F.Supp.2d 530 (S.D.N.Y.), *aff'd in part, vacated in part, rev'd in part,* 207 Fed. Appx 34, 2006 WL 3456538 (2d Cir.2006) (upholding district court's finding that speech did not constitute public speech and reversing on other grounds). In *McGuire,* a special education teacher contended that letters to parents of a child concerning the child's progression in school were matters of public concern because the care and education of special education children is a matter of public concern. *Id.* at 537. The court held that this was a matter of private interest not public interest. *Id.* The Cowards' interest in the treatment of PV is similar to that of a special education teacher in her students' well-being. Under the facts and circumstances of this case, this interest

does not rise to the level of public interest. Indeed in *McGuire,* the court stated that advocacy for services and rights of one's charges "may be an important issue, however it 'do [es] not necessarily become a matter of public concern simply because in different circumstances the opinions might become the topic of general interest to the public.' " *Id.* (quoting *Flynn v. N.Y. City Bd. Of Educ.,* No. 00-civ-3775, 2002 WL 31175229, at *7 (S.D.N.Y. Sept. 30, 2002)). For the foregoing reasons, the Court finds that the plaintiffs did not engage in protected speech.

**IV. CONCLUSION**

For the foregoing reasons, the Court finds that Plaintiffs were speaking pursuant to their official duties or, alternatively, that they were not speaking on matters of public concern and Defendants' motion for summary judgment is, therefore, GRANTED and the Complaint DISMISSED. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2007.
Coward v. Gilroy
Not Reported in F.Supp.2d, 2007 WL 1220578 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Westlaw Delivery Summary Report for WIENKE,JODY L**

| | |
|---|---|
| Your Search: | TI(rockland /5 vending & creen) |
| Date/Time of Request: | Thursday, September 17, 2009 14:45 Central |
| Client Identifier: | DOJ |
| Database: | USER-DEFINED-MB |
| Citation Text: | Slip Copy |
| Lines: | 2033 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Westlaw.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

Page 1

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
**ROCKLAND VENDING** CORP. and Kenneth
Gallagher, Plaintiffs,
v.
Roxanne **CREEN**, sued in her individual capacity,
Marsha F. Riley, sued in her individual capacity,
and Stewart Kidder, sued in his individual capacity,
Defendants.
**No. 07-CV-6268 (KMK).**

Aug. 4, 2009.

West KeySummary
**False Imprisonment 168** ⬡⟞5

168 False Imprisonment
   168I Civil Liability
      168I(A) Acts Constituting False Imprison-
ment and Liability Therefor
         168k1 Nature and Elements of False Im-
prisonment
            168k5 k. Act or Means of Arrest or
Detention. Most Cited Cases
A vending machine owner failed to raise a genuine
issue of material fact as to his claim that a prison
warden falsely imprisoned him inside the prison as
no reasonable jury would find that there was any
actual confinement or intent to confine him. The
owner argued that the warden's intent not to allow him to
leave the prison with the vending machine proceeds
was sufficient to establish her intent to confine him.
However, the owner's view of confinement, that an
individual who enters a place in order to remove
what he believes is his property is confined if he is
not permitted to leave with that property, was not
supported by any authority. U.S.C.A. Const.
Amend. 4, 14; ; 42 U.S.C.A. § 1983; Fed.Rules
Civ.Proc.Rule 56(c), 28 U.S.C.A.

Michael H. Sussman, Esq., Sussman & Watkins,
Goshen, NY, for Plaintiffs.

Daniel A. Schulze, Esq., Office of the Attorney
General of the State of New York, New York, NY,
for Defendants.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge.

**\*1** Plaintiffs Rockland Vending Corp. ("Rockland")
and Kenneth Gallagher (collectively, "Plaintiffs")
filed this action against Defendants Roxann Creen,
[FN1] Marsha F. Riley, and Stewart Kidder
(collectively, "Defendants"), officials of the New
York State Department of Correctional Services
("DOCS"), in their individual capacities, pursuant
to 42 U.S.C. § 1983 ("Section 1983"). Plaintiffs al-
lege that (1) Creen violated Gallagher's Fourth and
Fourteenth Amendment rights "[b]y holding him
against his will without due process and restricting
his liberty" (Am.Compl.("AC") ¶ 69), (2) all De-
fendants violated Rockland's Fourteenth Amend-
ment due process rights by taking Rockland's prop-
erty "without any pre[-] or post-deprivation pro-
ceeding" (*id.* ¶ 68), and (3) all Defendants violated
Rockland's First Amendment rights by retaliating
against Rockland for "complaints made to the State
Police and public officers" (*id.* ¶ 70). Plaintiffs seek
compensatory and punitive damages, attorney's
fees, and costs.[FN2] (*Id.* ¶ V(e)-(f).) Before the
Court is Defendants' motion for summary judg-
ment. For the reasons stated herein, summary judg-
ment is granted as to all claims.

> FN1. Plaintiffs' Amended Complaint mis-
> spells this Defendant's name as "Roxanne
> Creen."

> FN2. Plaintiffs also seek "temporar[y],
> preliminar[y] and permanent [ ]" injunctive
> relief. (AC ¶ V(c)-(d).) However, such re-
> lief is unavailable in this action, as
> Plaintiffs have brought suit against De-
> fendants only in their individual capacities.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

*See Corr. Officers Benevolent Ass'n v. Kralik,* No. 04-CV-2199, 2009 WL 856395, at *8 n. 7 (S.D.N.Y. Mar. 26, 2009) ("[I]njunctive relief against a state official may be recovered only in an official capacity suit." (internal quotation marks omitted).) The Court thus considers only Plaintiffs' claims for monetary relief.

### I. Background

The Court assumes the Parties' familiarity with the factual and procedural background of this case as it is set forth in Magistrate Judge Paul E. Davison's Report & Recommendation dated February 10, 2009 ("R & R").[FN3] In his R & R, Magistrate Judge Davison recommended that Defendants' motion for summary judgment be granted as to Gallagher's false imprisonment claim and Rockland's due process claim, and denied as to Rockland's First Amendment retaliation claim. (R & R 5.) All Parties filed timely objections to the R & R. Oral argument was held before this Court on June 24, 2009.

> FN3. On the date the original Complaint was filed, the case was referred to Magistrate Judge Mark D. Fox for all purposes. The case was assigned to this Court on August 6, 2007. The referral to Magistrate Judge Fox was reassigned to Magistrate Judge Davison on January 12, 2009.

### II. Discussion

#### A. Standard of Review

*1. Review of Magistrate Judge's Report & Recommendation*

A district court reviewing a magistrate judge's report and recommendation addressing a dispositive motion "may accept, reject, or modify, in whole or in part, the findings or recommendations made by

the magistrate judge." 28 U.S.C. § 636(b)(1); *see also Donahue v. Global Home Loans & Fin., Inc.,* No. 05-CV-8362, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007). Under 28 U.S.C. § 636(b) (1) and Federal Rule of Civil Procedure 72(b), parties may submit objections to the magistrate judge's report and recommendation. The objections must be "specific" and "written," Fed.R.Civ.P. 72(b)(2), and must be made "[w]ithin 10 days after being served with a copy of the recommended disposition," *id.; see also* 28 U .S.C. § 636(b)(1), plus an additional three days when service is made pursuant to Fed.R.Civ.P. 5(b)(2)(C)-(F), *see* Fed.R.Civ.P. 6(d), as was the case here (R & R 18).

Where a party submits timely objections to a report and recommendation-as Plaintiffs did here by submitting objections on February 20, 2009, and as Defendants did here by submitting objections on March 12, 2009, following an extension of time granted by the Court-the district court reviews de novo the parts of the report and recommendation to which the party objected. *See* 28 U .S.C. § 636(b)(1); Fed.R.Civ.P. 72(b)(3); *Donahue,* 2007 WL 831816, at *1. The district court "may adopt those portions of the ... report [and recommendation] to which no 'specific written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." *Eisenberg v. New England Motor Freight, Inc.,* 564 F.Supp.2d 224, 226 (S.D.N.Y.2008) (quoting Fed.R.Civ.P. 72(b)(2)).

*2. Motion for Summary Judgment*

**\*2** Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When ruling on a summary judgment motion, the district court must construe the facts in the light

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Atl. Mut. Ins. Co. v. CSX Lines, L.L. C.,* 432 F.3d 428, 433 (2d Cir.2005). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008) (internal citations omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted); *see also McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

*B. Gallagher's Fourth and Fourteenth Amendment Claims*

Gallagher claims that Creen violated his Fourth and Fourteenth Amendment rights "[b]y holding him against his will without due process and restricting his liberty." (AC ¶ 69.) Magistrate Judge Davison, after considering these claims, concluded that because it is undisputed that Gallagher "voluntarily entered [Shawangunk Correctional Facility ('Shawangunk') ] and never asked to or attempted to leave, and was never told he could not leave," that "the doors were locked only in the manner that was customary," and that Gallagher "believed that ... Creen would allow him to leave so long as he left the vending machine proceeds behind," Gallagher

"failed to set forth evidence from which a reasonable factfinder could determine that the elements of false imprisonment have been established or that the parallel constitutional rights were violated with respect to a deprivation of liberty." (R & R 14 (emphasis omitted).) Magistrate Judge Davison therefore recommended that the Court grant Defendants' motion for summary judgment as to Gallagher's claims. (*Id.* 14-15.) Plaintiffs objected to this recommendation, arguing that they had established a genuine issue of material fact as to whether Gallagher had been falsely imprisoned. (Pls.' Objections to R & R ("Pls.' Obj.") 7-9.) The Court therefore reviews the R & R de novo on this issue, and concurs with Magistrate Judge Davison that summary judgment is warranted.

*3 "A section 1983 claim for false arrest arises under the Fourth Amendment right to be free from unreasonable seizures and is identical to a claim for false arrest under New York law. False arrest and false imprisonment are synonymous under New York law. To establish a claim for false arrest or false imprisonment, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Dones v. City of New York,* No. 07-CV-3085, 2008 WL 2742108, at *6 (S.D.N.Y. July 9, 2008) (internal footnotes and quotation marks omitted). "In addition, [a] false imprisonment claim requires a prima facie showing of actual confinement or threatening conduct." *Albury v. J.P. Morgan Chase,* No. 03-CV-2007, 2005 WL 746440, at *13 (S.D.N.Y. Mar. 31, 2005) (internal quotation marks omitted) (alteration in original). "In the absence of a formal arrest, a seizure under the Fourth Amendment occurs where a 'reasonable person would have believed that he was not free to leave.' " *Munoz v. City of New York,* No. 04-CV-1105, 2008 WL 464236, at *4 (S.D.N.Y. Feb. 20, 2008) (quoting *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

For essentially the reasons stated by Magistrate Judge Davison, Gallagher has failed to raise a genuine issue of material fact as to his claim that Creen falsely imprisoned him in violation of the Fourth Amendment. There is no evidence from which a reasonable jury could find that Creen intended to confine Gallagher within the prison facility. Gallagher argues that Creen's intent not to allow him to leave the prison with the vending machine proceeds is sufficient to establish her intent to confine him, but this view of confinement-i.e., that an individual who enters a place in order to remove what he believes is his property is confined if he is not permitted to leave with that property-is not supported by any authority cited by Plaintiffs, and the Court is unaware of any such authority.

The undisputed evidence is that Gallagher freely entered the prison on May 9, 2007, as he had done several times before (Aff. of Daniel Schulze in Supp. of Mot. for Summ. J. ("Schulze Aff.") Ex. B (Dep. of Kenneth Gallagher ("Gallagher Dep.")), at 12-13, 28-29), that as Gallagher walked through the prison the doors were locked in the normal manner, that Gallagher was taken to the location in the prison where he normally did his job, that no one indicated to Gallagher that he was not free to leave at any time either before or after he serviced the vending machines, that Gallagher never attempted to contact any other person while inside the prison (Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶ 40), that Gallagher never attempted to leave or asked to leave until he had serviced the vending machines and turned over the cash to prison staff (*id.* ¶ 39), and that Gallagher spent only seven minutes longer inside the prison on May 9, 2007 than he did during his previous service call on May 4, 2007 (*id.* ¶ 38). In light of this evidence and Creen's sworn and unchallenged statement that she did not intend to confine Gallagher (Schulze Aff. Ex. F (Aff. of Roxann Creen in Supp. of Mot. for Summ. J. ("Creen Aff.") ¶ ¶ 3-4)), no reasonable jury could find that there was any actual confinement or that Creen intended to confine Gallagher.[FN4]

FN4. Even assuming *arguendo* that Gallagher was confined, no jury could find that Gallagher did not consent to the confinement. This is an independent reason to grant summary judgment as to this claim. *See Albury,* 2005 WL 746440, at *14 ("Plaintiff has failed to offer sufficient evidence of a *prima facie* case of false imprisonment, particularly with respect to [defendant's] intent to confine plaintiff in his office.... [P]laintiff's meeting with [defendant] lasted only eight minutes and there is no evidence that [defendant] indicated to plaintiff in any way that she was not free to leave."); *Cellamare v. Millbank, Tweed, Hadley & McCloy LLP,* No. 03-CV-39, 2003 WL 22937683, at *8 (E.D.N.Y. Dec. 2, 2003) (finding allegations insufficient to state a claim for false imprisonment where plaintiff alleged that she "was brought to a small room, interrogated for hours, called names, not told that she could leave or have counsel present, and was induced to sign [a] statement [stating that she had disclosed her employer's confidential information] with a promise that she would then be able to leave"); *Lee v. Bankers Trust Co.,* No. 96-CV-8153, 1998 WL 107119, at *5 (S.D.N.Y. Mar.11, 1998) (holding that plaintiff's allegations that "three of Defendant's high level security personnel told him that they were former FBI agents" and "prepared a confession for him to sign without permitting Plaintiff to add anything to the statement" did "not amount to an actual confinement or anything more than a lengthy interview," and noting that "[s]ummoning an employee into an interview in familiar surroundings ... does not indicate an intent to confine"). Plaintiffs assert that cases "ar[ising] from lengthy employer/employee interviews" are "distinguishable" (Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Mem.")

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

12), but they do not explain why, and the Court is not aware of any authority supporting the proposition that independent contractors are subject to greater liability for false imprisonment than employers, or that a plaintiff's claim of false imprisonment is strengthened if he is not subjected to questioning during his detention.

*4 The Court briefly notes that Plaintiffs' Amended Complaint alleges that Creen's actions, in addition to violating Gallagher's Fourth Amendment rights against false imprisonment, also violated his Fourteenth Amendment due process rights, and that Magistrate Judge Davison recommended that this due process claim should also be dismissed. Because Plaintiffs' objections to the R & R focused solely on Gallagher's false imprisonment claim and did not specifically object to its conclusion as to Gallagher's due process claim (Pls.' Obj. 7-9), the Court reviews this part of the R & R for clear error only.

The Court finds that there is no error, clear or otherwise, in Magistrate Judge Davison's recommendation that Gallagher's claims be dismissed in full. Gallagher's failure to establish an issue of material fact as to whether he was actually confined negates his claim of a deprivation of liberty for due process purposes; moreover, a due process claim relying on the same facts as a false imprisonment claim cannot be sustained even if confinement could be shown. *See Farag v. United States,* 587 F.Supp.2d 436, 450 n. 22 (E.D.N.Y.2008) ( "[P]laintiffs' Fourth Amendment and Fifth Amendment due-process claims are both premised on the same factual allegations of false arrest and false imprisonment. Consequently, the Fourth Amendment's specific guarantee of freedom from unreasonable seizures, not the Fifth Amendment's general guarantee of due process, provides the appropriate framework of analysis."); *Hall v. Brown,* 489 F.Supp.2d 166, 174-75 (N.D.N.Y.2007) ("Plaintiff's claim that she was deprived of liberty without due process of law, being duplicative of her false imprisonment claim, cannot stand.").

Accordingly, all of Gallagher's claims are dismissed.

*C. Rockland's Fourteenth Amendment Due Process Claims*

Rockland claims that, by retaining the cash collected from Rockland's vending machines on May 9, 2007, and impounding Rockland's machines, "without any pre [-] or post-deprivation proceeding" (AC ¶ 68), Defendants violated Rockland's Fourteenth Amendment due process rights. Magistrate Judge Davison considered these claims and concluded that Rockland had at least raised a genuine issue of material fact as to whether Defendants were obliged to provide predeprivation process before impounding Rockland's machines or retaining the money in those machines. (R & R 9-10.) In particular, because it was undisputed that Defendants had not provided any such proceeding, Magistrate Judge Davison concluded that Rockland had established "for purposes of deciding Defendants' Motion" that Defendants "violated Rockland's due process rights." (*Id.* 10.) However, because "the withholding of equipment and money was objectively reasonable, as a matter of law," Magistrate Judge Davison concluded that "Defendants are entitled to the protection of qualified immunity" as to Rockland's due process claims, and recommended that the Court grant Defendants' motion for summary judgment as to these claims. (*Id.* 12.) Plaintiffs objected to this recommendation, arguing that Defendants were not entitled to qualified immunity. (Pls.' Obj. 3-7.) Defendants objected to the R & R's preliminary conclusion that Rockland had asserted a valid due process claim. (Defs.' Objections to R & R ("Defs.' Obj.") 12-17.) The Court thus reviews de novo this portion of the R & R, and concludes that Defendants are entitled to summary judgment on grounds that Rockland has not established a genuine issue of material fact as to whether its due process rights were violated.

*5 "In order to sustain an action for deprivation of property without due process of law, a plaintiff

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

must first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Employees v. Town Bd. of Town of Huntington,* 31 F.3d 1191, 1194 (2d Cir.1994) (internal quotation marks and emphasis omitted).

### 1. Identifying a Property Right

"Identifying the relevant property interest is ... a two-step process." *O'Connor v. Pierson,* 426 F.3d 187, 196 (2d Cir.2005). "First, [the court] must determine whether some source of law other than the Constitution, such as a state or federal statute, confers a property right on the plaintiff." *Id.* "Once such a property right is found, [the court] must determine whether that property right constitutes a property interest for purposes of the Fourteenth Amendment." *Id.* (internal quotation marks omitted).

In opposing Defendants' motion for summary judgment as to Rockland's due process claims, Rockland asserts that it was deprived of its property rights in "its machines, product and funds" (Pls.' Mem. 13) when Defendants engaged in "self-help at Shawangunk," and when they "refus[ed] to allow plaintiff [to] retrieve its property at Lincoln [Correctional Facility ('Lincoln') ]" (*id.* 14). According to Rockland, it had "settled property interests" in "ownership of the vending machines, [and] the contents thereof, including the proceeds of prior sales." (*Id.; id.* 15 (identifying as property rights the "use of vending machines and their contents, including funds").)

Defendants argue that any property rights Rockland might assert in its vending equipment, products, and proceeds cannot constitute property interests protectable by the Due Process Clause, because it is undisputed that Defendants' actions were "taken pursuant to an interpretation of the contracts the DOCS facilities had with [Rockland]," and "contract disputes ... cannot be morphed into Sec-

tion 1983 actions." (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") 12.) Defendants note that "the type of interest a person has in the enforcement of an ordinary commercial contract often 'is qualitatively different from the interests the Supreme Court has ... viewed as "property" entitled to procedural due process protection,' " *Martz v. Inc. Vill. of Valley Stream,* 22 F.3d 26, 30 (2d Cir.1994) (quoting *S & D Maint. Co. v. Goldin,* 844 F.2d 962, 966 (2d Cir.1988)), and assert that the Second Circuit has avoided extending procedural due process protection to such interests. (Defs.' Obj. 13-14.)

Magistrate Judge Davison correctly concluded that Rockland properly asserted a cognizable property interest in its vending equipment, citing *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers,* 442 F.3d 101 (2d Cir.2006). (R & R 8.) In that case, the Second Circuit held that where the plaintiff ambulance corps "owned the ambulances and other vehicles and equipment that were seized and withheld" by the municipal defendant, those "tangible physical assets ... constituted property within the meaning of the Due Process Clause." *New Windsor,* 442 F.3d at 115. The *New Windsor* court distinguished *S & D Maintenance* as a case in which the plaintiff's claimed property deprivations were the municipal defendant's refusal to pay invoices pursuant to a contract and its termination of a contract between the plaintiff and defendant, noting that the *New Windsor* plaintiff did not claim a "property right to the continuation of its contractual relationship" with the defendant or to "money unpaid" by the defendant. *Id.* Here, as Magistrate Judge Davison noted, it is undisputed that Rockland owned the vending machines at issue. (R & R 8.) Defendants do not address *New Windsor* in their objections to this portion of the R & R (Defs.' Obj. 13-15); instead, they cite *Resource Services, LLC v. City of Bridgeport,* 590 F.Supp.2d 347 (D.Conn.2008), another case of the sort that *New Windsor* distinguished, i.e., one in which a plaintiff alleged "a property interest in a benefit such as the right to collect payment under a contract" or the right to a prospective contract, and claimed deprivation of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

that interest because the government defendant "breached the [existing] contract" or "improperly failed to award [a] contract[ ]" to the plaintiff, *id.* at 358. Here, as in *New Windsor,* Rockland claims a property right in its vending machines independent of any contract with DOCS; it owned the machines before it entered into contracts with DOCS, title never passed from Rockland to DOCS under these contracts, and Defendants' claim of a contractual right to seize the machines is separate from Rockland's claim of a property right in ownership of the machines. *Cf. Ford Motor Credit Co. v. NYC Police Dep't,* 503 F.3d 186, 191 (2d Cir.2007) (stating that a security interest is "indisputably a property interest protected by the Fourteenth Amendment," and distinguishing between the two rights of a secured creditor: "the *contractual* right to repayment of the debt owed and the *property* right to the collateral that secures the debt in the event of nonpayment").

## 2. Deprivation of a Property Right

*6 Having found that Rockland asserted a cognizable property interest in its vending machines, the Court next considers whether there is any disputed issue of material fact as to whether Defendants denied Rockland of that right. Defendants do not specifically contest that DOCS officials caused such a deprivation, and the Court finds no error in Magistrate Judge Davison's apparent finding that Defendants effected a constitutionally cognizable deprivation by "withholding the vending equipment and retaining the money collected by Plaintiffs." (R & R 10.)

## 3. Lack of Due Process

"While it is clear that some form of hearing is required before an individual is finally deprived of a property interest, due process is flexible and calls for such procedural protections as the particular situation demands." *Brody v. Vill. of Port Chester,* 434 F.3d 121, 134 (2d Cir.2005) (internal citation

and quotation marks omitted).

"If [a defendant's] conduct [effecting a deprivation of property] was random and unauthorized ..., the existence of a meaningful post-deprivation remedy ... would automatically satisfy procedural due process." *Rivera-Powell v. N.Y. City Bd. of Elections,* 470 F.3d 458, 466 (2d Cir.2006); *see also DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003) ("Generally, due process requires that a state afford persons 'some kind of hearing' prior to depriving them of a liberty or property interest. However, due process does not require the impossible. Where a deprivation at the hands of a government actor is 'random and unauthorized,' hence rendering it impossible for the government to provide a pre-deprivation hearing, due process requires only a post-deprivation proceeding." (internal citations omitted)). "If, on the other hand, ... [the] decision was part of an established state procedure, such that the availability of a post-deprivation remedy would not *automatically* satisfy due process, [a court must] merely go on to determine what process was due." *Rivera-Powell,* 470 F.3d at 466. What process is due in this latter situation is determined by reference to *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), which instructs courts to "balanc[e] ... three factors." *Rivera-Powell,* 470 F.3d at 466. These factors are:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 335.

Defendants contend that they are entitled to summary judgment on Rockland's due process claim because "even assuming *arguendo* that DOCS' interpretation of the contracts was incorrect and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

[Defendants'] actions constituted a breach, Rockland could sue in State court on the contract and obtain compensatory damages," which would be "a perfectly adequate post-deprivation remedy." (Defs.' Mem. 13.) However, Magistrate Judge Davison concluded that there was a genuine issue of material fact regarding "Kidder's decision-making authority and his involvement in the administration of the contracts at issue," thus barring a finding as a matter of law that Defendants' "conduct [was] 'random' and 'unauthorized' such that post-deprivation remedies could be deemed sufficient"; moreover, Defendants "have not established that a particular post-deprivation remedy was available and sufficient." (R & R 9-10.) Defendants objected to the R & R on this issue, maintaining that "a postdeprivation remedy is sufficient for ordinary contractual disputes." (Defs.' Obj. 17.)

*7 The weight of authority in the Second Circuit supports Defendants' position that a plaintiff alleging property deprivation by way of contract breach has an adequate postdeprivation remedy in a state court breach of contract action or Article 78 proceeding. *See Signet Constr. Corp. v. Borg,* 775 F.2d 486, 491 (2d Cir.1985) (holding that where the plaintiff claimed a "property interest ... [in] the right to prompt payment of monies due" under contracts with a government defendant, and where "it is undisputed that the parties' differences regarding the amounts due under [plaintiff's] various contracts ... will be resolved in ... breach of contract actions ... in the New York State Supreme Court," the postdeprivation remedy of bringing suit in state court was adequate, because "[t]here is ... no risk that [plaintiff] will be deprived permanently of property without a hearing"); *Christ Gatzonis Elec. Contractors, Inc. v. N.Y. City Sch. Constr. Auth.,* No. 93-CV-2418, 1993 WL 666697, at *2 (E.D.N.Y. Sept. 17, 1993) (holding that where the plaintiffs claimed deprivation of sums allegedly due under government contracts, assuming that those deprivations could give rise to a due process claim, "as a matter of law the availability of a postdeprivation hearing in the form of a state court action

based on breach of contract was all the process that was due plaintiffs under the Fourteenth Amendment"); *Washington v. White,* 805 F.Supp. 191, 193 (S.D.N.Y.1992) ("Even assuming arguendo that the alleged contract guaranteed release and thus created a constitutionally protected property interest, plaintiff received an adequate state court remedy, i.e., a breach of contract cause of action."); *cf. Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 881 (2d Cir.1996) (holding that an Article 78 proceeding was an adequate postdeprivation remedy for alleged de facto disbarment of plaintiff contractor).

These cases, however, might be distinguished on the grounds suggested by the Second Circuit in *New Windsor,* as they involve alleged deprivations of the right to contract with the government or the right to receive the benefit of a government contract, rather than deprivation of an interest in property owned by the plaintiff. The Supreme Court explained the potential significance of this distinction in *Lujan v. G & G Fire Sprinklers, Inc.,* 532 U.S. 189, 121 S.Ct. 1446, 149 L.Ed.2d 391 (2001). In *Lujan,* the Court "assume[d] ... that [plaintiff] ha[d] a property interest in its claim for payment [on a government contract]," but held that "it is an interest, unlike the interests discussed [by the Court in previous cases], that can be fully protected by an ordinary breach-of-contract suit." *Lujan,* 532 U.S. at 196. In reversing the lower court's holding that plaintiff was "entitled to a reasonably prompt hearing when payments were withheld," the *Lujan* Court distinguished its prior decisions mandating such a result, noting that "[i]n each of these cases, the claimant was denied a right by virtue of which he was presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation." *Id.* at 195-96; *see also Baird v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205,* 389 F.3d 685, 691 (7th Cir.2004) ("Not all injuries are equal, and not all parties can be made whole through a breach of contract action. The somewhat obscure quality that separates one from the other is important and yet eludes precise

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

definition. The Supreme Court has referred to this mysterious element as a 'present entitlement,' and identifies cases involving this factor as ones in which 'the claimant was denied a right by virtue of which he was presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation.' ").

**8** The Parties have not cited, and the Court is unable to find, any cases directly on point, i.e., where a government defendant, pursuant to his or her interpretation of a contract with the plaintiff, allegedly deprives the plaintiff of property to which the plaintiff claims a present entitlement independent of the plaintiff's contractual relationship with the government. In the absence of such a case, the Court finds that the reasoning of the court in *A. Aiudi & Sons v. Town of Plainville*, 862 F.Supp. 737 (D.Conn.1994), is persuasive in this context. In *A. Aiudi*, plaintiffs asserted a property interest in letter-of-credit funds held by the defendant municipality. *See id.* at 742. Accepting *arguendo* plaintiffs' claim to "a concrete property interest in the actual funds ... disbursed pursuant to the Letter of Credit," which plaintiffs characterized as "the actual ownership of real estate, chattels or money," *id.* (internal quotation marks omitted), the court held that plaintiffs were not entitled to a predeprivation hearing, because the essence of the alleged deprivation was a breach of contract. The court stated:

In breach of contract cases it is difficult to see how the decision complained of, i.e. the determination to engage in behavior that is later challenged as constituting a breach, can ever be said to be based on "some established state procedure." Even if the official nature of the decision by a body to breach a contract renders it analogous to an established procedure, "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the ini-

tial taking, can satisfy the requirements of procedural due process."

*Id.* at 743 (quoting *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).[FN5] The court noted that plaintiffs did not allege that the state failed to provide them a remedy for the alleged breach of contract, and concluded that that postdeprivation process-a breach of contract suit in state court-was adequate. *See id.* "A contrary conclusion," the court held, "would result in the somewhat puzzling holding that, before engaging in behavior that *may* later be judicially determined to constitute a breach, the state must hold some kind of hearing to determine whether the proposed behavior is a breach." *Id.*

> FN5. Thus, the involvement of a high-level official in a deprivation reflecting a mistaken view of a commercial contract does not defeat the conclusion that the deprivation was random and unauthorized. *See Van-Go Transp. Co. v. N.Y. City Bd. of Educ.*, 53 F.Supp.2d 278, 295 (E.D.N.Y.1999) (holding that where "plaintiffs contend that defendants' acts were not random or unauthorized," yet "do not expressly argue that the alleged due process violation at issue was caused by an 'established state procedure,' " instead "claim[ing] that high-level ... officials plotted to deprive [plaintiff] of its property rights to the ... contract ..., plaintiff's claim states a classic case of random, unauthorized acts by individual state or local officials," for which an Article 78 proceeding would have been an adequate postdeprivation remedy for the deprivation of a putatively cognizable property interest). Assuming *arguendo* that there is sufficient evidence from which a reasonable jury could conclude that "Kidder possessed and exercised high-level authority" in orchestrating

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

the impounding of Rockland's property (R & R 9), this is not dispositive proof of an established state procedure that was followed to deprive Rockland of its property and therefore does not negate the possibility that postdeprivation process could adequately satisfy the demands of the Fourteenth Amendment.

The same result should obtain in the instant case. There is no dispute that the alleged deprivation of property here-the seizure of Rockland's vending machines and its contents-was done pursuant to Defendants' interpretation of the contracts between Rockland and the DOCS facilities; the dispute is whether the actions taken were in compliance with or in breach of the contracts. A rule that made Section 1983 liability for such alleged commercial contract breaches depend on the initial ownership of the property at issue would comport poorly with the *Mathews* factors. For instance, such a rule might require DOCS to provide Rockland with a predeprivation hearing before arguably exercising its contract rights by temporarily impounding Rockland's merchandise or else risk having to litigate its contract dispute in federal court in a Section 1983 action, while at the same time limiting Rockland to a breach of contract suit in state court in the event that a government counterparty refused to pay invoices worth millions of dollars. Rockland does not allege that it could not be made whole via a state court suit for damages, nor is there any evidence in the record from which a reasonable jury could so find. [FN6] In other words, assuming *arguendo* that Rockland was deprived of its property interest in its vending equipment for several weeks following May 2007, the postdeprivation remedy of state court litigation was adequate, because "the remedy [wa]s available before the loss ... bec[a]me complete and irrevocable," *Baird*, 389 F.3d at 692 (noting that "[t]he postdeprivation remedies appropriate to the deprivation of an interest to which there is a present entitlement are characterized by promptness and by the ability to restore the claimant to possession").[FN7]

FN6. The Amended Complaint alleges that Rockland's "[l]oss of vending contracts" with DOCS facilities "will decrease [Rockland's] annual gross sales by about $725,000 or 30% and cause [Rockland] irreparable financial harm," and that this "sudden business loss"-not Defendants' allegedly improper seizure of Rockland's vending machines-was what "caused [Rockland] to proceed into Chapter 11 status." (AC ¶¶ 63-64.) Rockland does allege that Defendants' seizure of Rockland's vending machines "impeded its capacity to cover [its] substantial economic losses" (*id.* ¶ 65), but does not assert or offer evidence to prove either that the prompt release of such equipment would have enabled Rockland to stay out of bankruptcy or that the value of the equipment lost to Rockland during the period of the allegedly improper withholding could not be measured and repaid as damages in a state court suit for contract breach.

FN7. The fact that postdeprivation litigation was adequate to protect Rockland's property interests is underscored by the lack of urgency with which Rockland attempted to reassert possession over its vending equipment that had allegedly been impounded at Shawangunk. It is undisputed, for example, that Rockland was "notified in early July, 2007 that DOCS was releasing the machines to Rockland unconditionally" and yet "did not make any attempt to pick up its vending machines from Shawangunk until August 28, 2007." (Defs.' 56.1 ¶¶ 56-57.)

**\*9** A formal analysis under the *Mathews* balancing test confirms that the ability to sue for breach of contract in state court or bring an Article 78 proceeding was all the process due Rockland. First, although Rockland's property interests in possession and control of its vending equipment are not insub-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

stantial, prior to the alleged deprivation Rockland had already willingly given up considerable control over that equipment by entering into contracts with DOCS facilities; moreover, as Defendants point out, a corporation's right to use its property is not akin to the property interests traditionally accorded procedural due process protection, such as welfare benefits and tenured public employment. (Defs.' Obj. 13-14.) *See North Star Contracting Corp. v. Long Island R.R. Co.,* 723 F.Supp. 902, 910 (E.D.N.Y.1989) ("This case is a far cry from cases where the deprivation could result in consequences so serious as the wrongful termination of the right to receive public assistance."). Second, permitting Defendants to seize Rockland's property in pursuit of their asserted right of "self-help" without any predeprivation process would risk erroneous deprivation of Rockland's property interest in its vending equipment in the event that Defendants misinterpreted the relevant contracts, but that deprivation would be temporary and could-unlike, for instance, deprivation of education during a lengthy suspension from school, *see Goss v. Lopez,* 419 U.S. 565, 576, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)-be completely remediated through state court litigation after the fact; thus, requiring additional procedural safeguards would probably add little value. *Cf. United States v. Any & All Radio Station Equip.,* 93 F.Supp.2d 414, 423 (S.D.N.Y.2000) (holding that "while pre-seizure hearings provide additional safeguards and are generally preferable to an *ex parte* seizure, in this case the probable value of a pre-seizure hearing would have been minimal," where "claimants have had the opportunity to be fully heard in the current motions before this Court"). Third, and most importantly, DOCS has an important interest in enforcing what it perceives as its contractual rights without first having to provide its independent contractors with procedures to determine the scope of those rights. *Cf. North Star,* 723 F.Supp. at 910 ("[I]mposing the requirement of a pre-termination hearing every time a state actor wishes to end a contractual relationship would delay work on public contracts and place an undue burden on the state."). To require this would

effectively bar government entities from protecting their commercial contracts through self-help, even if such self-help may be common in a given industry, contravening the principle that "[t]he state, like any private party, must be able to breach contracts without 'turn[ing] every breach ... into a violation of the federal Constitution,' " *TM Park Ave. Assocs. v. Pataki,* 214 F.3d 344, 348-49 (2d Cir.2000) (quoting *Horwitz-Matthews, Inc. v. City of Chicago,* 78 F.3d 1248, 1250 (7th Cir.1996)) (second alteration in *TM Park Ave.*).

**\*10** Accordingly, Defendants are entitled to summary judgment on Rockland's due process claims, because there is no genuine issue of material fact as to the adequacy of the procedures provided to Rockland to protect against deprivation of its property interests.

*4. Qualified Immunity*

In the alternative, assuming *arguendo* that the Fourteenth Amendment entitled Rockland to some predeprivation hearing prior to Defendants' impounding of Rockland's vending equipment, the Court agrees with Magistrate Judge Davison's conclusion that Defendants are nonetheless entitled to qualified immunity. "Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007) (internal quotation marks omitted). "The question of whether a right is 'clearly established' is determined by reference to the case law extant at the time of the violation." *In re County of Erie,* 546 F.3d 222, 229 (2d Cir.2008). "This is an objective, not a subjective, test, and reliance upon advice of counsel therefore cannot be used to support the defense of qualified immunity." *Id.*

As Magistrate Judge Davison noted, "it is undisputed that the Defendants withheld the vending equipment and money based on a belief that con-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

tract law and/or common law principles entitled them to do so." (R & R 12.) For the reasons discussed above, *see supra* Section II.C.3, the Court finds that Rockland had no clearly established constitutional right to notice and opportunity to be heard prior to the deprivations of property at issue. [FN8] The Court therefore agrees with Magistrate Judge Davison that Defendants' belief that they were not violating Rockland's constitutional rights was "objectively reasonable, as a matter of law." (R & R 12.)

> FN8. In response to Defendants' assertion that Creen acted at the direction of DOCS counsel George Glassanos (Defs.' Mem. 22; Defs.' Obj. 7-8), Plaintiffs contend that there is evidence that Creen failed to follow Glassanos's advice, demonstrating that Creen had an improper motive and that her qualified immunity defense should fail. However, as Defendants point out, "subjectively improper intent" is relevant only to Plaintiffs' false imprisonment and retaliation claims (Defs.' Mem. 22), and so the Court need not address this issue in assessing whether Defendants are entitled to qualified immunity as to Rockland's due process claims.

Accordingly, Defendants are entitled to qualified immunity as to Rockland's due process claims.

*D. Rockland's First Amendment Retaliation Claims*

Rockland asserts claims against Defendants for violation of Rockland's First Amendment rights, alleging that in retaliation for Rockland's "requests for assistance from the New York State police and its exercise of the right to petition the government to investigate its grievances," Defendants (1) "cancelled or non-renewed [sic]" Rockland's contracts to provide vending services at DOCS facilities, and (2) "disallowed [Rockland] from retrieving its vending equipment from Lincoln ... in late May 2007" and "from removing one [vending] machine

from [Coxsackie Correctional Facility ('Coxsackie') ]." (AC ¶ ¶ 38-39, 42.) Magistrate Judge Davison concluded that Defendants are not entitled to summary judgment on the merits of these claims, because they "turn on an assessment of each Defendant's subjective intent (about which the parties are in dispute)," and therefore "these claims necessarily require a factual determination for resolution." (R & R 17.) Magistrate Judge Davison also recommended that the Court reject Defendants' assertion of qualified immunity, because "[a]ssuming Plaintiffs' allegations are true (i.e., that Defendants terminated contracts with Rockland in retaliation for Plaintiffs' complaints to the authorities), that conduct would unquestionably violate clearly established law" and "could not be described as objectively reasonable." (*Id.* 16.) Defendants objected to this recommendation (Defs.' Obj. 2-12), and so the Court reviews this portion of the R & R de novo.

*1. First Amendment Retaliation Against Government Contractors*

**\*11** According to the Supreme Court: "The government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption. And, absent contractual, statutory, or constitutional restriction, the government is entitled to terminate them for no reason at all." *Bd. of County Comm'rs v. Umbehr,* 518 U.S. 668, 674 (1996). However, "[t]he First Amendment's guarantee of freedom of speech protects government employees from termination *because* of their speech on matters of public concern. To prevail, an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination. If the employee discharges that burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Id.* at 675 (internal citation omitted).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

In *Umbehr,* the Supreme Court held that courts considering claims of First Amendment retaliation should "apply[ ] [the Court's] existing framework for government employee cases to independent contractors." *Id.* at 677. "To prevail, [an independent contractor claiming retaliation] must show that the termination of his contract was motivated by his speech on a matter of public concern .... If he can make that showing, the [government] will have a valid defense if it can show, by a preponderance of the evidence, that, in light of their knowledge, perceptions, and policies at the time of the termination, the [government] would have terminated the contract regardless of his speech." *Id.* at 685; *see also Afr. Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002) *("Umbehr* addressed and answered ... [the] question ... whether the protections enjoyed by government employees against termination based on protected speech should be extended to the termination of contracts with independent contractors who do business with the government. The Supreme Court held that it should ...." (internal citation omitted)); *Ansell v. D'Alesio,* 485 F.Supp.2d 80, 84 (D.Conn.2007) ("Numerous courts, including the Supreme Court, have concluded that for purposes of retaliation claims brought under the First Amendment, there is no legal distinction between independent contractors with pre-existing contracts ... and full-time employ- ees.").

The Court thus analyzes Defendants' motion for summary judgment on Rockland's First Amendment retaliation claims under the case law governing public employee speech. "To establish a First Amendment retaliation claim, a plaintiff must show: (1) his speech addressed a matter of public concern; (2) he suffered an adverse employment action; and (3) a causal connection between the speech and the adverse employment action." *Singh v. City of New York,* 524 F.3d 361, 372 (2d Cir.2008).

*2. Speech on a Matter of Public Concern*

**\*12** In their motion for summary judgment, Defendants did not dispute that Rockland's complaints addressed a matter of public concern, and their objections to the R & R did not address Magistrate Judge Davison's conclusion that Rockland's "complaints to law enforcement about Defendants' conduct w[ere] protected speech" (R & R 15). However, at the request of the Court during oral argument, the Parties submitted letter briefs on the issue of whether Rockland's complaints constituted speech on a matter of public concern.

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Ruotolo v. City of New York,* 514 F.3d 184, 189 (2d Cir.2008) (internal quotation marks omitted). "The heart of the matter is whether the employee's speech was calculated to redress personal grievances or whether it had a broader public purpose." *Id.* (internal quotation marks omitted). "A generalized public interest in the fair or proper treatment of public employees is not enough" to "transform a personal grievance into a matter of public concern." *Id.* at 190 (internal quotation marks omitted).

Rockland's complaints to law enforcement officials about the May 9, 2007 events at Shawangunk were essentially complaints about a civil contract dispute between Rockland and DOCS-notwithstanding Plaintiffs' various hyperbolic allegations of criminal conduct.[FN9] There is no evidence in the record that Rockland ever alleged that DOCS was pursuing an unfair policy or regularly engaged in illegal practices that affected anyone other than Rockland.[FN10] While Plaintiffs could suggest that their complaints about Gallagher's alleged false imprisonment might involve a matter of public concern, *cf. White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1060 (2d Cir.1993) (observing that "alleged defamation by state police officers of a citizen with whom the police department is doing business may well be a matter of interest to the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

[FN11] it is clear from the record that the complaints merely "stated private commercial grievances that do not appear to relate to any matter of political, social, or other concern to the community," *id.* In fact, the record is devoid even of isolated "comments [that] could be construed broadly to implicate matters of public concern," *Ezekwo v. N.Y. City Health & Hosps. Corp.,* 940 F.2d 775, 781 (2d Cir.1991) (holding that plaintiff's statements, which were "personal in nature and generally related to her own situation," did not address matters of public concern, as the record reflected that plaintiff "was not on a mission to protect the public welfare," notwithstanding her allegations of race and gender discrimination).[FN12]

> FN9. At his deposition, Gallagher testified that when he spoke to the police he thought he was reporting the crimes of "[r]obbery, theft and they were holding me in there." (Gallagher Dep. 72.) What he "[s]pecifically" told the police was that Shawangunk officials "confiscate[d][his] money bags" and that he "thought it was insane that they did that." (*Id.* 70.) Rockland's president, Michael Freed, also told the police that he "thought a crime had been committed." (Schulze Aff. Ex. A (Dep. of Michael Freed ("Freed Dep.")), at 56.) Freed also testified that he spoke to the Ulster County District Attorney, but could not remember anything that was said during the conversation other than the assistant district attorney explaining to Freed, at some length, that "it was a civil matter." (*Id.* 61.) Plaintiffs' current counsel wrote a letter, on behalf of Rockland and Freed, to the New York Attorney General, describing Creen's conduct as "outrageous" and "not in keeping with an orderly society," asserting that Creen "acted in an entirely illegal manner by conditioning Gallagher's freedom on his agreement to break his fiduciary relationship with his employer," and stating that "[c]ondoning

such behavior would be a tragedy for our state and set a terrible precedent." (Schulze Aff. Ex. Z (Letter of Michael Sussman, dated May 28, 2007), at 2.) Freed also sent a letter to Creen, copied to the New York Attorney General, stating that her actions "transcend a business relationship of any kind and were clearly criminal in nature," that she "incarcerated" Gallagher and "denied him his civil rights," that she was "an extremely hateful and sick person," and that she "committed grand larceny and extortion." (Schulze Aff. Ex. S (Letter of Michael Freed, dated June 15, 2007), at 1.)

FN10. In this regard, the instant case presents a situation quite different from *Umbehr,* which was the only authority cited in the R & R for the proposition that Rockland's complaints were protected speech. For one thing, the plaintiff in *Umbehr* was "an outspoken critic of ... the Board of County Commissioners ...; [he] spoke at the Board's meetings, and wrote critical letters and editorials in local newspapers regarding the County's landfill user rates, the cost of obtaining official documents from the County, alleged violations by the Board of the Kansas Open Meetings Act, the County's alleged mismanagement of taxpayers' money, and other topics." *Umbehr,* 518 U.S. at 671. Here, by contrast, the sum total of Plaintiffs' inflammatory statements about Defendants concerned only Defendants' interactions with Rockland regarding its performance on the contract.

FN11. In *White Plains Towing,* the plaintiffs' First Amendment retaliation claim arose out of the same alleged defamation that was the basis of a "stigma plus" due process claim that the district court, following a bench trial, had found meritorious. *See White Plains Towing,* 991 F.2d

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

at 1052. Though the Second Circuit found the due process portion of the district court's judgment "inappropriate" due to the absence of "a finding that there had been any dissemination of defendants' stigmatizing statements sufficient to affect plaintiffs' standing in the community or to foreclose future job opportunities," it agreed that "the potential injury to their reputation stemming from defendants' characterization of [a plaintiff] as dishonest or as related to organized crime, combined with his status as an exclusive assignee of towing rights on a portion of the Expressway, may have sufficed to give plaintiffs a liberty interest that could not properly be terminated without a hearing." *Id.* at 1063.

FN12. The Court notes that Plaintiffs' conclusory attempts to label their complaints as plausible reports of suspected criminal activity, *see supra* note 9, do not change what the evidence shows, which is the existence of a civil contract dispute. *Cf. Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted) (alteration in *Twombly* )).

Accordingly, Defendants are entitled to summary judgment on Rockland's First Amendment retaliation claim on grounds that the allegedly protected speech was not on a matter of public concern.[FN13]

FN13. In their supplemental briefing following oral argument, Plaintiffs advance the argument that Defendants unconstitutionally retaliated against Plaintiffs not for

exercising the First Amendment right to freedom of speech, but rather for exercising the First Amendment right to *petition* government for redress of grievances. (Pls.' Supplemental Mem. of Law in Supp. of First Amendment Claim 5.) According to Plaintiffs, "[r]eports to police seeking redress are constitutionally protected as instances of the right to petition," regardless of "whether the underlying cause of the petition concerns a private or public matter." (*Id.*) In support of this assertion, Plaintiffs do not cite any authority in the Second Circuit, relying solely on *Foraker v. Chaffinch,* 501 F.3d 231 (3d Cir.2007). In *Foraker,* the Third Circuit stated that "a public employee who has petitioned the government through a formal mechanism such as the filing of a lawsuit or grievance is protected under the Petition Clause from retaliation for that activity, even if the petition concerns a matter of solely private concern." *Id.* at 236. Here, Plaintiffs merely made oral and written complaints to the State Police, District Attorney, and Attorney General, and did not formally file a lawsuit or grievance. More importantly, *Foraker* is directly contrary to binding law of the Second Circuit, which has held that "retaliation claims premised on the First Amendment right to petition are subject to [the] public concern requirement," *Cobb v. Pozzi,* 363 F.3d 89, 105 (2d Cir.2004). This is the majority rule in the courts of appeals, and it is has long been settled law in the Second Circuit. *See White Plains Towing,* 991 F.2d at 1059 (holding that "right to petition the government for a redress of grievances ... is generally subject to the same constitutional analysis as the right to free speech" and that "the trial court could properly find plaintiffs' First Amendment claims meritorious only if [plaintiff's] speech constituted comments upon a matter of public concern"); *Peele v.*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

*N.Y. City Dep't of Soc. Servs.,* No. 92-CV-3765, 1995 WL 728478, at *6 (S.D.N.Y. Dec.8, 1995) (noting that *White Plains Towing* is contrary to *San Filippo v. Bongiovanni,* 30 F.3d 424 (3d Cir.1994), the case on which *Foraker* relies). Indeed, it is the law in the Second Circuit that retaliation for filing a lawsuit against a government employer is only actionable under the First Amendment if the lawsuit is speech on a matter of public concern. *See Ruotolo,* 514 F.3d at 189. The Court therefore is constrained to reject Plaintiffs' argument on this issue.

**3. *Adverse Action***

**\*13** Assuming *arguendo* that the complaints to law enforcement officials constituted speech on a matter of public concern, the Court considers the other prongs of Rockland's retaliation claim. With respect to the second prong-whether Rockland suffered adverse action akin to the "adverse employment action" discussed in the case law dealing with government employees-Defendants do not contest that the termination or non-renewal of Rockland's contracts with DOCS facilities would qualify as adverse for purposes of a retaliation claim, arguing instead that Kidder had no personal involvement in the decisions to terminate or not to extend the contracts. (Defs.' Mem. 15-16.) Defendants also argue that the detention of Rockland's vending equipment at Shawangunk "to secure payments" owed to DOCS was "constitutionally de minim[i]s," and that the detention of Rockland's equipment at Lincoln was not adverse at all, since "Rockland was unable to pick it up on May 30, 2007 only because [Rockland] failed to make advance arrangements with the Lincoln facility," and that in any event it was only a two-day detention and thus de minimis. (*Id.* 17; Defs.' Obj. 4.) In his R & R, Magistrate Judge Davison stated that "[t]ermination of a government contract constitutes an 'adverse action' within the meaning of the First Amendment" (R & R 15), and concluded that the following alleged ac-

tions provided grounds for Plaintiff's retaliation claims to survive summary judgment:

> Plaintiffs allege that Defendant Riley impounded [Rockland's] vending machines at Lincoln Correctional Facility; that Defendant Creen impounded vending machines at [Sha]wangunk; and that Defendant Kidder was involved in the impounding of the machines and in the termination of various contracts with Rockland, alleged to have occurred even at facilities where there had been no disputes, where no money was owed or past-due, and where the facility stewards had recommended that [Rockland's] contract be extended.

(*Id.* 17 (internal citations omitted).) These allegations aside, the question is whether there is sufficient *evidence* from which a reasonable jury could conclude that Rockland suffered any actionable adverse action by Defendants.

"[T]he proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dillon v. Morano,* 497 F.3d 247, 254 (2d Cir.2007) (internal quotation marks omitted). "A plaintiff cannot support such a determination unless he can show that an alleged act of retaliation is more than de minimis." *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 226 (2d Cir.2006).

Adverse employment actions may include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Id.* (internal quotation marks omitted). The Supreme Court has made clear that termination of a government contract qualifies as an adverse action for First Amendment retaliation purposes. *See Umbehr,* 518 U.S. at 677 ("To prevail, [the independent contractor] must show that the termination of his contract was motivated by his speech on a matter of public concern ...."). In addition, "[t]he weight of authority supports the proposition that failure to renew a [ ] ... contract may constitute an adverse ...

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

action." *McFarlane v. Chao,* No. 04-CV-4871, 2007 WL 1017604, at *23 (S.D.N.Y. Mar. 30, 2007) (collecting cases).

**\*14** "It is well settled in [the Second] Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (internal quotation marks omitted). "Because personal involvement is a question of fact[,] ... summary judgment may be granted only if no issues of material fact exist and the defendant[ ] is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted) (alterations in original).

*a. Detention of Rockland's Equipment*

The alleged detention of Rockland's equipment at Lincoln, as a matter of law, was not adverse action. Plaintiffs have proffered no evidence from which a reasonable jury could conclude that the two-day delay in retrieving Rockland's equipment from Lincoln was the type of action that was severe enough to deter the exercise of constitutional rights, especially in light of the undisputed evidence that Rockland was not prompt in attempting to collect that equipment (or its equipment at Shawangunk) after receiving permission to do so. *Cf. Menes v. City Univ. of N.Y. Hunter Coll.,* 578 F.Supp.2d 598, 615 (S.D.N.Y.2008) ("Plaintiff's transfer to a position that required him to learn how to use a new computer program imposed at most a de minimis burden and does not constitute an adverse employment action."). Because the delay at Lincoln is the only allegedly retaliatory action in which Riley is alleged to have been personally involved, Riley is entitled to summary judgment as to Rockland's First Amendment claim against her.

With respect to the equipment "held hostage at Shawangunk" (AC ¶ 33), the Amended Complaint does not allege that this action was taken in retaliation for any protected speech. Whereas Plaintiffs allege that the cancellation and non-renewal of Rockland's contracts and the retention of Rockland's equipment at Lincoln were "a direct consequence of [Rockland's] requests for assistance from the New York State police" (*id.* ¶ 38) and "in retaliation for [Rockland's] complaint about the treatment it received at Shawangunk" (*id.* ¶ 42), the only allegation regarding Defendants' intent with respect to the equipment at Shawangunk was that "Creen demanded disputed commissions and threatened to treat [Rockland's] machines as abandoned property if [Rockland] did not pay her disputed sums" (*id.* ¶ 32). As Rockland's alleged refusal to pay disputed sums pursuant to a contract is not alleged to be the basis of Rockland's First Amendment retaliation claim, and in any event does not qualify as speech on a matter of public concern, *see White Plains Towing,* 991 F.2d at 1060 (holding that the airing of "private commercial grievances ... [un]relate[d] to any matter of political, social, or other concern to the community" is not speech on a matter of public concern), Plaintiffs have failed to state a claim that Defendants' actions pertaining to Rockland's equipment at Shawangunk were adverse for purposes of First Amendment retaliation.[FN14]

> FN14. The Amended Complaint also alleges that Kidder retaliated against Rockland with respect to vending machines at Coxsackie. According to Plaintiffs, "upon the direction of defendant Kidder," Rockland was "[1] directed to remove its vending machines and then [2] disallowed from removing one machine because of a dispute concerning payment of commission." (AC ¶ 39 (brackets in original).) Defendants did not specifically address this allegation in their summary judgment motion, other than generally to deny Kidder's involvement in decisions relating to Rockland's contracts. (Defs.' Mem. 15-16.) Plaintiffs restated the allegation in their opposition to the motion, though without adding any dates, other specifics, or citations to the record (Pls.' Mem. 7-8); Defendants again did not specifically respond

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

(Defs.' Reply Mem. in Supp. of Mot. for Summ. J. ("Defs.' Reply Mem.") 5-6.) Plaintiffs did not mention the allegation in their Rule 56.1 statement, nor did Magistrate Judge Davison make reference to it in his R & R. The only citation to record evidence regarding the alleged seizure of equipment at Coxsackie appears in Plaintiffs' submission replying to Defendants' objections to the R & R, in which Plaintiffs refer to a May 10, 2007 email exchange between DOCS deputy counsel George Glassanos and DOCS official Nannette Ferri. (Pls.' Reply to Defs.' Resp. to Pls.' Obj. ("Pls.' Reply Obj.") 15.) In that correspondence, Ferri advised Glassanos that Coxsackie staff wanted to tell Rockland that it could not take its machines on May 30 unless its commissions were fully paid, and Glassanos replied that Coxsackie staff could do so. (Aff. of Michael Sussman in Opp'n to Mot. for Summ. J. ("Sussman Aff.") Ex. 18.) There is no evidence in the record as to whether Coxsackie staff actually prevented Rockland from taking its vending machines on May 30, and no evidence that Kidder was involved in any decision to prevent Rockland from doing so. The evidence is simply that "Rockland picked up all their machines on June 27, 2007." (Schulze Aff. Ex. I (Aff. of Nannette Ferri in Opp'n to Req. for TRO ("Ferri Aff.") ¶ 9(b)).) Thus, the disposition of Rockland's equipment at Coxsackie is not a basis to deny summary judgment on this claim.

### b. Termination and Non-Renewal of Rockland's Contracts

**\*15** Defendants do not dispute that the termination of Rockland's contract with Shawangunk, as expressed in Creen's letter dated May 11, 2007, was an adverse action for purposes of Rockland's retaliation claim. As to the allegation that Defendants re-

taliated against Rockland by cancelling or refusing to renew Rockland's contracts with other DOCS facilities-namely, Eastern Correctional Facility ("Eastern"), Ulster Correctional Facility ("Ulster"), Coxsackie, Woodbourne Correctional Facility ("Woodbourne"), Otisville Correctional Facility ("Otisville"), and Fulton Correctional Facility ("Fulton") [FN15] (AC ¶¶ 38, 53, 57)-Defendants assert that there is no genuine issue of material fact as to whether there was adverse action taken as to those contracts by any of the three Defendants. There is no allegation that either Creen or Riley was personally involved in any action relating to those contracts, and so the issue is whether Plaintiffs have adduced evidence from which a reasonable jury could find that Kidder was involved in the decisions to terminate or not renew the contracts.

> FN15. Plaintiffs allege that the non-renewal of Rockland's contract with Fulton was in retaliation not for Rockland's complaints to law enforcement personnel, but instead for Plaintiffs' filing of their original Complaint in this lawsuit. (AC ¶ 57.) As with the complaints to the police, Ulster County prosecutor, and Attorney General, Plaintiffs' filing of this lawsuit was not speech on a matter of public concern, because the "lawsuit sought to redress [Plaintiffs'] personal grievances" and "did not seek to advance a public purpose," *Ruotolo*, 514 F.3d at 189. The filing of a lawsuit in which a plaintiff alleges adverse acts "bear[ing] upon the circumstances and perquisites of his employment" and resulting in "adverse ... effects that [he] suffered personally," and in which the "relief sought is also almost entirely personal to [him]," is not speech on a matter of public concern. *Id.* at 190; *see also Kempkes v. Marvin*, No. 07-CV-11351, 2008 WL 5330673, at \*8 (S.D.N.Y. Dec. 19, 2008) (holding that the filing of a retaliation complaint was not speech on a matter of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

public concern where "all of defendants' alleged retaliatory ... acts ... related to Plaintiff's employment[,] Plaintiff did not allege that anyone other than himself suffered the effects of defendants' acts[, and] Plaintiff [did not] ... allege[ ] that he sought any relief in order to deter future adverse acts by defendants against others"); *cf. Konits v. Valley Stream Cent. High Sch. Dist.,* 394 F.3d 121, 125-26 (2d Cir.2005) (holding that the filing of a retaliation lawsuit could be speech on a matter of concern where plaintiff had claimed retaliation for her "speech about gender discrimination against a fellow employee that directly implicated the access of the courts to truthful testimony"); *Sassone v. Quartararo,* 598 F.Supp.2d 459, 466 (S.D.N.Y.2009) (holding that plaintiffs stated a claim that their filing of a lawsuit "involved something more than 'the airing of generally personal grievances,' " because it "s[ought] an injunction that would remove the barriers to Plaintiffs' speech as citizens on a matter of public concern ... [and thus] plausibly raised the possibility that prospective injunctive relief could directly benefit the larger public"). Accordingly, Defendants are entitled to summary judgment as to Rockland's retaliation claim based on the non-renewal of the Fulton contract. However, assuming *arguendo* that the filing of the original Complaint in this action was speech on a matter of public concern, the Defendants are still entitled to summary judgment on this claim for the reasons stated below.

In support of their motion for summary judgment, Defendants argue that "the decisions to terminate or not renew ... the Rockland contracts ... were made at the facility level," and that "Kidder had *no contact whatsoever* with the facilities other than Shawangunk in this regard." (Defs.' Mem. 16.) In response, Plaintiffs assert that a jury "could disbe-

lieve [Kidder's] claims of non-involvement" based on (1) the deposition testimony of George Glassanos that he "had several conversations with Kidder as he assisted [Nannette] Ferri and Creen [to] plan the self help at Shawangunk," and (2) the fact that "all the documents from the facilities which manifest an intent to consider termination [of Rockland's] contract[s] are addressed ... to Ferri, Kidder's deputy and a woman he acknowledged speaking with continually about work-related matters." (Pls.' Mem. 19.) In his R & R, Magistrate Judge Davison noted that "Plaintiffs allege ... that Defendant Kidder was involved ... in the termination of various contracts with Rockland," and concluded that "Plaintiffs have therefore set forth sufficient evidence ... to create a genuine issue of material fact." (R & R 17.) However, as Defendants note in their objections to the R & R, on the issue of Kidder's involvement, Magistrate Judge Davison cited only to the Amended Complaint and did not explain what evidence in the record might be the basis for finding that Kidder was involved in decisions to terminate or not to renew Rockland's contracts. (Defs.' Obj. 9.)

Defendants are correct, as there is no evidence in the record from which a reasonable jury could find that Kidder was personally involved in the decisions to terminate or not to renew Rockland's contracts with Eastern, Ulster, Coxsackie, Woodbourne, Otisville, or Fulton. There is no evidence in the record regarding the decisions to terminate Rockland's contract with Ulster [FN16] and not to renew Rockland's contract with Fulton. The only evidence as to Woodbourne is that the Head Account Clerk, Steward, and other facility administrators jointly decided not to renew Rockland's contract in August 2007, and did so without any input from Kidder. (Schulze Aff. Ex. W (Aff. of Deborah Fleury in Supp. of Mot. for Summ. J. ¶¶ 2-3).) The only evidence as to Otisville is that the facility Steward decided to terminate Rockland's contract by letter of July 9, 2007, and did so without any input from Kidder. (Schulze Aff. Ex. X (Aff. of Sandra House in Supp. of Mot. for Summ. J. ¶¶

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

2-3).) The only evidence as to Coxsackie is that a facility administrator informed Rockland, by letter of April 5, 2007, that due to Rockland's nonpayment of commissions and fees its contract would not be renewed.[FN17] (Sussman Aff. Ex. 16.) There is no evidence that Kidder, who was sent a carbon copy of the letter, was involved in this decision, and in any event the decision could not have been in retaliation for Plaintiff's complaints about the Shawangunk incident that had not yet transpired.

> FN16. Apparently Rockland had a single contract covering both Ulster and Eastern. (Ferri Aff. ¶ 9(c); Freed Dep. 120.) Assuming that the evidence as to the non-renewal of the Eastern contract (discussed below) applies equally to Ulster, this would have no impact on the instant motion.

> FN17. Freed stated during his deposition that he did not think Rockland's contract with Coxsackie expired, but rather that it was terminated by Coxsackie prior to its expiration. (Freed Dep. 74-75.)

*16 The only admissible evidence in the record as to Eastern is that the facility Steward, Martha Denardo, made the decision in June 2007 not to extend Rockland's contract, and did so without any input from Kidder. (Schulze Aff. Ex. V (Aff. of Martha Denardo in Supp. of Mot. for Summ. J. ("Denardo Aff.") ¶¶ 2-3).) Plaintiffs point to Freed's deposition testimony that "Marti" told him, "[j]ust prior to their not renewing our extension," that she "did everything [she] could" to get Rockland's contract renewed, and in fact that "[t]hey accused [her] in Albany of being [Freed's] relative," but "[t]hey will not renew any of [Rockland's] contracts because of what is going on." (Freed Dep. 84-85.) As Defendants note (Defs.' Surreply to Pls.' Reply Obj. 6 n. 5), this testimony is hearsay, and thus cannot help Plaintiffs create a genuine issue of material fact. See Fed.R.Civ.P. 56(e)(1) (requiring affidavits opposing summary judgment to "set out facts that would be admissible in evidence"); *Capobianco v. City of New York,* 422 F.3d 47, 55 (2d

Cir.2005) (noting that "inadmissible hearsay ... [is] an insufficient basis for opposing a motion for summary judgment"). Moreover, Plaintiffs' assertion that this testimony supports the inference that Kidder was personally involved in the renewal or termination of Rockland's contracts is based only on speculation-Rockland's president testified that Marti did not mention Kidder's name, and that "[he] can only *guess* based on the conversation [he] had with Marti that when she was talking about Albany that Stewart Kidder is the decisions maker [sic] in Albany" (Freed Dep. 86-88 (emphasis added))-and therefore could not be grounds for defeating summary judgment even if admissible. See *ITC Ltd. v. Punchgini, Inc.,* 518 F.3d 159, 163 (2d Cir.2008) ("Conjecture, of course, is insufficient to withstand summary judgment."). In any event, Denardo clarified in her sworn affidavit that if she had referred to "Albany" in her conversation with Rockland's president, she would have been referring to "the State Comptroller's Office in Albany"-not Kidder's office (DOCS Support Opperations). (Denardo Aff. ¶ 4.) Plaintiffs did not depose Denardo, and during Kidder's deposition they did not inquire about his conversation with Denardo. Therefore, there is no admissible evidence in the record to dispute Denardo's sworn statement that Kidder had no involvement in the termination of the contract with Eastern.

Plaintiffs' view is that Kidder made broad "claims of non-involvement" in the administration of Rockland's contracts that are inconsistent both with Glassanos's testimony that he spoke with Kidder regarding his advice to Creen about retaining the funds from the Shawangunk vending machines on May 9, 2007, and with the contract-related communications between facility administrators and Ferri, who was Kidder's subordinate. (Pls.' Mem. 19.) According to Plaintiffs, a reasonable jury could infer from these purported inconsistencies that Kidder was not telling the truth and that he actually orchestrated the various terminations and non-renewals of Rockland's DOCS contracts. This conjectural leap is not supported by the evidence. First, just as there

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

is no actual evidence that Kidder was involved in the decisions to terminate or not to renew Rockland's contracts, there is no evidence that Ferri was personally involved in the decisions, so linking Kidder to the terminations through her would be futile even if Section 1983 liability could properly be based on such a connection.[FN18] Second, as Defendants point out, for a jury to conclude-in the absence of any evidence aside from its assessment of Kidder's credibility-that Kidder was personally involved in the terminations and non-renewals of Rockland's contracts, the jury would have to disbelieve not only Kidder, but also several other DOCS officials, all of whom denied Kidder's involvement in the relevant decision-making processes. (Defs.' Reply Mem. 6.) Against this evidence, a reasonable jury could not conclude that Kidder was involved. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993) (noting that a party opposing summary judgment "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

> FN18. The Court further notes that Plaintiffs do not argue that Kidder should be held liable for failure to supervise Ferri or any other DOCS official, but instead maintain that Kidder was personally involved in making the decisions adverse to Rockland. If Plaintiffs' theory is that Ferri was directly involved in carrying out the retaliation, Plaintiffs could have named Ferri as a defendant in this action, but did not.

**\*17** Accordingly, Defendants are entitled to summary judgment as to Plaintiffs' allegations that the terminations and non-renewals of Rockland's contracts were adverse actions in which Defendants were personally involved, except with respect to Shawangunk. It is undisputed that the termination of Rockland's contract with Shawangunk was an adverse action for purpose of Rockland's First Amendment retaliation claim, as Defendants concede that Creen terminated the contract.

*4. Causal Connection*

"To establish causation, a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action ...." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 167 (2d Cir.2006) (internal quotation marks omitted); *see also Hoyt v. Andreucci,* 433 F.3d 320, 327 (2d Cir.2006). "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999). "No bright line ... define[s] the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Cioffi,* 444 F.3d at 168 (internal quotation marks omitted) (alteration in original). "Even if the plaintiff demonstrates [a causal relationship], the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse employment action even in the absence of the protected conduct." *Cotarelo v. Vill. of Sleepy Hollow Police Dep't,* 460 F.3d 247, 251-52 (2d Cir.2006) (internal quotation marks omitted). "Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." *Morris,* 196 F.3d at 110.

Defendants argued that Plaintiffs had failed to adduce evidence from which a jury could find a causal relationship between Rockland's protected speech and the adverse actions against Rockland, but Magistrate Judge Davison disagreed, concluding that "Plaintiffs' proffered evidence is ... sufficient to create a genuine issue of material fact" as to "[t]he motive behind ... the contract terminations." (R & R 17.)

With respect to the May 11, 2007 termination of Rockland's contract with Shawangunk-the only al-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

leged adverse action that survives summary judgment as to the first two prongs of a retaliation claim-Defendants are correct in noting that there is no direct evidence in the record supporting the conclusion that Creen decided to terminate Rockland's contract in retaliation for Rockland's complaints to law enforcement,[FN19] but direct evidence of retaliatory intent is not necessary to survive summary judgment. Absent any other context, the fact that Creen terminated Rockland's contract only two days after Rockland made its complaints to law enforcement officials might be sufficient circumstantial evidence of retaliatory motive. However, it is undisputed that on May 10, 2007, the day after Rockland made its complaints, Creen called Rockland "to ask whether Rockland would be sending an employee the following day to stock the vending machines," as it was scheduled to do in performance of the contract. (Defs.' 56.1 ¶¶ 48-49.) It is further undisputed that the next day Rockland did not send an employee to service the vending machines and told Creen that "Rockland would not be sending its employees into the Shawangunk facility again." (Id. ¶¶ 50-51.) Thus, notwithstanding Rockland's May 9 complaints, Creen called Rockland on May 10 and again on May 11 to ask for reassurance that Rockland would perform under the contract-clearly demonstrating that she intended for the contract to continue-and terminated the contract only after receiving unambiguous confirmation that Rockland refused to perform on May 11 or "again" in the future. In light of this chain of events, it is obvious that Creen reacted to Rockland's unwillingness to perform its basic duties of serving the vending machines, and no reasonable jury could find that Rockland's May 9 complaints were a substantial motivating factor in her decision.

> FN19. The Court concludes, for the same reasons discussed above, see supra Section II.D.3.b, that Plaintiffs have adduced sufficient evidence only as to the personal involvement of Creen in the termination of Rockland's contract with Shawangunk. The undisputed evidence is that on May 11,

2007, Creen made the decision, without any direction or encouragement from Kidder, to terminate Rockland's contract (Creen Aff. ¶¶ 5, 7), and on that date Creen and Glassanos jointly drafted a letter to Rockland stating that its contract with Shawangunk was terminated (Defs.' 56.1 ¶ 52). Plaintiffs offer only conjecture that Kidder was involved in this allegedly retaliatory act, asserting that a reasonable jury "could disbelieve [Kidder's] claims of non-involvement," but failing to provide any evidence from which a jury could find that Kidder actually was involved. (Pls.' Mem. 19.)

**\*18** Plaintiffs essentially argue that, in response to Rockland's complaints, Creen intentionally provoked Rockland's repudiation of the contract. According to Plaintiffs, following Rockland's May 9 complaints, "Creen advised [Rockland] that any driver sent [to Shawangunk] would be detained and made to disgorge [Rockland's] proceeds," knowing that Rockland "had protested the same conduct as against Gallagher" and that it would refuse to service the vending machines at Shawangunk, thereby giving Creen an excuse to terminate the contract. (Pls.' Mem. 19.) This explanation cannot be maintained, as it does nothing to cast doubt on the simple conclusion that Creen threatened Rockland that she would repeat her actions of May 9 for the same reasons that she previously took those actions. Whatever motivated Creen to retain the proceeds from the vending machines on May 9-whether she aimed to honestly enforce Shawangunk's putative rights under its contract with Rockland, or to unfairly and improperly gain an advantage over Rockland in negotiating the parties' performance of the contract, or to punish Rockland for some reason-she plainly could not have been motivated by a desire to retaliate against Rockland for complaints to law enforcement that had not yet been made. Plaintiffs contend that a jury could find that Creen retained proceeds from Shawangunk's vending machines on May 9 for some unknown reason, learned

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 23

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

of Rockland's subsequent complaints about her con-
duct, decided to punish Rockland for making those
complaints by threatening to retain proceeds from
the vending machines again as long as she
knew the threat would cause Rockland to repudiate
its contract and give her grounds to terminate it,
and would *not* have made the threat had Rockland
not complained. Considering the ample evidence
that Creen consistently believed that Shawangunk
was entitled to retain proceeds from the vending
machines, the complete lack of evidence that Creen
had any retaliatory animus toward Rockland, and
the implausibility of Plaintiffs' theory of Creen's
motivations, a reasonable jury could not infer a
causal connection merely from the close temporal
proximity between Rockland's complaints and
Creen's termination of the contract.

Thus, Defendants are entitled to summary judgment
on all of Rockland's First Amendment retaliation
claims.

### III. Conclusion

For the reasons stated herein, Magistrate Judge
Davison's R & R is adopted to the extent that it is
consistent with this Opinion. Defendants' motion
for summary judgment is granted in full. The Clerk
of Court is respectfully directed to terminate the
pending Motion (Dkt. No. 20), to grant judgment
for Defendants, and to close this case.

SO ORDERED.

### REPORT AND RECOMMENDATION

PAUL E. DAVISON, United States Magistrate
Judge.

### TO: THE HONORABLE KENNETH M.
### KARAS, UNITED STATES DISTRICT JUDGE

### INTRODUCTION

Plaintiffs    Rockland    Vending    Corporation

("Rockland") and Kenneth Gallagher, a vending
machine service technician for Rockland
("Gallagher") (collectively, "Plaintiffs"), bring this
action under 42 U.S.C. § 1983 against Defendants
Roxanne Creen ("Creen"), Chief Steward of
Shawangunk Correctional Facility
("Shawangunk"), Marsha F. Riley ("Riley"), Chief
Steward of Lincoln Correctional Facility
("Lincoln"), and Stewart Kidder ("Kidder"), Chief
of the Division of Support Operations for the New
York State Department of Correctional Services
("DOCS"). Each defendant is an officer of DOCS
being sued in his or her individual capacity.

*19 Plaintiffs contend: 1) that money and property
of Rockland was illegally taken and/or withheld
from Rockland in violation of its Fourteenth
Amendment due process rights; 2) that Gallagher
was illegally detained by Defendants in violation of
his Fourth and Fourteenth Amendment rights; and
3) that after Plaintiffs reported this purportedly il-
legal conduct to the authorities, Defendants retali-
ated by, *inter alia,* terminating several contracts
Rockland had with DOCS, in violation of Plaintiffs'
First Amendment free speech rights. Before the
Court is Defendants motion for summary judge-
ment, which asserts, *inter alia,* that Defendants are
immune from suit and liability under the doctrine of
qualified immunity.

### FACTS

The incident which gave rise to this action occurred
on May 9, 2007, when Gallagher arrived at
Shawangunk, as part of his regular job duties, to
service and collect money from vending machines
that Rockland maintained there. (Defendants' Rule
56.1 Statement ("Def.St.") ¶ 27; Plaintiffs' Reply to
Defendants' Rule 56.1 Statement ("Pl.St.").) Upon
his arrival, as was routine, Gallagher was escorted
through a series of locked doors to reach the prison
visiting room where the vending machines were
located. (Def. St. ¶¶ 27-30; Plaintiffs' Memorandum
of Law in Opposition to Defendants' Motion for
Summary Judgment ("Opp.") at 5, 11.) At some

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

point after Gallagher arrived at the facility, Creen told him that Rockland owed money under its contract with the facility and that DOCS counsel had instructed Creen to retain the money Gallagher removed from the vending machines that day, rather than allow him to collect and return the proceeds to Rockland as he usually did.[FN1] (Def.St.¶ 31.) There was extended discussion about whether or not Gallagher was authorized to leave the money with Creen, and Creen left the room more than once to attempt at Gallagher's request to contact Gallagher's supervisor by phone. (Def. St. ¶¶ 32-34; Pl. St. ¶¶ 32-34.) Although the parties agree that Gallagher did not ask to leave or attempt to leave the facility, and that no one ever told Gallagher that he was not allowed to leave (Def. St. ¶ 39; Pl. St. ¶¶ 32, 39), Gallagher claims that he believed he was being detained and would not be permitted to leave unless turned over the money from the vending machines to Creen and her staff (Pl. St. ¶¶ 32-33; Opp. at 5). When Creen was not able to reach Gallagher's supervisor, Gallagher reluctantly surrendered the money to Creen and left the facility empty-handed. (*See* Pl. St. ¶¶ 32, 36; *see* Def. St. ¶¶ 32, 34, 36.)

> FN1. The parties disagree about when Creen informed Gallagher of this. Plaintiffs claim Creen did not tell Gallagher of this plan until after he was in the visiting room, behind three sets of locked doors. (Pl. St. ¶ 30; Opp. at 5, 11.) Defendants contend that Creen advised Gallagher of Schwangunk's position when he arrived at the prison entrance. (Def. St. ¶ 31 n. 1.) The parties also disagree as to the reason given to Gallagher by Creen for the demand. Defendants claim that Gallagher was informed that the money would be retained as a measure of "self-help" to offset the money owed by Rockland under the contract. (Def. St. ¶ 31; Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Mot.") at 12.) Plaintiffs deny that Gallagher was informed that the money was being withheld

as a measure of "self-help" under the contract (Pl.St.¶ 31), although they later refer to the incident as one of "self-help" (Opp. at 6.)

Later that same day, phone calls between Creen's supervisor (Kidder) and Gallagher's supervisor (Michael Freed, president of Rockland ("Freed")) ensued and Kidder told Freed to contact counsel for the facility, George Glassanos ("Glassanos"), if he wanted to discuss what had transpired. (Def. St. ¶¶ 41-42; Pl. St. ¶¶ 41-42.) Freed then instructed Gallagher to report the incident to the police, which Gallagher did. (Def. St. ¶ 43; Pl. St. ¶ 43.) When the police failed to respond, Freed reported the incident to the District Attorney's Office, which indicated that it would take no action in what was deemed to be a civil matter. (Def. St. ¶¶ 44-46; Pl. St. ¶¶ 44-46.)

*20 On May 11, 2007, Rockland advised Creen that the vending machines would not be serviced that day because employees were afraid to enter the facility. (Def. St. ¶¶ 51; Pl. St. ¶ 51.) That same day, Shawangunk terminated its contract with Rockland by letter, and announced that the vending machines would be impounded at Shawangunk until Rockland paid the amounts due under the contract. (Def. St. ¶ 52; Pl. St. ¶ 52.) On May 28, 2007, Rockland, through counsel, complained to the New York Attorney General about the May 9, 2007 incident at Shawangunk. (Def. St. ¶ 53; Pl. St. ¶ 53.) Plaintiffs contend that Rockland was soon advised that its contracts with several other prisons were also being terminated: Eastern Correctional Facility (terminated June 8, 2007), Ulster Correctional Facility (terminated June 8, 2007), Coxsackie Correctional Facility (terminated June 12, 2007), Woodburne Correctional Facility (terminated August 24, 2007), Fulton Correctional Facility (terminated August 30, 2007), and Otisville Correctional Facility (non-renewal occurred "[i]n the same time period").[FN2] (Am.Compl.¶¶ 38, 53-57.) [FN3]

> FN2. Defendants have not responded to these allegations by way of answer or mo-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

tion and they are therefore assumed to be true for purposes of deciding the instant motion.

FN3. Plaintiffs also claim that, in retaliation for their reporting of the May 9, 2007 incident with Gallagher, Defendants demanded that Rockland remove its vending machines from the Lincoln facility by May 30, 2007, but then refused to allow the machines to be removed or serviced by Plaintiffs. (Am. Compl. ¶¶ 49-52; Opp. at 8-9.) Defendants deny this allegation, claiming instead that the Lincoln contract was terminated *before* the May 9, 2007 incident. (Mot. at 5, 14-15.)

Plaintiffs contend that these contract terminations were carried out by Defendants in retaliation for Plaintiffs' complaints to law enforcement about the May 9, 2007 Shawangunk incident involving Gallagher. (Am.Compl.¶¶ 38-48, 53-60.) In support of the retaliation claim, Plaintiffs assert that there had never been any disputes or claims of overdue payment at some of the facilities which terminated their contracts, and that staff at some of those facilities advised Rockland as late as June of 2007 that the contracts were going to be renewed. (Am.Compl.¶¶ 43-48.) Defendants deny that these contracts were terminated in retaliation for Plaintiffs' complaints and claim non-retaliatory reasons for terminating the contracts. (Mot. at 13-16.)

Plaintiffs commenced the instant action on July 9, 2007, seeking a temporary restraining order to allow Rockland to pick up its vending machines at Shawangunk without making payment on the contract, an injunction prohibiting Defendants from breaking or terminating any more contracts with Rockland in retaliation for its complaints to law enforcement, and compensatory and punitive damages. (Compl. ¶¶ 10-11; Mot. at 11; Pl. St. ¶ 56; Def. St. ¶ 56.) Thereafter, Shawangunk agreed to release the vending machines without receiving payment from Rockland, and Rockland ultimately

collected the machines on or about August 28, 2007. (Mot. at 11; Pl. St. ¶ 57; Def. St. ¶ 57.)

**JURISDICTION AND POSTURE**

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.[FN4] Defendants now move for summary judgment on grounds of, *inter alia,* qualified immunity. For the reasons that follow, I recommend that summary judgment be granted as to Plaintiffs' deprivation of liberty and property claims, and denied as to Plaintiffs' First Amendment retaliation claims.

FN4. This case was referred to a magistrate judge on July 9, 2007, under Standing Order M-10-468 issued by Chief Judge Kimba M. Wood on December 18, 2006.

**DISCUSSION**

**I. Summary Judgment**

\*21 Summary judgment is appropriate when the pleadings and evidence submitted to the district court establish that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). In determining whether the moving party is entitled to judgment as a matter of law, the court must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 162 (2d Cir.2006). The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful. *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998). A court may grant summary judgment when no reasonable jury could find

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

in favor of the non-moving party. *Id.*

## II. Qualified Immunity

For each count of the Complaint, Defendants assert the affirmative defense of qualified immunity. (Mot. at 2, 20-22.) Qualified immunity shields government officials "from liability for civil damages insofar as their conduct [in performing discretionary functions] does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kerman v. City of New York,* 374 F.3d 93, 108 (2d Cir.2004) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). It is designed to protect government officials not only from liability but from the burdens of having to defend against litigation as well. *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007). For this reason, courts are directed to resolve the issue of qualified immunity, where possible and appropriate, prior to trial and as early on in the litigation as possible. *Burns v. Citarella,* 443 F.Supp.2d 464, 468 (S.D.N.Y.2006).

Although the Supreme Court has recently changed course and no longer mandates that, when addressing a claim of qualified immunity, the "requisites of a qualified immunity defense must be considered in proper sequence," *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *receded from by Pearson v. Callahan,* --- U.S. - - - -, 129 S.Ct. 808, 172 L.Ed.2d 565, 2009 WL 128768, at *9 (2009), the court still has discretion to perform the analysis in whatever order it deems most appropriate in light of the circumstances at hand. --- U.S. - - - -, 129 S.Ct. 808, 172 L.Ed.2d 565, 2009 WL 128768, at *9. In the absence of any compelling reason to deviate from the traditional sequence in this case, I will consider the requisites of qualified immunity in the order set forth by *Saucier.* That sequence requires that the court first consider whether the official's conduct violated a federal constitutional right. 533 U.S. at 201. If it is determined that the conduct did violate a constitutional right, the court next considers whether the right was

"clearly established" and, if so, whether the official's actions were "objectively reasonable." *Id. See also Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211-12 (2d Cir.2003). As a general rule, officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. *Kerman,* 374 F.3d at 108.

**\*22** Having addressed the relevant standards for considering the claims and defenses asserted by the parties, I turn now to each of Plaintiffs' claims.

## III. Plaintiffs' Deprivation of Property Claims (Fourteenth Amendment Claim)

Plaintiffs claim that "[b]y taking [Rockland's] property without any pre or postdeprivation proceeding in an intentional, not random, manner, defendants denied [Rockland's] right to due process of law as protected by the Fourteenth Amendment, as made actionable by 42 U .S.C. sec.1983." (Am.Compl.¶ 68.) Defendants admit that Creen demanded and retained the proceeds from the vending machines serviced on May 9, 2007, and that Rockland's vending machines were impounded (at least temporarily), all without any pre-deprivation or postdeprivation proceeding. (Def St. ¶¶ 30-31, 52.) Defendants assert, and Plaintiffs agree, that Defendants withheld the money and equipment due to Defendants' claim that past-due money was owed to them under one or more of the contracts at issue. (Def. St. ¶¶ 24-26, 30-31; Opp. at 6, 13-14.) It is Plaintiffs' position that Defendants were not entitled, either by contract or common law principles, to withhold the money or equipment. (Opp. at 13-16.) Defendants now claim they are protected from liability under the doctrine of qualified immunity. (Mot. at 20-22.)

Following the traditional *Saucier* analysis outlined above for assertions of the defense of qualified immunity, and construing all evidence in favor of Plaintiffs, I will first determine whether or not the actions of Defendants constituted a violation of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

Plaintiffs' due process rights. To sustain a § 1983 claim based on an alleged violation of due process, a plaintiff must show (1) possession of a liberty or property interest protected by the Constitution or federal statutes and (2) deprivation (by an official) of that liberty or property interest without due process. *Little v. City of New York,* 487 F.Supp.2d 426, 442 (S.D.N.Y.2007) (citing *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002)). In the instant case, it is indisputable that Plaintiff Rockland had a property interest in the vending equipment withheld by Defendants because, as both parties agree, Rockland owned the machines (Def. St. ¶¶ 13, 52; Pl. St. ¶¶ 13, 52). *See New Windsor Volunteer Ambulance Corps., Inc. v. Meyers,* 442 F.3d 101, 115 (2d Cir.2006). Rockland also had a property interest in the money withdrawn by Gallagher from the machines. *See Luian v. G & G Fire Sprinklers, Inc.,* 532 U.S. 189, 195-96, 121 S.Ct. 1446, 149 L.Ed.2d 391 (2001). The next issue that must be decided then, is whether Rockland was deprived of these interests without due process.

Plaintiffs argue that they were entitled to notice and a hearing *before* the equipment and money were withheld. (Opp. at 13-16.) Defendants argue that *post*-deprivation remedies are available to Plaintiffs and will provide sufficient process. (Mot. at 13; Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("Reply") at 3.) While it is true that, in general, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property," *New Windsor Volunteer Ambulance Corps., Inc.,* 442 F.3d at 115, post-deprivation remedies can provide constitutionally sufficient process in circumstances where the deprivation was caused by a state agent's conduct that was "random" and "unauthorized." *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003), *cert. denied,* 541 U.S. 988, 124 S.Ct. 2018, 158 L.Ed.2d 492 (2004). For the conduct to be "random" and "unauthorized" such that post-deprivation remedies could be deemed sufficient, the state agent must have been a lower-level employee, one who does not have the final au-

thority over the decision-making process regarding the matter. *Id.* at 303-03. Here, the parties disagree over the extent of Defendant Kidder's decision-making authority and his involvement in the administration of the contracts at issue. Defendants claim Kidder had virtually no authority or involvement with the administration, renewal, or termination of contracts with Rockland. (Def.St.¶¶ 6-7.) Plaintiffs claim Kidder possessed a high level of authority and had extensive involvement in decisions pertaining to Rockland's contracts. (Pl. St. ¶¶ 5-7, 9, 42, 47; Plaintiff's Statement of Material Facts (within Pl. St.) ("Pl.St.Mat.Facts") ¶ 10.) Therefore, resolving all ambiguities and drawing all justifiable factual inferences in favor of Plaintiffs, as is required upon this motion for summary judgment, the court must assume that Defendant Kidder possessed and exercised high-level authority and therefore cannot hold that post-deprivation remedies were sufficient or that Plaintiffs were not entitled to pre-deprivation notice and hearing.

**\*23** Moreover, although Defendants assert that "the availability of an adequate post-deprivation remedy also defeats plaintiff's Due Process claim" (Mot. at 13), Defendants have failed to identify the specific remedy which was available to Plaintiffs. The remedies deemed sufficient in the cases cited by Defendants are not obviously applicable and sufficient remedies for the case at hand.[FN5] Because Defendants have not established that a particular post-deprivation remedy was available and sufficient, and construing the evidence in the light most favorable to Plaintiffs, the Court must apply the default rule by which, in general, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *New Windsor Volunteer Ambulance Corps., Inc.,* 442 F.3d at 115; *see also DiBlasio,* 344 F.3d at 302. It is undisputed that there was no pre-deprivation notice and hearing regarding the taking and/or withholding of funds or vending equipment by Defendants. This Court therefore concludes that, for purposes of deciding Defendants' Motion for Summary Judgment, withholding the vending equipment and retaining the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

money collected by Plaintiffs, without any pre-deprivation proceeding, violated Rockland's due process rights.

> FN5. *Costello v. Town of Friends* involved a bargaining agreement that provided grievance procedures specific to that particular agreement. 811 F.2d 782 (2d Cir.1987). *TM Park Avenue Associates v. Pataki* involved claims surrounding legislation that allegedly deprived plaintiffs of their due process rights and about which the court explicitly declined to make any findings, in light of a simultaneously pending contract action that would resolve the dispute without the court needing to reach Fourteenth Amendment issues. 214 F.3d 344, 350 (2d Cir.2000). *Hellenic American Neighborhood Action Committee v. City of New York* involved use of an Article 78 proceeding as a post-deprivation remedy-a remedy that Defendants fail to demonstrate is applicable and sufficient in the instant case. 101 F.3d 877 (2d Cir.1996).

The next step in the qualified immunity analysis requires a determination as to whether the right violated was "clearly established" and, if so, whether the official's actions were "objectively reasonable." "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made.... If the offic [ial]'s mistake as to what the law requires is reasonable, however, the offic [ial] is entitled to the immunity defense." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002). Therefore, in short, if an official's conduct is mistaken but reasonable, the official is entitled to the protection of qualified immunity. If the right violated was not "clearly established," then an official can not be deemed to have been acting in an objectively *un* reasonable fashion in violating the right, and, therefore, would be entitled to the protection of qualified immunity. *See Grilles v. Repicky,* 511 F.3d 239, 244 (2d Cir.2007); *Malley v. Briggs,* 475 U.S. 335, 341, 106

S.Ct. 1092, 89 L.Ed.2d 271 (1986). If the right was "clearly established," the official will still be protected by qualified immunity if it was objectively reasonable for him or her to have believed that the conduct did not violate the plaintiff's right. 475 U.S. at 340-41; *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995).

Whether or not a right was "clearly established" is a matter of law. *Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). A right is deemed "clearly established" if there is Supreme Court case law (or other pre-existing, controlling precedent) that supports the existence of the right. *See Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993). At the time of the incidents at issue, there was Supreme Court case law confirming that deprivation by Defendants of the vending equipment and money being removed from the vending machines (in which Rockland had an interest) without notice and a hearing was a due process violation where state law did not provide an adequate post-deprivation remedy. *See, e. g., Lujan,* 532 U.S. at 195-96 (withholding money due a party under a contract implicates that party's property interest in its claim for payment); *Connecticut v. Doehr,* 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991) (even temporary or partial impairments to property rights are sufficient to merit due process protections). Therefore, the Plaintiffs' right not to have equipment and money confiscated without pre-deprivation process (e.g ., notice and a hearing) was clearly established. Accordingly, Defendants' depriving Rockland of the equipment and money was a violation of a "clearly established" right.

**\*24** Whether or not an official's conduct was "objectively reasonable" is also a matter of law. *Lennon,* 66 F.3d at 421. When making a determination about the objective reasonableness of Defendants' conduct in the context of summary judgment, "if [P]laintiffs' version of the facts reveals that the officials could reasonably have believed they were not violating plaintiffs' constitutional rights," then the Court must find in favor of Defendants with re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

gard to this issue. *Bizarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005). Because it is undisputed that the Defendants withheld the vending equipment and money based on a belief that contract law and/or common law principles entitled them to do so, and because the Defendants could reasonably have believed that this did not violate Plaintiffs' constitutional rights, I conclude, and respectfully recommend that your Honor should conclude, that the withholding of equipment and money was objectively reasonable, as a matter of law. Accordingly, the Defendants are entitled to the protection of qualified immunity with respect to the deprivation of property claims, and summary judgment should therefore be granted on these claims.

## IV. Plaintiffs' Deprivation of Liberty Claims (Fourth and Fourteenth Amendment Claims)

Plaintiffs claim that "[b]y holding [Gallagher] against his will without due process and restricting his liberty, one or more of the Defendants violated Plaintiff Gallagher's rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution as made actionable by 42 U.S.C. sec.1983." (Am.Compl.¶ 69.) In analyzing claims alleging a violation of Fourth Amendment and/or Fourteenth Amendment rights that amount to false imprisonment, courts in the Second Circuit look to state law regarding parallel state law claims. *Russo v. City of Bridgeport,* 479 F.3d 196, 203 (2d Cir.2007); *Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006). Therefore, the elements of a plaintiff's claim of false arrest or imprisonment under § 1983 are substantially the same as the elements of a false arrest or imprisonment claim under New York law. *Hygh v. Jacobs,* 961 F.2d 359, 366 (2d Cir.1992).

In order to make out a New York common law or § 1983 claim for false arrest or imprisonment,[FN6] a plaintiff must demonstrate that (1) the defendant intended to confine him, (2) he was conscious of the confinement, (3) he did not consent to the confinement, and (4) the confinement was not otherwise privileged or justified. *Shain v. Ellison,* 273 F.3d

56, 67 (2d Cir.2001) (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (1995)); *Little v. City of New York,* 487 F.Supp.2d 426, 438-39 (S.D.N.Y.2007).

> FN6. Under New York law, false arrest and false imprisonment are synonymous causes of action. *See Little v. City of New York,* 487 F.Supp.2d 426, 438-39 (S.D.N.Y.2007) (citing *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991)).

Plaintiff Gallagher asserts that he was held against his will at Shawangunk on May 9, 2007. (Am.Compl.¶ 69.) However, he does not dispute that he entered the facility voluntarily (Pl.St.¶¶ 27-28). He acknowledges that he never asked or attempted to leave Shawangunk during the time he alleges he was held against his will. (Pl.St.¶ 39.) Nowhere does Gallagher allege that the doors were locked specifically to confine him or were secured in any way that was different from how they were routinely locked at the prison. Nor does he allege that any of the Defendants told him he could not leave. Furthermore, and of crucial importance, Gallagher admits that he knew he could leave the facility so long as he left the money from the vending machines with Defendant Creen and her staff (rather than taking it with him when he left). (Pl.St.¶ 33.)

**\*25** Because Gallagher voluntarily entered the facility and never asked to or attempted to leave, and was never told he could **not** leave, he has not proffered evidence from which a reasonable jury could conclude that he did not consent to the alleged confinement. Similarly, because the doors were locked only in the manner that was customary to secure this prison facility, he has not provided evidence to support a finding that the alleged confinement was not otherwise privileged or justified. Moreover, because Gallagher acknowledges that he believed that Defendant Creen would allow him to leave so long as he left the vending machine proceeds behind with the facility's staff, he has failed to set forth evidence from which a reasonable jury

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
(Cite as: 2009 WL 2407658 (S.D.N.Y.))

could conclude that the Defendant intended to confine *his person,* as opposed to *the money* (which came from the vending machines and was never on his person). This distinction is crucial because Plaintiff Gallagher claims a deprivation of liberty, rather than a deprivation of property.

In short, even when all evidence is viewed in the light most favorable to Plaintiff Gallagher and all ambiguity is construed in his favor, Plaintiff has failed to set forth evidence from which a reasonable factfinder could determine that the elements of false imprisonment have been established or that the parallel constitutional rights were violated with respect to a deprivation of liberty. Accordingly, there is no reason to proceed further to consider whether Defendants are entitled to qualified immunity as to this claim. I recommend that your Honor conclude that Defendants are entitled to summary judgment on the deprivation of liberty claims stated in Paragraph 69 of the Amended Complaint. *See D'Amico,* 132 F.3d at 149.

**v. Plaintiffs' Retaliation Claim (First Amendment Claim)**

Plaintiffs claim that, in retaliation for their complaints to the police and other authorities concerning the May 9, 2007 incident, Defendants, *inter alia,* terminated or caused to be terminated Plaintiff's contracts correctional facilities throughout the New York State, thus violating the Plaintiff's First Amendment rights, actionable pursuant to 42 U.S.C. § 1983. (Am.Compl.¶¶ 31-66, 70.) Defendants deny these allegations and assert a qualified immunity defense as to this count as well.

As set forth above, the first step in evaluating a qualified immunity claim is to determine whether the plaintiff's federal right was violated. To sustain a First Amendment retaliation claim, a plaintiff must demonstrate that (1) the speech at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the ad-

verse action. *Gill v. Pidlupchak,* 389 F.3d 379, 380 (2d Cir.2004). It is well-settled that Plaintiff's complaints to law enforcement about Defendants' conduct was protected speech, thus satisfying the first requirement. *Bd. of County Comm'rs v. Umbehr,* 518 U.S. 668, 678-81 (1996). Plaintiffs have alleged that several of Rockland's contracts were terminated by Defendants after Plaintiffs' complaints.[FN7] (Opp. at 7.) Termination of a government contract constitutes an "adverse action" within the meaning of the First Amendment, so the second element is satisfied as well. *Id.*

> FN7. With one exception (Lincoln) (Mot. at 14), Defendants have not disputed that these contract terminations occurred. For purposes of summary judgment, Plaintiffs' allegations are accepted as true with regard to all contracts.

**\*26** The third element turns on the Defendants' motive(s) for terminating the contracts. Accordingly, the question of whether or not the Plaintiffs' First Amendment right was violated depends on the subjective intent of the Defendants.[FN8] This is necessarily a factual issue (here disputed by the parties) and, therefore, the threshold determination under *Saucier* (whether or not the plaintiff's federal right was violated) cannot be resolved upon a motion for summary judgment with respect to this type of claim. *See Crawford-El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

> FN8. The same is true with respect to the merits of Plaintiffs' claim, which turns on the establishment of a subjective motive on the part of Defendants, as discussed in greater detail below.

However, in a case where a public official asserts a qualified immunity defense to a claim requiring proof of wrongful motive, a district court is to resolve the threshold question of immunity, despite the unresolved factual dispute, and, thus, must determine whether, assuming the truth of plaintiff's allegations, the official's conduct violated "clearly

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

established" law. *Crawford-El*, 523 U.S. at 597-98. Assuming Plaintiffs' allegations are true (i.e., that Defendants terminated contracts with Rockland in retaliation for Plaintiffs' complaints to the authorities), that conduct would unquestionably violate clearly established law. *Id.* Moreover, such intentional retaliation could not be described as objectively reasonable. Accordingly, Defendants are not entitled to qualified immunity on this count.

Having addressed the qualified immunity defense and concluded that it does not apply, I turn now to the merits of Plaintiffs' claim. For a First Amendment retaliation claim to withstand a motion for summary judgment, a plaintiff need only introduce sufficient evidence to create a genuine issue of material fact on the question of Defendants' improper motive. *Locurto v. Safir*, 264 F.3d 154, 167 (2d Cir.2001). This evidence can be either direct or circumstantial in nature. *See Sheppard v. Beerman*, 94 F.3d 823, 828 (2d Cir.1996).

Plaintiffs in this case assert that, shortly after their complaints to various authorities and in direct response to those complaints, the Defendants retaliated against them in violation of their First Amendment rights. Specifically, Plaintiffs allege that Defendant Riley impounded Plaintiff's vending machines at Lincoln Correctional Facility (Am.Compl.¶¶ 49-51); that Defendant Creen impounded vending machines at Schwangunk (Pl. St. of Mat. Fact ¶ 203); and that Defendant Kidder was involved in the impounding of the machines and in the termination of various contracts with Rockland, alleged to have occurred even at facilities where there had been no disputes, where no money was owed or past-due, and where the facility stewards had recommended that Plaintiffs' contract be extended (Am.Compl.¶¶ 40, 53, 57, 60). Plaintiffs have therefore set forth sufficient evidence to suggest that their claim is not "wholly fanciful." *See D'Amico*, 132 F.3d at 149. The motive behind the equipment seizures and the contract terminations is a material matter, and Plaintiffs' proffered evidence is thus sufficient to create a genuine issue of mater-

ial fact. Therefore, for each claim against each Defendant, there is a genuine issue of material fact with respect to that Defendant's motive. In short, because the merits of Plaintiffs' retaliation claims turn on an assessment of each Defendant's subjective intent (about which the parties are in dispute), these claims necessarily require a factual determination for resolution. Summary judgment cannot be granted as to the retaliation claims.

**CONCLUSION**

**\*27** For the foregoing reasons, I conclude-and respectfully recommend that your Honor should conclude-that there are no issues of material fact regarding Plaintiffs' Fourth and Fourteenth Amendment deprivation of property and liberty claims, and that summary judgment should accordingly be GRANTED dismissing those two claims.

With regard to Plaintiffs' First Amendment retaliation claims, I conclude that Defendants are not entitled to qualified immunity, and that disposition of those claims must await resolution of factual disputes which cannot be decided on a motion for summary judgment. Accordingly, I respectfully recommend that summary judgment be DENIED as to the retaliation claims.

**NOTICE**

Pursuant to 28 U.S.C. § 636(b) and Fed Rule Civ. P. 72(b), the parties shall have ten (10) days, plus an additional three (3) days, pursuant to Fed.R.Civ.P. 6(d), or a total of thirteen (13) working days, *see* Fed.R.Civ.P. 6(a), from the date hereof to serve and file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kenneth M. Karas, at the United States District Court, Southern District of New York, United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2407658 (S.D.N.Y.)
**(Cite as: 2009 WL 2407658 (S.D.N.Y.))**

Failure to file timely objections to the Report and
Recommendation will preclude later appellate re-
view of any order of judgment that will be entered.

Requests for extensions of time to file objections
must be made to the Judge Karas and not to the un-
dersigned.

S.D.N.Y.,2009.
Rockland Vending Corp. v. Creen
Slip Copy, 2009 WL 2407658 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.