Westlaw.

Page 1

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
(Cite as: 2004 WL 1119648 (S.D.N.Y.))

c

United States District Court,
S.D. New York.
Gregory J. **NONNENMANN**, Plaintiff,
v.
THE **CITY** OF NEW YORK, Mayor Michael
Bloomberg, Police Commissioner Raymond Kelly,
Deputy Chief Edward Cannon, Captain Natale Gal-
atioto, Captain John McCluskey, and the New York
**City** Police Department, Defendants.
No. 02 Civ.10131 JSR AJP.

May 20, 2004.

*REPORT AND RECOMMENDATION*

PECK, Chief Magistrate J.

**\*1** "Pro se" plaintiff Gregory J. Nonnenmann, an
attorney and retired police lieutenant, brings this
action against the City of New York, the New York
City Police Department, Mayor Michael
Bloomberg, Police Commissioner Raymond Kelly,
Deputy Chief Edward Cannon, Captain Natale Gal-
atioto, and Captain John McCluskey, pursuant to
(1) 42 U.S.C. § 1983 and the First Amendment, (2)
the Sixth Amendment, (3) the Fair Labor Standards
Act, and (4) New York defamation laws (Dkt. No.
1: Compl.; Dkt. No. 14: Am. Compl.; Dkt. Nos.
32-33, 39: Discontinuances; Dkt. No. 36: Nonnen-
mann Aff. ¶¶ 3-4.) Presently before this Court is
defendants' summary judgment motion.
(Dkt.Nos.28-29.) For the reasons set forth below,
defendants should be granted summary judgment
on the § 1983-First Amendment and Sixth Amend-
ment claims, and denied on the Fair Labor Stand-
ards Act claim and the state law defamation claim.

*FACTS*

Nonnenmann was admitted to practice law in New
York in 1983 (Dkt. No. 11: Am. Compl. ¶ 7; Dkt.

No. 35: Nonnenmann 56.1 Stmt. ¶ 1; Dkt. No. 28:
City 56.1 Stmt. ¶ 3) and is representing himself in
this action. A New York City Police Officer since
1983, Nonnenmann was promoted to Sergeant in
1989 and Lieutenant in 1998. (Am. Compl. ¶ 6;
City 56.1 Stmt. ¶¶ 1-2; Nonnenmann 56.1 Stmt. ¶
1.) In April 2001, Nonnenmann transferred from
the 28th Precinct to the 110th Precinct and was as-
signed to the 1st Platoon.[FN1] (City 56.1 Stmt. ¶ ¶
8-9; Dkt. No. 28: Molfetta Aff. Ex. F: Nonnenmann
Dep. at 57-58.) [FN2] After a few days at the 110th
Precinct, Nonnenmann was appointed Grand Lar-
ceny Lieutenant, a position that permitted Nonnen-
mann to propose his own schedule for approval.
(City 56.1 Stmt. ¶ 10; Nonnenmann Dep. at 60.)

> FN1. "1st Platoon" refers to the midnight
> to 8 a.m. shift. (Am. Compl. ¶ 30; City
> 56.1 Stmt. ¶¶ 9, 48.)

> FN2. Unless otherwise indicated, refer-
> ences to Exhibits are to the exhibits to the
> Affidavit of Assistant Corporation Counsel
> Michele Molfetta, contained within Dkt.
> No. 28.

Defendant Captain Natale Galatioto became the
110th Precinct's Commanding Officer in May 2001.
(City 56.1 Stmt. ¶ 11.) After a few weeks, Capt.
Galatioto assigned Nonnenmann to the 1st Platoon
for a brief period and then appointed Nonnenmann
as the 110th Precinct's Replacement Lieutenant.
(City 56.1 Stmt. ¶ 12; Nonnenmann Dep. at 63-64.)
As Replacement Lieutenant, Nonnenmann's shifts
varied with the precinct's needs, but he generally
worked the 2d Platoon, which is the 8 a.m. to 4
p.m. shift, or the 3d Platoon, from 4 p.m. to mid-
night. (City 56.1 Stmt. ¶ 13; Nonnenmann Dep. at
63.) In January 2002, Capt. Galatioto reassigned
Nonnenmann to the 1st Platoon. (City 56.1 Stmt. ¶
15; Nonnenmann 56.1 Stmt. ¶ 11.)

*The February 3, 2002 Stop-and-Frisk*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
(Cite as: 2004 WL 1119648 (S.D.N.Y.))

On February 3, 2002, around 1 a.m. Capt. Galati-oto, Lieutenant James Lombardi, Nonnenmann, Nonnenmann's driver Officer Robert Dirosse, and others responded to a radio report that, at the intersection of 41st Avenue and Junction Boulevard in Queens, a group of males were creating a disturbance and one of the males may have a gun. (Am. Compl. ¶ 9; City 56.1 Stmt. ¶¶ 16-17; Nonnenmann 56.1 Stmt. ¶ 15; Nonnenmann Aff. ¶¶ 7, 194-96; Nonnenmann Dep. at 80-89; Ex. G: Galatioto Dep. at 29-31, 35.) Nonnenmann "was the first on the scene, [and] observed five male Hispanics, less than a half a block away talking. There was no apparent dispute, no complainants at the location, no broken bottles or glass, no indication of any unlawful or criminal activity." (Nonnenmann Aff. ¶¶ 8, 196.)

*2 When Nonnenmann arrived at the scene, he remained in his patrol car and observed Capt. Galati-oto and Lt. Lombardi stop the group of five Hispanic males. (City 56.1 Stmt. ¶ 17-18; Galatioto Dep. at 29-30.) According to Nonnenmann, Capt. Galati-oto and Lt. Lombardi arrived at the scene, "exited their car and immediately stopped all the individuals." (Nonnenmann Aff. ¶ 10.) Nonnenmann also contends that during the frisk, Nonnenmann was " '[g]etting out of [his] car to go down to where they were." ' (Nonnenmann 56.1 Stmt. ¶ 19; Nonnenmann Dep. at 83.)

Capt. Galatioto, Lt. Lombardi, and Officer Dirosse frisked the males. (City 56.1 Stmt. ¶¶ 19-21; Nonnenmann Aff. ¶¶ 10, 194; Nonnenmann Dep. at 83-84; Galatioto Dep. at 29-30.) At the conclusion of the stop-and-frisk, the group of males were advised that they were free to leave or stay in the area, and were not arrested or taken into custody. (City 56.1 Stmt. ¶ 22.) Nonnenmann claims that at the time of the stop-and-frisk, he wrote in his NYPD memo book: "no legal basis for the stop and frisk." (Am. Compl. ¶ 9; Nonnenmann Aff. ¶ 11; Nonnenmann Dep. at 85, 88; City 56.1 Stmt. ¶ 24.)

According to Nonnenmann, Police Officer Jose Abreu observed the stop-and-frisk while off-duty and on his way home. (City 56.1 Stmt. ¶ 25; Nonnen-mann 56.1 Stmt. ¶ 20; Nonnenmann Aff. ¶ 12; Ex. Y: 4/23/03 IAB Rpt.) At around 10:50 a.m that day, "Officer Abreu informed [Nonnenmann] that he witnessed the stop and frisk, felt it was unjustified and racially motivated. [Abreu] request[ed] that [Nonnenmann] file a misconduct complaint against the defendant." (Nonnenmann Aff. ¶ 12; Nonnen-mann 56.1 Stmt. ¶ 20.) At 11:00 a.m. on February 3, 2002, Nonnenmann called IAB to file a formal complaint about the stop-and-frisk. (Am. Compl. ¶ 10; City 56.1 Stmt. ¶ 26; Nonnenmann 56.1 Stmt. ¶ 21; Nonnenmann Dep. at 91-92 .) Pursuant to NYPD "Patrol Guide Procedure 207-21," Nonnen-mann was "mandated to report all 'Allegations of Corruption and Serious Misconduct Against Members of the Service' ' and "[f]ailure to report can result in termination." (Am. Compl. ¶ 8; Ex. X & Am. Compl. Ex. B: NYPD Patrol Guide 207-21; City 56.1 Stmt. ¶ 27.)

On February 8, 2002, Nonnenmann attended a departmental interview at the Queens Borough North Investigations Unit, which was the IAB office that first handled his complaint. (Am. Compl. ¶ 14; City 56 .1 Stmt. ¶¶ 28-29; Nonnenmann Aff. ¶¶ 17, 58.) Nonnenmann's request for an adjournment because his wedding was the next day was denied. (Nonnenmann 56.1 Stmt. ¶ 33; Am. Compl. ¶ 14; Nonnenmann Aff. ¶ 17.) When he arrived at the meeting, however, Capt. McNulty of IAB told Nonnenmann that he "was now the subject of the hearing and was allowed an adjournment as a matter of right." (Nonnenmann 56.1 Stmt. ¶ 34; Nonnenmann Aff. ¶ 18; Am. Compl. ¶ 14.)

The stop-and-frisk investigation was later referred to IAB office Group 1, which "investigates cases involved high level members of the NYPD and cases that receive media attention." (City 56.1 Stmt. ¶ 35; Am. Compl. ¶ 20; Nonnenmann 56.1 Stmt. ¶ 49.) Defendant Captain John McCluskey, the Commanding Officer of IAB Group 1, led the investigation. (City 56.1 Stmt. ¶ 36; Nonnenmann 56.1 Stmt. ¶ 49.)

*3 In IAB's April 23, 2003 "Investigative Findings

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

Case Closing/Final Report," (1) Capt. Galatioto was "exonerated" of the allegation that the February 3, 2002 stop-and-frisk was racially motivated; (2) Nonnenmann's allegation that Chief Cannon made slanderous comments against him were deemed unsubstantiated; and (3) Nonnenmann's allegations that Capt. Galatioto retaliated against him were deemed unsubstantiated. (City 56.1 Stmt. ¶¶ 70-73; Ex. Y: 4/23/03 IAB Rpt.)

*Nonnenmann's Allegations Against Defendant Captain Galatioto*

On February 15, 2002, Nonnenmann filed a complaint with the Police Department Office of Equal Employment Opportunity ("OEEO"). (Am. Compl. ¶ 22; City 56.1 Stmt. ¶ 37; Ex. C: 2/15/02 Nonnenmann NYPD OEEO Compl.; Nonnenmann 56.1 Stmt. ¶ 50; Nonnenmann Aff. ¶ 73) Nonnenmann alleged that he "is being discriminated against based on race and national origin" and "is being retaliated against for filing or assisting in an investigation of a complaint." (Ex. C: 2/15/02 Nonnenmann NYPD OEEO Compl.) The Police Department referred Nonnenmann's OEEO complaint to IAB for investigation (Am. Compl. ¶ 25; City 56.1 Stmt. ¶ 45), and combined it with IAB's investigation of the stop-and-frisk (City 56.1 Stmt. ¶ 37; Ex. L: 3/1/02 NYPD EEO Letter to Nonnenmann).

On February 19, 2002 (and again on March 26, 2002), Nonnenmann filed a notice of claim alleging retaliation, violations of 42 U.S.C. §§ 1983 and 2000, the Fourth and Fourteenth Amendments, Title VII, libel, slander, and discriminatory retaliation in violation of New York State and City Civil Rights laws. (Nonnenmann 56.1 Stmt. ¶ 47; Ex. R: Nonnenmann Notices of Claim; Nonnenmann 56.1 Stmt. Ex. O: Nonnenmann Notices of Claim.) On February 24 and 25, 2002, Nonnenmann and his union filed unfair labor practices grievances with the NYPD Office of Labor Relations alleging that Capt. Galatioto retaliated against him and "violated the collective bargaining agreement by conducting a disciplinary hearing without allowing

[Nonnenmann] the benefit of legal or union counsel." (Am. Compl. ¶ 23-24; City 56.1 Stmt. ¶¶ 43-44; Ex. J: Nonnenmann 2/24/02 Unfair Labor Practice Compl.; Nonnenmann Aff. ¶ 73) Like Nonnenmann's OEEO complaint, his unfair labor practices grievance was combined with IAB's stop-and-frisk investigation. (Am. Compl. ¶ 43; Nonnenmann Aff. ¶ 73; City 56.1 Stmt. ¶¶ 43-44; Ex. Q: 8/20/02 Office of Labor Relations Letter.)

On March 28, 2002, Nonnenmann filed a complaint against defendants with the Civilian Complaint Review Board. (Am.Compl.¶ 27.) On June 1, 2002, Nonnenmann filed a complaint against Capt. Galatioto with the Internal Affairs Bureau. (Am.Compl.¶ 31.) On July 24, 2002, Nonnenmann filed a complaint with the Internal Affairs Bureau alleging continued retaliation by Captain McCafferty. (Am.Compl.¶ 41.) On August 5, 2002, Nonnenmann sent a complaint to Police Commissioner Raymond Kelly. (Am.Compl.¶ 42.)

*4 After Capt. Galatioto allegedly denied Nonnenmann one hour and twenty minutes of overtime on May 3, 2002, Nonnenmann filed a grievance against Capt. Galatioto on May 8, 2002. (Am. Compl. ¶ 29; City 56.1 Stmt. ¶ 47; Nonnenmann 56.1 Stmt. ¶ 61; Nonnenmann Aff. ¶ 76.) Nonnenmann admits that he was eventually paid for that overtime. (Nonnenmann Aff. ¶ 78; Nonnenmann Dep. at 113-14; Nonnenmann Aff. Ex. G: Nonnenmann 5/30/02 Approved Overtime Slip.)

*Nonnenmann's Transfer From the 1st to 2d Platoon*

On May 31, 2002, Nonnenmann learned that as of June 7, 2002, he would be transferred from the 1st Platoon to the 2d Platoon. (Am. Compl. ¶ 30; City 56.1 Stmt. ¶ 48; Nonnenmann 56.1 Stmt. ¶ 62; Nonnenmann Aff. ¶ 79.) The 1st Platoon is a shift from midnight to 8 a.m., while the 2d Platoon is from 8 a.m. to 4 p.m. (*See also* page 2 & fn.1 above.) Nonnenmann had been assigned to the 1st Platoon since January 2002 (City 56.1 Stmt. ¶¶ 15, 48; *see also* page 3 above.) According to Nonnen-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
(Cite as: 2004 WL 1119648 (S.D.N.Y.))

Page 4

mann, the shift change "resulted in nearly a $600.00 a month reduction in income and a reduction to [his] life time pension benefits of in excess of $45,000.00" and that "[a]n additional loss of overtime can cause this loss to double." (Am.Compl.¶ 30.) Specifically, the "1st platoon commander receives $6,740.00 in night shift differential which is fully pensionable, [while] a 2nd platoon commander does not receive any night shift differential." (Nonnenmann Aff. ¶ 80; Nonnenmann Aff. Ex. H: LBA 5/23/2002 Newsletter.) Nonnenmann claims that Capt. Galatioto removed him from the 1st Platoon "deliberately to reduce [Nonnenmann's] income, upset his family schedule," "reduce the available time by which [Nonnenmann] could practice law," and because Galatioto "was aware [Nonnenmann] was approaching retirement eligibility and by reducing plaintiff's pay his retirement benefits would be substantially reduced." (Nonnenmann Aff. ¶¶ 79, 229, 234.) Nonnenmann further alleges that the platoon change "was a blatant violation of law and department guidelines" because "Police Department policy, as part of the consent decree with the Federal Government, does not allow transfers or changes to work assignments or hours of a 'protected party.' ' (Am.Compl.¶ 30.)

Also on May 31, 2002, Capt. Galatioto transferred three other 110th Precinct Lieutenants who were Platoon Leaders. (City 56.1 Stmt. ¶ 49.) [FN3] Capt. Galatioto testified that he adjusted all of the Platoon Leader Lieutenants by one shift due to the poor performance of the 110th Precinct and complacency among its officers. (City 56.1 Stmt. ¶ 50; Nonnenmann Aff. ¶ 216; Galatioto Dep. at 76-77.) Capt. Galatioto "felt the lieutenants weren't doing enough to move the place along to get the cops doing what needed to be done" and that "there was a little too much comfort ... between the bosses and officers." (Galatioto Dep. at 77.) Specifically, Capt. Galatioto was very impressed with Lieutenant Cahill's qualifications, and wanted him on the 3d Platoon because Lt. Cahill "had an extensive background out on the street" and "as a relief lieutenant

[Cahill] ... seemed to be making some head-way with the officers getting to work." (Galatioto Dep. at 76, 110.) The 2d Platoon had a vacancy created by the then-Platoon Leader's promotion to Captain. (Galatioto Dep. at 76.) Capt. Galatioto found Lieutenant Pristera "a little weak" on the 3d Platoon (Galatioto Dep. at 76), and felt that Nonnenmann, as a lawyer, was "probably better suited" on the 2d Platoon because it "is certainly a more administrative tour." (Galatioto Dep. at 97; *see also* City 56.1 Stmt. ¶ 51.) [FN4] As a result, Capt. Galatioto replaced Nonnenmann with Lt. Pristera on the 1st Platoon, moved Nonnenmann to the vacant position on the 2d Platoon, and replaced Lt. Pristera with Lt. Cahill on the 3d Platoon. (Galatioto Dep. at 76-77.) Capt. Galatioto testified that crime statistics showed "a real dramatic decrease" after the Platoon Leader shifts. (City 56.1 Stmt. ¶ 53; Galatioto Dep. at 97, 110.)

> FN3. Nonnenmann disputes the accuracy of City's statement in its 56.1 Statement, because "[o]nly 3 of the 7 lieutenants assigned to the 110 Pct. were re-assigned." (Nonnenmann 56.1 Stmt. ¶ 63.) However, the City did not represent that *all* of the 110th Precinct lieutenants were reassigned, but rather that *all three* of the lieutenants who were Platoon Leaders were reassigned. (City 56.1 Stmt. ¶ 49.)

> FN4. The City notes that robberies were highest at the 110th Precinct during the 1st Platoon while Nonnenmann was the 1st Platoon Leader. (City 56.1 Stmt. ¶ 52; Ex. V: 110th Precinct Crime Stats. 2/1/02-6/30/02.) However, during this period the 1st Platoon also had the lowest number of Grand Larcenies and Grand Larceny, Autos and the second-highest total (out of three) of Felony Assaults. (Ex. V. 110th Precinct Crime Stats. 2/1/02-6/30/02.)

*5 On June 1, 2002, Nonnenmann filed an IAB complaint against Capt. Galatioto because of his

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

platoon transfer. (Am. Compl. ¶ 31; Nonnenmann 56.1 Stmt. ¶ 67; Nonnenmann Aff. ¶ 82.) Nonnenmann alleges that Sergeant LaPorte of IAB called his home on June 2, 2002, asked him several questions, and ordered him "to remain at [his] residence ... pending instructions from an IAB Captain." (Am. Compl. ¶ 32; Nonnenmann Aff. ¶ 85.) Nonnenmann alleges that he submitted for six hours of overtime for this period and initially was paid, but that his overtime was subsequently "docked" pursuant to orders from Capt. Galatioto and a Captain McCaffrey. (Am. Compl. ¶ 32; Nonnenmann 56.1 Stmt. ¶ 68; Nonnenmann Aff. ¶ 85; Nonnenmann Aff. Ex. K: Nonnenmann 6/2/02 Overtime Slip & 7/3/02 Denial.) Nonnenmann also claims that he had the right to seek 53 hours of overtime because, as the IAB Sergeant directed, Nonnenmann stayed home for 53 hours until his next tour of duty. (Am. Compl. ¶ 32; Nonnenmann 56.1 Stmt. ¶ 68; Nonnenmann Aff. ¶ 85.)

According to Nonnenmann, Capt. Galatioto called Nonnenmann at home on June 10, 2002 "to harass [Nonnenmann] about [Nonnenmann's] work and tour changes." (Am. Compl. ¶ 33; Nonnenmann 56.1 Stmt. ¶ 69; Nonnenmann Aff. ¶ 86.) Nonnenmann claims he "is entitled to overtime pay for the invasion of [Galatioto] into [Nonnenmann's] personal time." (Nonnenmann Aff. ¶ 86.)

Nonnenmann filed another unfair labor grievance against Capt. Galatioto after he did not allow Nonnenmann to use department time to attend medical testing on June 11, 2002 for a line-of-duty injury. (Am. Compl. ¶¶ 34, 36; City 56.1 Stmt. ¶ 54; Nonnenmann Aff. ¶¶ 87, 89.) As Nonnenmann admits, however, Capt. Galatioto permitted him to keep the appointment and leave work on his personal time. (City 56.1 Stmt. ¶ 55; Nonnenmann Aff. ¶¶ 87, 89; Nonnenmann Dep. at 105-06; Galatioto Dep. at 145.) According to the IAB Findings & Case Closing Report, Nonnenmann was later granted the lost time. (Ex. Y: 4/23/03 IAB Rpt.)

Nonnenmann filed a complaint with the EEOC on June 3, 2002, alleging retaliation since Officer Ab-

reu, a Hispanic, had asked him to file a complaint of racial profiling against Capt. Galatioto for the stop and frisk. (Am. Compl. ¶ 38; City 56.1 Stmt. ¶ 56; Ex. D: 6/3/02 EEOC Compl.) Nonnenmann alleged in his EEOC complaint that on February 4, 2002, the day after the stop-and-frisk, Capt. Galatioto "ordered [Nonnenmann] into his office approximately 10 times ... for verbal abuse and intimidation." (Ex. D: Nonnenmann 6/3/02 EEOC Compl. ¶ 5; Nonnenmann 56.1 Stmt. ¶ 31.) Nonnenmann claimed that at this meeting, Capt. Galatioto "blamed [him] for [Galatioto's] failure to properly prepare the required documentation to justify his search" of the five males. (Ex. D: Nonnenmann 6/3/02 EEOC Compl. ¶ 5.) According to Nonnenmann's EEOC complaint, union members were present for several hours and "were forced to intervene" on behalf of Nonnenmann and Dirosse. (Id.)

*6 Nonnenmann further alleged that he was retaliated against when: (1) he was ordered to attend a department hearing at 11:00 a.m. on February 8, 2002, the day before his wedding, and was refused an adjournment (City 56.1 Stmt. ¶ 57; Nonnenmann 56.1 Stmt. ¶¶ 32, 33; Nonnenmann Aff. ¶ 17; Ex. D: Nonnenmann 6/3/02 EEOC Compl. ¶ 6; see also pages 4-5 above); (2) Nonnenmann's locker contents were disturbed between February 12 and February 14, 2002 (although nothing was taken) (City 56.1 Stmt. ¶ 57; Nonnenmann 56.1 Stmt. ¶ 46; Nonnenmann Aff. ¶ 44; Ex. D: Nonnenmann 6/3/02 EEOC Compl. ¶ 9); (3) Nonnenmann was allegedly the subject of defamatory comments by Chief Cannon during remarks to the 3rd Platoon on February 13, 2002 (City 56.1 Stmt. ¶ 57; Ex. C: Nonnenmann 6/3/02 EEOC Compl. ¶ 10); and (4) on February 18, 2002, Capt. Galatioto called Nonnenmann into his office for "an interim evaluation meeting," which Nonnenmann believes was intended to "discipline and harass" Nonnenmann in the absence of a union delegate (City 56.1 Stmt. ¶ 57; Nonnenmann 56.1 Stmt. ¶ 51; Nonnenmann Aff. ¶¶ 45-56, 184, 185; Ex. D: Nonnenmann 6/3/02 EEOC Compl. ¶ 11).[FN5] On October 5, 2002, Nonnenmann received an EEOC right to sue letter dated September

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

30, 2002. (Am. Compl. ¶ 44; City 56.1 Stmt. ¶ 63; Nonnenmann 56.1 Stmt. ¶ 76.)

> FN5. Although Nonnenmann testified that although the meeting began as "instructional," it became "disciplinary" when Capt. Galatioto became "aggressive [and] overbearing." (Nonnenmann Dep. at 138.) Capt. Galatioto testified that "[i]t was not a disciplinary meeting" (Galatioto Dep. at 16), and Nonnenmann concedes that Capt. Galatioto did not threaten him with disciplinary charges during the meeting and that Nonnenmann was not disciplined as a result of the meeting. (Nonnenmann Dep. at 108, 138.)

*The Compstat Meeting*

On July 12, 2002, Capt. Galatioto ordered Nonnenmann to attend a Headquarters Compstat meeting. (Am. Compl. ¶ 40; City 56.1 Stmt. ¶ 59; Nonnenmann 56.1 Stmt. ¶ 73; Nonnenmann Aff. ¶ 94; Nonnenmann Dep. at 123-24.) Although Nonnenmann alleges that Capt. Galatioto "stated he was going to put [Nonnenmann] on the podium and see that [Nonnenmann] was publicly embarrassed," Capt. Galatioto never called Nonnenmann to the podium. (Am. Compl. ¶ 40; *see also* Nonnenmann Aff. ¶ 94; Nonnenmann Dep. at 124-25.) Nonnenmann claims that he nevertheless was "publicly embarrassed" by "watching the higher-ups on the Police Department to commit [a]n act of gender discrimination against Chief Kunk[le]." (Nonnenmann Dep. at 125; Am. Compl. ¶ 40.) Nonnenmann concedes that no acts of discrimination or retaliation against him were committed at the July 12, 2002 Compstat meeting. (Nonnenmann Dep. at 125.)

On July 22, 2002, Nonnenmann filed an unfair labor practice grievance, alleging retaliation including (1) his platoon transfer; (2) denial of overtime for the time IAB ordered him to remain home following his June 1, 2002 IAB complaint against Capt. Galatioto, and (3) Capt. Galatioto's allegedly

harassing June 10, 2002 phone call to Nonnenmann's home. (Ex. O: 7/22/02 Grievance Form; City 56.1 Stmt. ¶ 58.) On July 24, 2002, Nonnenmann filed an IAB complaint alleging "continued retaliation during an ongoing IAB investigation ." (Am. Compl. ¶ 41; City 56.1 Stmt. ¶ 60.) Like several of Nonnenmann's other complaints, the July 24, 2002 IAB complaint was merged with IAB's stop-and-frisk investigation. (City 56.1 Stmt. ¶ 60.)

*7 On August 29, 2002, Capt. Galatioto transferred Nonnenmann from the 2d Platoon (8 a.m. to 4 p.m.) to the 3d Platoon (4 p.m. to midnight) and appointed Nonnenmann the "Special Operations Burglary Lieutenant." (City 56.1 Stmt. ¶ 62.) Nonnenmann's account is slightly different:

> On or about August 29, 2002, Capt[ain] Shandley was chosen to command a PBQN [Patrol Borough Queens North] initiative, with resources being diverted from other commands to the 110th Pct. Inspector D'Amico, the adjutant of PBQN, was in charge of the overall detail. Capt. Shandley asked [Nonnenmann] if he would transfer to his initiative. [D'Amico] stated it would separate [Nonnenmann] from Galatioto. [Nonnenmann] accepted the new assignment; which lasted until Insp. D'Amic[o] was transferred from PBQN, at which time [Nonnenmann] was once again working directly for defendant Galatioto, still under the title as the Special Operations Burglary Lieutenant.

(Nonnenmann 56.1 Stmt. ¶ 74.)

Nonnenmann alleges that on or about January 30, 2003, Capt. Galatioto "ordered that [Nonnenmann] was to receive no further overtime assignments." (Am.Compl.¶ 51(g).) Nonnenmann filed an IAB complaint against Capt. Galatioto as a result. (Am.Compl.¶ 51(g); Nonnenmann 56.1 Stmt. ¶ 77.)

In February 2003, Capt. Galatioto ordered the 110th Precinct's Anti-Crime team to work overtime on Mondays because the burglary rate was steadily rising and Monday was the team's only day off.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

(City 56.1 Stmt. ¶ 64.) As a result of the Anti-Crime team's Monday assignment, Capt. Galatioto cancelled two days of Nonnenmann's scheduled overtime on Mondays in February 2003. (City 56.1 Stmt. ¶ 64; Nonnenmann 56.1 Stmt. ¶ 78.) Nonnenmann filed an IAB complaint against Capt. Galatioto regarding the cancelled overtime. (Nonnenmann 56.1 Stmt. ¶ 78.)

Nonnenmann further alleges that on February 5, 2003, Capt. Galatioto "unlawfully committed an act of physical contact against" him, and on February 25, 2003, "physically removed a clip board from [Nonnenmann's] hands and again accused [Nonnenmann] of being in an improper uniform." (Am.Compl.¶ 51(k); Nonnenmann 56 .1 Stmt. ¶ 82; Nonnenmann Aff. ¶¶ 143, 240.)

*Nonnenmann's Retirement*

Nonnenmann filed for retirement on March 12, 2003, allegedly "[t]o protect his pension and because of the unrelenting harassment," effective July 30, 2003. (City 56.1 Stmt. ¶ 75; Nonnenmann Aff. ¶ 144.) Nonnenmann claims that he "was forced to retire before he intended," and "received no overtime from April through July 2003" as a result. (Nonnenmann Aff. ¶¶ 145, 150.) [FN6] Nonnenmann estimates that he lost at least $362,553.75, based on 301 hours and 33 minutes of cash overtime he claims he lost through early retirement, multiplied by 50% and his life expectancy of 37 years. (Nonnenmann Aff. ¶¶ 151, 153.)

> FN6. According to the City, Nonnenmann "was out on pre-separation leave" from March 12, 2003 until July 30, 2003, that is, he "used up the compensatory time he had accrued" and thus received his full salary without actually working during that period. (City 56.1 Stmt. ¶ 75.)

*Nonnenmann's Allegations Against Defendant Chief Cannon*

On February 12, 2002, *The New York Daily News* published an article about the February 3, 2002 stop-and-frisk. (Am. Compl. ¶ 19; Nonnenmann 56.1 Stmt. Ex. G: John Marzulli, *3 Cops Accuse Chief of Misconduct vs. Latinos,* N.Y. Daily News, Feb. 12, 2002; Nonnenmann 56.1 Stmt. ¶ 36; Nonnenmann Aff. ¶ 20.) The article read:

> *\*8* A hard-charging NYPD precinct commander is under investigation for allegedly conducting an illegal stop-and-frisk procedure last week on five Hispanic men on a Queens street, the Daily News has learned.

> Capt. Natale Galatioto, commander of the 110th Precinct in Queens, was accused of misconduct by three of his own cops who were present. *One of the accusers, a lieutenant, is also a lawyer, sources told The News.*

> "I don't think there's any merit to [the allegation]," Galatioto said yesterday when reached at the stationhouse. "I think I'm a fair and balanced supervisor."

> But some cops at the command, which covers Corona, Jackson Heights and Elmhurst, portrayed Galatioto as a hard-driving boss whose demand for more arrests and summonses could lead to civil rights abuses.

> The cops have complained about him to the Latino Officers Association.

> "The people whose rights are being violated are primarily of Mexican and South American descent, a community that lacks representation," said the association's president, Anthony Miranda. "These officers observed something wrong and took a stand."

> NYPD officials did not immediately respond to a request for comment, but the allegation against a high-ranking officer comes at a sensitive time for the NYPD, as Mayor Bloomberg and Police Commissioner Raymond Kelly carry out a highly publicized crackdown on quality-of-life offenses.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
(Cite as: 2004 WL 1119648 (S.D.N.Y.))

The Feb. 3 stop-and-frisk was prompted by two 911 calls involving quality-of-life complaints, said police sources close to the probe.

About 1 a.m., one caller reported a group of about 15 Hispanic men breaking bottles on Junction Blvd. Then a second caller reported a noisy Hispanic man who may have been armed with a gun in the past. The callers gave no further description.

*Sources said Lt. Greg Nonnenmann and his driver, Officer Robert Dirosse, saw five Hispanic men about two blocks from the location given by the callers. They did not notice any broken bottles and the men were just talking. Nonnenmann, who is a 19-year NYPD veteran and also a practicing lawyer, told his driver there was no reason to frisk the men.*

Then Galatioto and his driver, Lt. James Lombardi, arrived and proceeded to search the men. Galatioto instructed Dirosse to prepare stop-and-frisk reports, the sources said.

Stop-and-frisk reports, updated after the fatal shooting by cops of unarmed immigrant Amadou Diallo, contain a checklist for specifying the reason for the police action. Dirosse, the sources said, wrote there was no legal basis for the stops.

*An off-duty cop, Jose Abreu, witnessed the incident and told Nonnenmann he thought the incident was racially motivated. Nonnenmann reported that allegation to the Internal Affairs Bureau.*

"The good news in this story is there are police officers who refused to participate in [alleged] wrongdoing," said Donna Lieberman, executive director of the New York Civil Liberties Union. "The next step is to see how the Police Department treats them."

*9 (Nonnenmann 56.1 Stmt. Ex. G: John Marzuilli, *3 Cops Accuse Chief of Misconduct vs. Latinos,* N.Y. Daily News, Feb. 12, 2002, emphasis added.)

On February 13, 2002, defendant Deputy Chief Edward Cannon visited the 110th Precinct and addressed the 3d Platoon roll call, comprised of twenty to twenty-five uniformed officers. (Am. Compl. ¶ 14; City 56.1 Stmt. ¶ 31; Nonnenmann 56.1 Stmt. ¶ 37; Nonnenmann Aff. ¶ 21; Ex. H: Cannon Dep. at 17-22, 30.) Nonnenmann alleges that Chief Cannon "in his public remarks defamed [Nonnenmann] and held him to public embarrassment and ridicule in both his professional occupations as an attorney and as a police lieutenant. His comments were knowingly false at the time they were made and were made with a reckless disregard for the truth." (Nonnenmann Aff. ¶ 21; *see also* Nonnenmann 56.1 Stmt. ¶ 39.)

At his deposition, Chief Cannon did not recall exactly what he said to the Platoon, but explained that he "made statements in support of [Capt. Galatioto], and ... made statements regarding what [Chief Cannon] believed to be inaccurate statements in the newspaper article that had been published that day." (Cannon Dep. at 17-18; *see also* Nonnenmann Aff. ¶ 215; Nonnenmann 56.1 Stmt. ¶¶ 42-43.) According to Chief Cannon, his "purpose was to show support for the captain and to dispute some of the inaccuracies within the article." (Cannon Dep. at 30; Nonnenmann 56.1 Stmt. ¶¶ 42-43.) Chief Cannon recalled that during his address he said "something to the effect of I'd rather ride in a radio car with an officer like the captain out on patrol after midnight so he doesn't have to be backing up police officers as they respond to a ra[ ]dio run specifically one involving a gun and getting out and taking police action. I'd rather ride next to an officer like that than some malcontent who hates his job ..." (Cannon Dep. at 52; *see also* Nonnenmann Aff. ¶ 215.) Chief Cannon testified that none of his comments were specifically about Nonnenmann. (Cannon Dep. at 50-52.)

It is undisputed that Nonnenmann was not present during Chief Cannon's remarks and that Chief Cannon never mentioned Nonnenmann by name. (City 56.1 Stmt. ¶ 32; Nonnenmann 56.1 Stmt. ¶ 42;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

Nonnenmann Dep. at 128-29; Cannon Dep. at 17-22.) Nonnenmann testified that "several police officers" told him about Chief Cannon's comment, but he "[did]n't recall specifically" if anyone who was at the meeting said that the comment was about Nonnenmann. (Nonnenmann Dep. at 128-29; *see also* Nonnenmann Aff. ¶ 36.) Nonnenmann believes that Chief Cannon was referring to him because Chief Cannon's address

was in response to the newspaper articles. He was there to defend Galatioto to say that Galatioto was a captain yesterday, is a captain today, and will be a captain tomorrow, and that he'd rather be sitting in a squad car next to him than that other person. And anyone with common sense would know how many people were pensionable at that time, who were appropriately at a position where they could start planning retirement. Who were the people that were at that incident, who else would he refer to [as] the malcontent waiting to collect a pension? The rookie that was waiting, I think not.

**\*10** (Nonnenmann Dep. at 129; *see also* Nonnenmann Aff. ¶ 35.) Nonnenmann believes that Chief Cannon's comments were intended "to disparage and harm [Nonnenmann] and [his] reputation." (Nonnenmann Dep. at 130.) When asked how his reputation had been harmed, Nonnenmann stated that the statement that he comes to work only to collect his pension was "embarrassing." (Nonnenmann Dep. at 130.)

On March 26, 2002, Nonnenmann amended his February 19, 2002 Notice of Claim to add a defamation claim against Chief Cannon. (Nonnenmann 56.1 Stmt. ¶ 47; Ex. R: 3/26/02 Notice of Claim.) Nonnenmann alleged that on or about February 13, 2002, Chief Cannon "did make public statements, communicated to an audience, to defame and hold open to ridicule [Nonnenmann]. Said statements were also made in an attempt to impede and inhibit and intimidate witnesses from coming forward in a department employment discrimination case." (Ex. R: 3/26/02 Notice of Claim.) Nonnenmann para-

phrased Chief Cannon's comments as stating that Chief Cannon would "[r]ather be sitting next to the Captain than some malcontent who just wants to collect his check and his pension and doesn't want to be on this job" and that the "Captain could have saved 2 cops from sitting on their asses from being blown away." (Ex. R: 3/26/02 Notice of Claim.)

*Nonnenmann's Allegations Against Defendant Captain McCluskey*

In early February 2002, Queens Borough North Inspections Unit transferred the investigation to IAB Group 1, whose commanding officer, defendant Captain John McCluskey, led the investigation. (City 56.1 Stmt. ¶¶ 35-36.)

On February 22, 2002, Nonnenmann was ordered to attend another IAB interview, at which time defendant Captain McCluskey informed him that Nonnenmann was the subject of a misconduct allegation for failing to promptly notify IAB of the misconduct allegation against Capt. Galatioto.[FN7] (Am. Compl. ¶ 20; City 56.1 Stmt. ¶ 39; Nonnenmann 56.1 Stmt. ¶¶ 53-54, 58; Nonnenmann Aff. ¶¶ 58, 61, 95.) Nonnenmann characterizes his failure to report the allegation to IAB as "a factual and legal impossibility" because Patrol Guide 270-21 requires written notification to the IAB Chief within 24 hours (Am.Compl.¶ 20), while Nonnenmann contacted IAB approximately ten hours after the stop-and-frisk (Am. Compl. ¶ 10; City 56.1 Stmt. ¶ 26; Nonnenmann Aff. ¶¶ 65, 96.) According to the City, however, Nonnenmann "became a subject of the IAB investigation when IAB determined that despite being a witness to the stop and frisk, [Nonnenmann] did not file the complaint with IAB until Abreu asked him to file the complaint on [Abreu's] behalf." (City 56.1 Stmt. ¶ 40; *see* Nonnenmann Aff. ¶ 95.) Nonnenmann claims that "defendants deliberately conspired to keep a bogus allegation open against [Nonnenmann] as an act of retaliation to harass, to place him in fear of losing his pension and benefits, to attempt to get conflicting statements in the numerous interrogations

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

which would provide a reason to terminate his employment and to charge him with perjury and/or to force [Nonnenmann's] retirement." (Nonnenmann Aff. ¶ 97.)

> FN7. Nonnenmann contends that he "was first informed he was the subject of a misconduct investigation on February 8, 2002 by Capt. McNulty" and that "[o]n February 22, 2002, defendant [Capt.] McClusky merely restated that plaintiff was the subject of the investigation." (Nonnenmann 56.1 Stmt. ¶ 53; Nonnenmann Aff. ¶¶ 18, 61, 95.)

*11 Also in February 2002, Nonnenmann contacted Amato Salas, one of the subjects of the February 3, 2002 stop-and-frisk, to see if Salas would testify on Nonnenmann's behalf in civil litigation and possible NYPD trials. (City 56.1 Stmt. ¶ 41; Ex. I: McCluskey Dep. at 41-47; Nonnenmann Dep. at 109, 112; Nonnenmann Aff. ¶¶ 67-71.) After Nonnenmann's meeting with Salas, Capt. McCluskey ordered Nonnenmann not to contact the subjects of the stop-and-frisk during the IAB investigation. (City 56.1 Stmt. ¶ 42; Nonnenmann Aff. ¶ 68; Nonnenmann Dep. at 109, 112; McCluskey Dep. at 46-47, 63-65.) On February 25, 2002, Nonnenmann filed an unfair labor practices grievance alleging retaliation by Capt. McCluskey. (Am. Compl. ¶ 24; City 56.1 Stmt. ¶ 44.) Like Nonnenmann's unfair labor practice grievance against Capt. Galatioto, his grievance against Capt. McCluskey was combined with the IAB's stop-and-frisk investigation. (Am. Compl. ¶ 43; City 56.1 Stmt. ¶¶ 44, 61; Ex. Q: 8/20/02 Labor Relations Letter.)

Nonnenmann attended another IAB departmental interview on April 17, 2002 regarding the stop-and-frisk investigation, pursuant to Capt. McCluskey's orders. (Am. Compl. ¶ 28; City Stmt. ¶ 46; Nonnenmann Aff. ¶¶ 58, 75.) Nonnenmann characterized the meeting as part of "continuing attempts to use authority as a means of harassment against" Nonnenmann. (Am. Compl. ¶ 28; Nonnenmann Aff. ¶¶ 58, 75.)

*Nonnenmann's Present Federal Lawsuit*

On or about December 23, 2002, Nonnenmann brought this lawsuit, alleging seven causes of action, including violations of Title VII (Dkt. No. 1: Compl. ¶ ¶ 52-55), Equal Protection under the Fourteenth Amendment (Compl.¶ 56-57), the First Amendment (Compl.¶¶ 58-59), and the Sixth Amendment (Compl.¶¶ 60-61), as well as defamation (Compl.¶¶ 62-65) and a punitive damages claim (Compl.¶ ¶ 66-67). Nonnenmann filed an amended complaint on May 21, 2003 to add an eighth cause of action: violation of the Fair Labor Standards Act, Collective Bargaining Agreement, and statutory and common law contract rights. (Dkt. No. 14: Am. Compl. ¶¶ 68-69; City 56.1 Stmt. ¶ 74.)

At a conference before me on October 15, 2003, Nonnenmann voluntarily dismissed with prejudice his claims against the "John Doe" defendants. (10/15/03 Order; 10/15/03 Hearing Transcript at 21 .) By stipulation and order on January 8, 2003, Nonnenmann voluntarily dismissed with prejudice his Fourteenth Amendment Equal Protection Claim (the third cause of action). (Dkt. No. 39: 1/8/03 Stip. & Order.) On or about October 27, 2003, Nonnenmann voluntarily dismissed with prejudice his Title VII claims (the first and second causes of action). (Dkt. Nos. 32-33: 10/27/03 Partial Discontinuance; Dkt. No. 36: Nonnenmann Aff. ¶ 4; Ex. Z: 10/27/03 Partial Discontinuance.)

Presently before this Court is defendant's summary judgment motion on Nonnenmann's remaining claims, including (1) violations of 42 U.S.C. § 1983 and the First Amendment; (2) violations of the Sixth Amendment; (3) violations of the Fair Labor Standards Act; and (4) defamation. (*See generally* Dkt. No. 28: City SJ Notice of Motion, City 56.1 Stmt., City 56.2 Stmt., Molfetta Aff.; Dkt. No. 29: City Br.; Dkt. No. 38: City Reply Br.)

*ANALYSIS*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

I. *SUMMARY JUDGMENT STANDARDS IN SEC-TION 1983 CASES* [FN8]

FN8. For additional decisions authored by this Judge discussing the summary judgment standards in Section 1983 cases, in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g., Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *3-4 (S.D.N.Y. May 13, 2004) (Peck, M.J.); *Baker v. Welch,* No. 03 Civ. 2267, 2003 WL 22901051 at *4-6 (S.D.N.Y. Dec. 10, 2003) (Peck, M.J.); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *10 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.); *Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *9-10 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.); *Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *4-5 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *5-7 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *5 (S.D.N.Y. Apr. 23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *4 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *4 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *4 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb. 3, 2000) (Peck, M.J.); *Salahuddin v.. Coughlin,* 999 F.Supp. 526, 534 (S.D.N.Y.1998) (Rakoff, D.J. & Peck, M.J.); *Watson v. McGinnis,* 981 F.Supp. 815, 817 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.).

**\*12** Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment-here, defendants. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also, e.g., Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 36; *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party-here, Nonnenmann-only after

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v.. TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11-12.

*\*13* "The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" and that "pro se parties are to be given special latitude on summary judgment motions." [FN9] *Salahuddin v. Coughlin,* 999 F.Supp. at 535 (citations & internal quotations omitted); *see, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' ").[FN10] Moreover, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See, e.g., Irby v. New York City Transit Auth.,* 262 F.3d 412, 413-14 (2d Cir.2001)

("[W]e remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.... [E]ither the district court or the moving party is to supply the pro se litigant with notice of the requirements of Rule 56.... In the absence of such notice or a clear understanding by the pro se litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic."); *McPherson v. Coombe,* 174 F.3d at 280-81 (" '[t]he failure of a district court to apprise pro se litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal.' ") (citations omitted).[FN11] Defendants here served the appropriate notices on Nonnenmann. (Dkt. No. 28: City SJ Notice of Motion & City 56.2 Stmt.: Notice to Pro Se Litigant Opposing SJ Motion.)

> FN9. The Court notes, however, that Nonnenmann is a practicing attorney representing himself in this action. (Am. Compl. ¶ 7; Nonnenmann 56.1 Stmt. ¶ 7.)

> FN10. *See also, e.g., Commer v. American Fed'n of State, County & Mun. Employees,* 02 Civ. 7930, 2003 WL 21698637 at *1 (S.D .N.Y. July 17, 2003) ("[T]he Court is mindful that the plaintiff is proceeding pro se and that his submissions should be held to 'less stringent standards than formal pleadings drafted by lawyers....' "); *Douglas v. Portuondo,* 232 F.Supp.2d 106, 113 (S.D.N.Y.2002).

> FN11. *See also, e.g., Trammell v. Coombe,* No. 97-2622, 201 F.3d 432 (table), 1999 WL 1295856 at *2 (2d Cir. Dec. 23, 1999); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *see generally* S.D.N.Y. Local Civil Rule 56.2 (requiring service of notice explaining the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

requirements of Rule 56 on litigant proceeding pro se).

"Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases); *see also, e.g., Viruet v. Citizen Advice Bureau,* 01 Civ. 4594, 2002 WL 1880731 at *9 (S.D.N.Y. Aug 15, 2002) (Peck, M.J.); *Smith v. Planas,* 975 F.Supp. 303, 305 n. 2 (S.D.N.Y.1997).

II. *DEFENDANTS ARE ENTITLED SUMMARY JUDGMENT ON NONNENMANN'S SECTION 1983-FIRST AMENDMENT CLAIM* [FN12]

> FN12. As an initial matter, the Court finds that all claims against the New York City Police Department should be dismissed. "[A]ctions may not be brought against an agency of the City of New York but must rather be brought against the City itself." *Butler v. N.Y.C. Dep't of Corrections,* 92 Civ. 7709, 1993 WL 106367 at *1 (S.D.N.Y. Apr. 5, 1993) (citing NYC Charter & additional cases); *accord, e.g., Morris v. New York City Police Dep't,* No. 00-0007, 59 Fed. Appx. 421, 422, 2003 WL 943780 at *2 (2d Cir. Mar. 11, 2003); *Barry v. New York City Police Dep't,* 01 Civ. 10627, 2004 WL 758299 at *9 (S.D.N.Y. Apr. 7, 2004) (citing cases); *McAllister v. New York City Police Dep't,* 97 Civ. 7420, 1998 WL 314732 at *1 (S.D.N.Y. June 15, 1998) (Peck, M.J.); *Rossi v. New York City Police Dep't,* 94 Civ. 5113, 1998 WL 65999 at *5 (S.D.N.Y. Feb. 17, 1998) ("[T]he New York City Police Department is an organizational subdivision of the City of New York, lacking independent legal existence and as such is not a suable entity.");

*Maurice v. New York City Dep't of Corrections,* 93 Civ. 6008, 1997 WL 431078 at *2 (S.D.N.Y. July 30, 1997); *Russell Pipe & Foundry Co. v. City of New York,* 94 Civ. 8642, 1997 WL 80601 at *6 (S.D.N.Y. Feb. 25, 1997); *Williams v. New York City Police Dep't,* 930 F.Supp. 49, 53-54 (S.D.N.Y.1996); *Romano v. New York City Dep't of Corrs.,* 95 Civ. 0302, 1996 WL 233689 at *1 (S.D.N.Y. May 7, 1996); *Campbell v. Department of Corrs.,* 95 Civ. 3242, 1996 WL 79869 at *1 (S.D.N.Y. Feb. 26, 1996); *Wilson v. City of New York,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992); *East Coast Novelty Co. v. City of New York,* 781 F.Supp. 999, 1010 (S.D.N.Y.1992); *Jolly v. New York City Dep't of Corrs.,* 89 Civ. 4520, 1989 WL 153053 at *4 (S.D.N.Y. Dec. 13, 1989).

Nonnenmann claims that defendants violated 42 U.S.C. § 1983 by retaliating against him in violation of his First Amendment Rights. (Dkt. No. 14: Am. Compl. ¶ 59.) Specifically, Nonnenmann alleges that "from on or about February 4, 2002 until the date hereof he has been the subject of ongoing retaliatory discrimination for informing his superiors of a racial discrimination complaint that was made by former Police Officer Jose Abreu against Capt. Galatioto ." (Am.Compl.¶ 8.)

A. *Legal Principles Regarding Public Employees' First Amendment Rights*

**\*14** It is well-settled that "[p]ublic employees do not surrender their First Amendment rights to comment on matters of public interest by virtue of their acceptance of government employment." *Cobb v. Pozzi,* 363 F.3d 89, 101 (2d Cir.2004) (citing *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734 (1968)).[FN13] As employers, however, states and municipalities possess " 'greater leeway to control employees' speech that threatens to undermine its ability to perform its legitimate functions." ' *Cobb v. Pozzi,* 363 F.3d at

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

101 (quoting *Lewis v. Cowen,* 165 F.3d 154, 161 (2d Cir.), *cert. denied,* 528 U.S. 823, 120 S.Ct. 70 (1999)); *accord, e.g., Barry v. New York City Police Dep't,* 2004 WL 758299 at *5. "Courts determine the extent to which the government may permissibly regulate the speech of its employees by balancing the interest of the employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Cobb v. Pozzi,* 363 F.3d at 101-02 (quoting *Pickering v. Board of Educ .,* 391 U.S. at 568, 88 S.Ct. at 1734). [FN14]

> FN13. *See, e.g., Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003); *Mandell v. County of Suffolk,* 316 F.3d 368, 382 (2d Cir.2003); *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999); *Blum v. Schlegel,* 18 F.3d 1005, 1010-11 (2d Cir.1994); *Barry v. New York City Police Dep't,* 01 Civ. 10627, 2004 WL 758299 at *5 (S.D.N.Y. Apr. 7, 2004).

> FN14. *See also, e.g., Melzer v. Board of Educ.,* 336 F.3d 185, 192-93 (2d Cir.2003), *cert. denied,* 124 S.Ct. 1424 (2004); *Catletti v. Rampe,* 334 F.3d 225, 230 (2d Cir.2003); *Mandell v. County of Suffolk,* 316 F.3d at 382; *Pappas v. Giuliani,* 290 F.3d 143, 146 (2d Cir.2002), *cert. denied,* 123 S.Ct. 2642 (2003); *Morris v. Lindau,* 196 F.3d at 109-10; *Blum v. Schlegel,* 18 F.3d at 1011; *Barry v. New York City Police Dep't,* 2004 WL 758299 at *5.

"Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.' " *Johnson v. Ganim,* 342 F.3d at 112 (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690 (1983)).[FN15] Thus, "[t]he first part of the inquiry, commonly referred to as the public concern test, serves a gatekeeping function for employee speech claims in federal court. The First Amendment protects an employee only when he is speaking 'as a citizen upon matters of public concern' as opposed to when he speaks only on matters of personal concern." *Melzer v. Board of Educ.,* 336 F.3d at 193. If the speech "is focused on matters personal to the employee, it cannot be classified as being on a matter of public concern and the government, acting as an employer, 'has greater latitude to discipline' the employee." *Johnson v. Ganim,* 342 F.3d at 112; *see also, e.g., Melzer v. Board of Educ.,* 336 F.3d at 193; *Cahill v. O'Donnell,* 75 F.Supp.2d 264, 272 (S .D.N.Y.1999) (Parker, D.J.). "In general, an employee's protests about the conditions of his or her own employment situation do not rise to the level of public concern necessary for First Amendment protections to attach." *Munafo v. Metropolitan Transp. Auth.,* Nos. 98-CV-4572, 00-CV-0134, 2003 WL 21799913 at *8 (E.D.N.Y. Jan. 22, 2003); [FN16] *accord, e.g., Cahill v. O'Donnell,* 75 F.Supp.2d at 272. [FN17] Moreover, " '[e]ven as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight.' " *Cahill v. O'Donnell,* 75 F.Supp.2d at 273 (quoting *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1058 (2d Cir.), *cert. denied,* 510 U.S. 865, 114 S.Ct. 185 (1993)); *see also Blum v. Schlegel,* 18 F.3d at 1012 ("It is true that the fact that an employee's speech touches on matters of public concern will not render that speech protected where the employee's motive for the speech is private and personal."). " 'A communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents, is not likely to address a matter of public concern.' " *Cahill v. O'Donnell,* 75 F.Supp.2d at 273.

> FN15. *Accord, e.g., Catletti v. Rampe,* 334 F.3d at 229; *Mandell v. County of Suffolk,* 316 F.3d at 383; *Morris v. Lindau,* 196 F.3d at 110.

> FN16. "[M]aking a strictly employment-re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
(Cite as: 2004 WL 1119648 (S.D.N.Y.))

lated complaint on behalf of another does not transform the matter into one of public concern." *Munafo v. Metropolitan Transp. Auth.,* 2003 WL 21799913 at *8 (citing *Nonnenmann v. City of New York,* 174 F.Supp.2d 121, 136 (S.D.N.Y.2001)).

FN17. *See also, e.g., Tilitti v. Weise,* 155 F.3d 596, 602-03 (2d Cir.1998) (allegations related to the nature of the work assigned to plaintiffs and their pay were matters of personal interest, not public concern.); *Brennan v. Straub,* 246 F.Supp.2d 360, 365-66 (S.D.N.Y.2003) ( "Speech pertaining to internal personnel disputes and working conditions is generally held not to involve matters of public concern.").

*15 " 'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.' " *Johnson v. Ganim,* 342 F.3d at 112 (quoting *Connick v. Myers,* 461 U.S. at 147-48, 103 S.Ct. at 1690).[FN18] "While this determination may be somewhat fact-intensive, it presents a question of law for the court to resolve." *Johnson v. Ganim,* 342 F.3d at 112; *see also, e.g., Melzer v. Board of Educ.,* 336 F.3d at 196; *Morris v. Lindau,* 196 F.3d at 110; *Munafo v. Metropolitan Transp. Auth.,* 2003 WL 21799913 at *7 (" 'Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record.' "). In making this determination, " 'the court should focus on the motive of the speaker, attempting to discern whether the speech was calculated to redress personal grievances or whether it had a broader public purpose.' " *Brennan v. Straub,* 246 F.Supp.2d at 366. "[S]uch a determination is a question of law, not fact." *Walker v. New York City Trans. Auth.,* 99 Civ. 3337, 2001 WL 1098022 at *11 (S.D.N.Y. Sept. 19, 2001).

FN18. *Accord, e.g., Melzer v. Board of Educ.,* 336 F.3d at 196; *Catletti v. Rampe,* 334 F.3d at 229; *Pappas v. Guiliani,* 290 F.3d at 146.

To establish a prima facie case of First Amendment retaliation, a public employee "must demonstrate that '(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination.' " *Cobb v. Pozzi,* 363 F.3d at 102.[FN19] If a plaintiff satisfies these factors, the government can still prevail if it either "(1) demonstrate[s] by a preponderance of the evidence that it would have taken the same adverse action regardless of the protected speech, or (2) show that the plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment expression." *Cobb v. Pozzi,* 363 F.3d at 102. [FN20] The second of these options is known as the "*Pickering* balancing test." *Cobb v. Pozzi,* 363 F.3d at 102. If the government relies on the *Pickering* balancing test "and the balance of interests indeed weighs in the government's favor, plaintiff may still succeed by proving that the adverse action was in fact motivated by retaliation rather than by fear of disruption." *Mandell v. County of Suffolk,* 316 F.3d at 383.

FN19. *Accord, e.g., Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003); *Nicholas v. Davis,* No. 03-0011, 74 Fed. Appx. 131, 134, 2003 WL 22056224 at *2 (2d Cir. Sept. 4, 2003); *Johnson v. Ganim,* 342 F.3d at 112; *Mandell v. County of Suffolk,* 316 F .3d at 382; *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2003); *Conlon v. Austin,* No. 01-9280, 48 Fed. Appx. 816, 817, 2002 WL 31262078 at *1 (2d Cir. Oct. 10, 2002); *Morris v. Lindau,* 196 F.3d at 110; *Blum v. Schlegel,* 18 F.3d at 1010; *Barry v. New York City Police Dep't,* 2004 WL 758299 at *5.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

FN20. *See also, e.g., Johnson v. Ganim,* 342 F.3d at 114; *Melzer v. Board of Educ.,* 336 F.3d at 193; *Mandell v. County of Suffolk,* 316 F.3d at 382-83; *Barry v. New York City Police Dep't,* 2004 WL 758299 at *5.

B. *Nonnenmann's Speech Addressed a Matter of Public Concern and is Protected by the First Amendment*

The City argues that Nonnenmann's complaint to IAB does not constitute protected speech because he was motivated to speak by his employment obligations and private interests, since the NYPD Patrol Guide requires all officers to report serious misconduct to IAB. (Dkt. No. 29: City Br. at 4-9; Dkt. No. 38: City Reply Br. at 2-6.) The Court disagrees.

**\*16** The subject of Nonnenmann's complaint-the allegation that a police captain's stop and frisk of a group of Hispanic males was discriminatory-is clearly a matter of public concern. "The disclosure and attempted remediation of racially insensitive behavior by government employees cannot be viewed as anything other than a matter of public concern." *Hagemann v. Molinari,* 14 F.Supp.2d 277, 284 (E.D.N.Y.1998); *see also, e.g., Conlon v. Austin,* No. 01-9280, 48 Fed. Appx. 816, 817, 2002 WL 31262078 at *1 (2d Cir. Oct. 10, 2002) (finding plaintiff's complains "regarding racist and sexist remarks that defendant [fire chief] allegedly made while conducting an officers' meeting" to be "protected speech"); *Wagner v. City of Holyoke,* 241 F.Supp.2d 78, 91 (D.Mass.2003) (Plaintiff's speech that "included allegations of racism within the [police] department ... were manifestly directed to matters of public concern ... and were entitled to protection under the First Amendment."); *Bennett v. City of Holyoke,* 230 F.Supp.2d 207, 224 (D.Mass.2002) ( "Statements uncovering corruption within a police department are precisely the type of communications that demand strong First Amendment protection.... This court hereby finds that the statements made by [plaintiff] regarding corruption

and racism within the Holyoke police department *were* on matters of public concern."), *aff'd,* 362 F.3d 1 (1st Cir.2004); *cf., e.g., Walker v. New York City Transit Auth.,* 99 Civ. 3337, 2001 WL 1098022 at *12 (S.D.N.Y. Sept. 19, 2001) ("While it is true that speech regarding discrimination may generally relate to a matter of public concern, a court must still determine whether the particular speech in question was a matter of public concern by examining the circumstances of the individual case."); *Daniels v. City of New York,* 138 F.Supp.2d 562, 565 (S.D.N.Y.2001) (In denying a stay of discovery pending appeal in a class action against the NYPD Street Crimes Unit, Court found that staying discovery was against public interest because "[p]laintiffs are litigating a controversial matter of serious public concern, namely racial profiling.").

As for the context of Nonnenmann's complaint about the stop and frisk, "[t]he key inquiry is whether the comment was made by plaintiff in his role as a disgruntled employee or in his role as a private citizen." *Ianillo v. County of Orange,* 187 F.Supp.2d 170, 181 (S.D.N.Y.2002) (citing *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690 (1983)); *see also* cases cited at pages 27-28 above.

The Court finds the present facts distinguishable from *Cahill v. O'Donnell,* 75 F.Supp.2d 264 (S.D.N.Y.1999) (Parker, D.J.), on which the City heavily relies. (*See* Dkt. No. 29: City Br. at 7-9; Dkt. No. 38: City Reply Br. at 3-5.) The Court in *Cahill* held that the plaintiffs' speech was not entitled to First Amendment protection, in part because their investigations and statements arose out of the ordinary course of their work as Internal Affairs officers. *Cahill v. O'Donnell,* 75 F.Supp.2d at 273. Then-District Judge Parker explained that:

**\*17** The plaintiff's work in the Internal Affairs department is undoubtedly important, and the vigilance and integrity of police officers is, in a general way, a matter of public concern. *Plaintiff's actions,* under the circumstances presented here, *were encompassed within their*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

*day-to-day professional obligations within their department and are not fairly distinguishable from the responsibilities of all personnel within Internal Affairs.* In this case, the plaintiffs were not attempting to bring to the public's attention pervasive and systematic cover-up in Internal Affairs. Rather *they simply exercised their duties, as Internal Affairs personnel, to investigate allegedly improper occurrences within the State Police, and to report their findings as requested.* The speech documented in this lawsuit was not public, but was intramural....

All the admissible evidence adduced by the plaintiffs illustrates that *they were not speaking out in an attempt publicly to expose institutional problems or police coverups, but rather complaining to their superiors about their perceived mistreatment by the PBA and the lack of support by the upper level officials.* The admissible evidence adduced on this motion establishes that *these statements were made because of the plaintiffs' overriding desire to clear their names and maintain their reputations and standing with their colleagues* in the face of the attacks by the PBA.

*Cahill v. O'Donnell,* 75 F.Supp.2d at 273 (emphasis added).

Unlike the officers in *Cahill* who were assigned to IAB and reported and investigated misconduct on a daily basis, reporting misconduct was not among Nonnenmann's ordinary employment duties. Further, unlike the officers in *Cahill,* Nonnenmann was attempting to expose a discriminatory practice that was not in any way directed at him, not simply a disgruntled employee seeking to redress his personal employment grievances. *Compare Knight v. City of New York,* 303 F.Supp.2d 485, 501 (S.D.N.Y.2004) (Plaintiff's complaints that he suffered sexual harassment and discrimination were not entitled to First Amendment protection because they "were related solely to his employment status and do not amount to protected speech on a matter of public interest."); *Walker v. New York Transit*

*Auth.,* 2001 WL 1098022 at *12 (Plaintiff's speech was merely a "personal employment grievance" where he "did not protest any broad discriminatory policies or practices" and his "complaints were 'personal in nature and generally related to h[is] own situation," ' and the "record contains no evidence that plaintiff sought to participate in a greater discussion about discrimination, remedy pervasive discrimination by public officials, or engage in any broad effort to combat discriminatory practices or bring them to public light.").

Nonnenmann's speech involved in this case also contrasts with the subject of an earlier First Amendment retaliation claim he brought against, *inter alia,* the City of New York and the NYPD in 2000. *Nonnenmann v. City of New York,* 174 F.Supp.2d 121, 136 (S.D.N.Y.2001). In the earlier case, Nonnenmann alleged that he suffered retaliation after testifying on behalf of a female, black co-worker in her employment discrimination suit. *Id.* at 136. In determining that Nonnenmann's speech was not a matter of public concern, Chief Judge Mukasey held that "[i]n determining the scope of protected speech, ... it is the scope and nature of the employment dispute to which plaintiff's speech is addressed, rather than the level of plaintiff's self-interest, that is dispositive." *Id.* Although Nonnenmann did not speak out in his own self-interest, Chief Judge Mukasey found that Nonnenmann merely "was participating in a particular dispute related to one employee that cannot more broadly be considered a matter of public concern." *Id.* Further, although Nonnenmann addressed serious allegations about "racial and gender prejudices" of supervising officers, Chief Judge Mukasey noted that Nonnenmann's testimony referred to the conduct of a few supervisors in the precinct, rather than "system-wide discrimination." *Id.* Chief Judge Mukasey also considered that both Nonnenmann and the female officer on whose behalf he had testified entered into settlement agreements that provided only for money damages and no modification of NYPD policies. *Id.* In light of these factors, Chief Judge Mukasey concluded that Nonnen-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

mann's testimony on his co-worker's behalf "related to a private employment dispute and did not involve a matter of public concern that warrants First Amendment protection." *Id.*

*\*18* Here, in contrast, Nonnenmann's complaint about racial profiling during the stop and frisk by senior members of the police department (a captain and a lieutenant) did not in any way involve him personally. Indeed, he made the complaint to IAB at the request of another police officer. Moreover, while employment discrimination as to one officer was found insufficient by Chief Judge Mukasey in the prior case, Nonnenmann's complaint here involved alleged racial profiling of members of the public by high ranking police officers. Allegations of racial profiling by police in the New York-New Jersey area had generated tremendous amounts of press attention and public concern before Nonnenmann's February 2002 complaint. *See, e.g.,* David Kocieniewski & Robert Hanley, *Racial Profiling was the Routine, New Jersey Finds,* N.Y. Times, Nov. 28, 2000, at A1; David Kocieniewski, *Race Profiling by Troopers Under Review By Legislature,* N.Y. Times, Oct. 16, 2000, at B5; David Barstow & David Kocieniewski, *Records Show New Jersey Police Withheld Data on Race Profiling,* N.Y. Times, Oct. 12, 2000, at A1; David Kocieniewski, *U.S. Will Monitor New Jersey Police on Race Profiling,* N.Y. Times, Dec. 22, 1999, at B1. Indeed, the City concedes "that, as a general matter, racial profiling is a subject of public concern." (City Reply Br. at 3.) As the Second Circuit has noted:

> The effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, evenhandedly, and without bias.... If the police department treats a segment of the population of any race, religion, gender, national origin, or sexual preference, etc., with contempt, so that the particular minority comes to regard the police as oppressor rather than protector, respect for law en-

forcement is eroded and the ability of the police to do its work in that community is impaired.

*Pappas v. Giuliani,* 290 F.3d 143, 146-47 (2d Cir.2002) (upholding over First Amendment claim the police department's firing of police officer who worked in its computer department for anonymous, off duty racist comments). Further, while the Court does not put too much weight on it, it is significant that this stop and frisk incident and the allegation that it was racially motivated was, in fact, written up in the press. (*See* pages 14-15 above.)

The Court finds Nonnenmann's complaint to IAB alleging racial profiling by high-ranking police personnel during a stop and frisk to be entitled to First Amendment protection.

The Court rejects the City's final argument, that Nonnenmann's complaint to IAB was not entitled to protection because it was required by his job duties, that is, NYPD Patrol Guide 207-21 which requires police personnel to report to IAB about " 'serious misconduct of which they become aware" ' or are informed. (City Br. at 7, quoting Ex. X: Patrol Guide 207-21; *see also* Dkt. No. 38: City Reply Br. at 3-5.) While *Cahill* found speech to be part of "routine business and normal police duties" when made by Internal Affairs personnel, *Cahill v. O'Donnell,* 75 F.Supp.2d at 273, the Court does not believe it appropriate to extend that to all police personnel. The City's argument would deprive all police personnel of First Amendment protection; for no matter how much the speech is of public concern, it would be the officer's duty to make a report, and thus, under the City's logic, no First Amendment protection could ever attach.[FN21] The City cites no case for this extension of *Cahill.* Under the City's logic, police officers like Serpico who expose systemic corruption in the police department would have no First Amendment protection, since the City would claim they were "merely complying with the duties of [their] job," as required by the Patrol Guide.[FN22] (City Br. at 8.) This is not, nor should it be, the law.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

FN21. The City also argues that Nonnenmann's IAB complaint involved "mere[ ] forwarding" of Officer Abreu's complaint and therefore is not protectable. (City Reply Br. at 3-5.) The axiom "don't shoot the messenger" would appear to apply and the City does not explain why it should be permitted to shoot, *i.e.,* retaliate against, Nonnenmann as the messenger. Surely, such a rule would discourage police personnel from forwarding complaints to higher levels of the police department.

FN22. And if the Court were to uphold this position as to the police department, every other government agency could institute a similar rule requiring reporting of serious misconduct, and government employees generally would lose their limited First Amendment protections.

**\*19** Nonnenmann's complaint to IAB alleging racial profiling by senior police officers during the stop and frisk is entitled to First Amendment protection. The Court therefore must consider whether Nonnenmann suffered an adverse employment action(s) as a result of his IAB complaint.

### C. Most Of The Retaliatory Acts Nonnenmann Alleges Are Not Adverse Employment Actions

"The Supreme Court has suggested that a First Amendment retaliation claim may prove susceptible to summary judgment in cases where the plaintiff cannot establish the threshold showing of retaliation." *Barry v. New York City Police Dep't,* 01 Civ. 10627, 2004 WL 758299 at *6 (S.D.N.Y. Apr. 7, 2004).

Nonnenmann alleges that he suffered retaliation as follows: (1) an allegedly disciplinary February 18, 2002 meeting with Capt. Galatioto, (2) several departmental interviews as part of the stop-and-frisk investigation, including one on the day before Nonnenmann's wedding, (3) an allegedly embar-

rassing July 12, 2002 Compstat meeting, (4) denial of Nonnenmann's Sixth Amendment right to counsel by the IAB, (5) denial of department time to receive medical attention for a line-of-duty injury, (6) denial of overtime for time IAB ordered Nonnenmann to stay at home, (7) denial of cash for overtime in lieu of time credit, (8) touching and harassment by Capt. Galatioto about Nonnenmann's uniform on February 25, 2003, (9) transfer from the 1st Platoon to the 2d Platoon on May 31, 2002, and (10) removal from two days of scheduled overtime in February 2003. (Dkt. No. 29: City Br. at 10-11; Dkt. No. 34: Nonnenmann Br. at 11-13; *see also* pages 4-19 above.)

Nonnenmann's retaliation claim fails as to all but the last acts listed-his transfer to the 1st Platoon and removal from scheduled overtime.[FN23] The other actions do not constitute "adverse employment actions" under Second Circuit law.

FN23. These two incidents will be discussed in section II.D below.

"In order to prove her First Amendment retaliation claim, plaintiff must show [*inter alia* ] that ... she suffered from an adverse employment action." *Quoka v. City of West Haven,* No. 02-7675, 64 Fed. Appx. 830, 832, 2003 WL 21223422 at *2 (2d Cir. May 22, 2003) (quoting *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002)); *see also* cases cited at page 29 above. The Second Circuit has held that "[t]o constitute an adverse employment action ... a change in working conditions must be 'materially adverse." ' *Patrolmen's Benevolent Assoc. v. City of New York,* 310 F.3d 43, 51 (2d Cir.2002) (quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)), *cert. denied,* 538 U.S. 1032, 123 S.Ct. 2076 (2003); *accord, e.g., Barry v. New York City Police Dep't,* 2004 WL 758299 at *6.

A materially adverse change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities" and "might be indicated by a termination of employment, a demotion

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation."

**\*20** *Patrolmen's Benevolent Assoc. v. City of New York,* 310 F.3d at 51; *accord, e.g., Staff v. Pall Corp.,* No. 03-7002, 76 Fed. Appx. 366, 368-69, 2003 WL 22056230 at \*2 (2d Cir. Sept. 4, 2003); *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003); *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) (First Amendment claim: "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."); *Barry v. New York City Police Dep't,* 2004 WL 758299 at \*6 (First Amendment claim; citing cases).[FN24]

> [FN24.] *See, e.g., Barton v. City of Bristol,* 294 F.Supp.2d 184, 199-200 (D.Conn.2003); *Mullen v. City of New York,* 02 Civ. 103, 2003 WL 21511952 at \*4 (S.D.N.Y. July 1, 2003); *Hurdle v. Board of Educ. of the City of New York,* 02 Civ. 4703, 2002 WL 31834454 at \*2 (S.D.N.Y. Dec. 16, 2002); *Washington v. County of Rockland,* 211 F.Supp.2d 507, 513-14 (S.D.N.Y. July 22, 2002); *see also, e.g., Diaz v. Weill Med. Ctr. of Cornell Univ.,* 02 Civ. 7380, 2004 WL 285947 at \*19 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.); *Williams v. New York City Dep't of Sanitation,* 00 Civ. 7371, 2001 WL 1154627 at \*16 & n. 25 (S.D.N.Y. Sept. 28, 2001) (Peck, M.J.) ( & cases cited therein).

First, the February 18, 2002 meeting with Capt. Galatioto was not an adverse employment action because, as Nonnenmann admits, Capt. Galatioto did not discipline him during or as a result of the meeting. (Nonnenmann Dep. at 108, 138; *see also* page 11 & fn.5 above.) Similarly, Nonnenmann's attendance at IAB interviews related to the stop-and-frisk investigation were not adverse employment actions. Although Nonnenmann argues that the meetings were intended to harass him (Dkt. No.

14: Am. Compl. ¶¶ 14, 20, 28), as one of the officers on the scene of an allegedly discriminatory stop-and-frisk and the source of the IAB complaint against Capt. Galatioto, Nonnenmann's participation appears not only understandable but expected-particularly after Nonnenmann was added as a subject of the investigation for failure to timely report the incident. The fact that one of the interviews was scheduled for the day before Nonnenmann's wedding was no more disruptive than a "mere inconvenience." *Patrolmen's Benevolent Assoc. v. City of New York,* 310 F.3d at 51; *see also, e.g., Allen v. St. Cabrini Nursing Home, Inc.,* 198 F.Supp.2d 442, 449 (S.D.N.Y.2002) ("The courts in this circuit have consistently held that mere scheduling inconveniences do not constitute an adverse employment action absent a materially significant change in plaintiff's employment."), *aff'd,* No. 02-7630, 64 Fed. Appx. 836, 2003 WL 21369263 (2d Cir. June 13, 2003), *cert. denied,* 124 S.Ct. 1158 (2004).

Next, Nonnenmann alleges that his attendance at the July 12, 2002 Compstat meeting was retaliatory because Capt. Galatioto allegedly "stated he was going to put [Nonnenmann] on the podium and see that [Nonnenmann] was publicly embarrassed." (Am. Compl. ¶ 40; *see* pages 11-12 above.) However, Capt. Galatioto never called Nonnenmann to the podium and Nonnenmann concedes that no acts of discrimination or retaliation against him were committed at the July 12, 2002 meeting. (Nonnenmann Dep. at 124-25; Nonnenmann Aff. ¶ 94; Am. Compl. ¶ 40.) Further, Nonnenmann's claim that he felt "publicly embarrassed" by "[w]atching the higher-ups on the Police Department to commit [a]n act of gender discrimination against ChiefKunk[le]" (Nonnenmann Dep. at 125; Am. Compl. ¶ 40), is not an adverse employment action against Nonnenmann. *See, e.g., Islamic Soc'y of Fire Dep't Pers. v. City of New York,* 205 F.Supp.2d 75, 85 (E.D.N.Y.2002) ("[C]ourts in this circuit have universally rejected attempts by plaintiffs to show an adverse employment action based simply on the plaintiff's personal feelings about the employers actions.") ( & cases cited

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

therein).

**\*21** The alleged denial of Nonnenmann's Sixth Amendment right to counsel at IAB interviews is not "a change in working conditions" let alone one that is "materially adverse." *Patrolmen's Benevolent Assoc. v. City of New York,* 310 F.3d at 51; *see* Point III below.

Three of Nonnenmann's claims regarding overtime credits are moot because he admitted that he was compensated for the time in question. First, although Nonnenmann claims Capt. Galatioto required him to attend a medical appointment on personal time, according to the IAB Findings & Case Closing Report, Nonnenmann was later granted compensation for the lost time. (Ex. Y: 4/23/03 IAB Rpt.) Second, although Nonnenmann complains that Capt. Galatioto allegedly denied him one hour and twenty minutes of overtime on May 3, 2002 (Am.Compl.¶ 29), Nonnenmann admits that he was eventually paid for that overtime. (Nonnenmann Aff. ¶ 78; Nonnenmann Dep. at 113-14; Nonnenmann Aff. Ex. G: Nonnenmann 5/30/02 Approved Overtime Slip.) [FN25]

> FN25. Nonnenmann further asserts that he was denied overtime for the time he spent at home in June 2002, when the IAB had ordered Nonnenmann to remain home until further notice due to the IAB complaint about his platoon transfer that Nonnenmann had filed against Capt. Galatioto the day before. (Am. Compl. ¶ 32; *see* page 9 above.) Nonnenmann alleges that he submitted for six hours overtime for this period and was paid, but that his overtime was subsequently "docked" pursuant to orders from Capt. Galatioto and Capt. McCaffrey. (Am. Compl. ¶ 32; Nonnenmann 56.1 Stmt. ¶ 68; Nonnenmann Aff. ¶ 85; Nonnenmann Aff. Ex. K: Nonnenmann 6/2/02 Overtime Slip & 7/3/02 Denial.) Because Nonnenmann was at home during the time claimed, albeit under IAB orders, he is not entitled to be paid overtime,

which, for lieutenants, is defined as time *worked* in excess of 40 hours a week. The Court need not address Nonnenmann's claim that his denial of overtime constitutes an adverse employment action because the issue of whether Nonnenmann is entitled to payment is co-terminus with his Fair Labor Standards Act claim, which will be resolved at trial. (*See* Point IV below.)

Nor has Nonnenmann shown adverse employment actions based on Capt. Galatioto's February 5 and 11, 2003 "unlawfully touching" of Nonnenmann, and the February 25, 2003 accusation that Nonnenmann was wearing an improper uniform. Nonnenmann refers to Capt. "Galatioto physically touch[ing]" him on "several occasions" (Nonnenmann Aff. ¶ 143), but details only one incident in which Capt. Galatioto "ripped a clip board from" his hands. (Nonnenmann Br. at 13.) Nonnenmann fails to show how any of these minor incidents of non-sexual touching materially adversely changed his employment conditions. *See, e.g., Weeks v. New York State Div. of Parole,* 273 F.3d 76, 86-87 (2d Cir.2001) (Plaintiff failed to show that her "physical removal" from an office was an adverse employment action "because [plaintiff] does not allege what tangible adverse effect this incident had on the terms and conditions of her employment." "[F]eeling 'frightened' or 'intimidated' is irrelevant if there is no 'materially adverse change in the terms and conditions of employment.' ") (quoting *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir.), *cert. denied,* 522 U.S. 997, 118 S.Ct. 563 (1997)), *abrogated on other grounds by National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061 (2002); *Jenkins v. New York State Dep't of Corr.,* 01 Civ. 0754, 2002 WL 205674 at \*6 (S.D.N.Y. Feb. 8, 2002) (Shove and verbal harassment by employer on one occasion "that was devoid of any indicia of [discriminatory] motive ... may have caused anxiety or embarrassment, [but] it did not prevent [plaintiff] from doing his job and thus is not an adverse employment action."); *cf., e.g., Faragher v. City of Boca Raton,*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 22

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
(Cite as: 2004 WL 1119648 (S.D.N.Y.))

524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84 (1998) (Under Title VII, " 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " To prevent Title VII from becoming a "general civility code," the Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment.") (citation omitted). Moreover, because Capt. Galatioto's accusation about Nonnenmann's uniform did not result in any disciplinary action, Capt. Galatioto's criticism alone does not rise to the level of an adverse employment action. *See, e.g., Diaz v. Weill Med. Ctr. of Cornell Univ.,* 2004 WL 285947 at *21 n. 30 ("[I]t is well-settled that a negative evaluation alone is not an adverse employment action.") ( & cases cited therein); *Jenkins v. New York State Dep't of Corr.,* 2002 WL 205674 at *6 (Employer's reprimand for plaintiff's use of an unauthorized parking space, may have caused plaintiff embarrassment, but he "does not allege that the reprimand had any adverse impact on the actual performance of his duties.").

*22 Although the Second Circuit has held that " 'a combination of seemingly minor incidents' could 'form the basis of a constitutional retaliation claim,' ... the incidents alleged here do not rise to the level of a 'pattern of nearly constant harassment' necessary to sustain such a claim." *Conlon v. Austin,* No. 01-9280, 48 Fed. Appx. 816, 817, 2002 WL 31262078 at *1 (2d Cir.2002) (quoting *Phillips v. Bowen,* 278 F.3d at 108-09); *see also, e.g., Barry v. New York City Police Dep't,* 2004 WL 758299 at *7. The Court concludes that "while plaintiff's complaints were protected speech, he has failed to raise a genuine issue that any of these alleged actions by defendant constituted adverse employment decisions as defined by this Court." *Conlon v. Austin,* 2002 WL 31262078 at *1.

D. *Nonnenmann Cannot Establish a Causal Connection Between His Speech and the Remaining Adverse Employment Actions*

Nonnenmann cannot establish a causal connection between his February 3, 2002 complaint to IAB about the stop-and-frisk and the two remaining retaliatory actions. Capt. Galatioto transferred Nonnenmann from the 1st Platoon to the 2d Platoon on May 31, 2002 as part of a re-assignment of all Platoon Leaders in the 110th Precinct. (*See* pages 8-9 above.) [FN26] In February 2003, a full year after Nonnenmann's stop-and-frisk complaint, Capt. Galatioto cancelled two days of Nonnenmann's scheduled overtime on Mondays in February 2003 when he assigned the Anti-Crime Team to Mondays. (City 56.1 Stmt. ¶ 64; Nonnenmann 56.1 Stmt. ¶ 78; *see* page 13 above.) [FN27]

> FN26. Capt. Galatioto testified that he adjusted all of the Platoon Leader Lieutenants by one shift due to the poor performance of the 110th Precinct and complacency among its officers. (City 56.1 Stmt. ¶ 50; Nonnenmann Aff. ¶ 216; Galatioto Dep. at 76-77.) Capt. Galatioto "felt the lieutenants weren't doing enough to move the place along to get the cops doing what needed to be done" and that "there was a little too much comfort ... between the bosses and officers." (Galatioto Dep. at 77.)

> FN27. Capt. Galatioto ordered the 110th Precinct's Anti-Crime team to work on overtime on Mondays because the burglary rate was steadily rising and Monday was the team's only day off. (City 56.1 Stmt. ¶ 64.)

The Second Circuit has held that the causal connection between the protected speech and the adverse employment action "must be sufficient to support the inference 'that the speech played a substantial part in the employer's adverse employment action.' " *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000); *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) ("The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech."); *Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994); *Barry v. New York City Police Dep't,* 01 Civ. 10627, 2004 WL 758299 at *7 (S.D.N.Y. Apr. 7, 2004); *Kantha v. Blue,* 262 F.Supp.2d 90, 103 (S.D.N.Y.2003). "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Morris v. Lindau,* 196 F.3d at 110; *accord, e.g., Mandell v. County of Suffolk,* 316 F.3d 368, 383 (2d Cir.2003); *Gilligan v. Town of Moreau,* No. 00-7109, 234 F.3d 1261 (table), 2000 WL 1608907 at *2 (2d Cir. Oct. 25, 2000); *Barry v. New York City Police Dep't,* 2004 WL 758299 at *7; *Stein v. Janos,* 269 F.Supp.2d 256, 260 (S.D.N.Y.2003); *Kantha v. Blue,* 262 F.Supp.2d at 103.[FN28]

> FN28. *See, e.g., Martinez v. City of New York,* 00 Civ. 7914, 2003 WL 2006619 at *5 (S.D.N.Y. Apr. 30, 2003), *aff'd,* No. 03-7495, 82 Fed. Appx. 253, 2003 WL 22879401 (2d Cir. Dec. 4, 2003); *Weiss v. City of New York,* 96 Civ. 8281, 2003 WL 1621403 at *5 (S.D.N.Y. Mar. 28, 2003); *Walker v. City of New York,* 98 Civ. 2685, 2002 WL 31051534 at *6 (S.D.N.Y. July 22, 2002); *Ayiloge v. City of New York,* 00 Civ. 5051, 2002 WL 1424589 at *12 (S.D.N.Y. June 28, 2002); *Jean-Gilles v. County of Rockland,* 195 F.Supp.2d 528, 534 (S.D.N.Y.2002).

**\*23** "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.' " *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74, 121 S.Ct. 1508, 1511 (2001); *accord, e.g., Diaz v. Weill Med. Ctr. of Cornell Univ.,* 02 Civ. 7380, 2004 WL 285947 at

*22 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.) (citing cases). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 & n. 5 (2d Cir.2001) (collecting cases); *see also, e.g., Diaz v. Weill Med. Ctr. of Cornell Univ.,* 2004 WL 285947 at *22. Nevertheless, the respective spans of four months and one year between Nonnenmann's speech and the adverse employment actions are not the "very close" proximity sufficient to raise an inference of causality. *See, e.g., Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85-86 (2d Cir.1990) (Three and one-half month lapse between plaintiff's agency complaints and alleged retaliatory act insufficient to show causal nexus.); *Punsal v. Mount Sinai Servs.,* 01 Civ. 5410, 2004 WL 736892 at *13 (S.D.N.Y. Apr. 6, 2004) ("[B]ecause ten months passed between the time when plaintiff filed the SDHR/EEOC complaint and plaintiff's termination, this is not a case in which temporal proximity demonstrates a causal nexus between the charge of discrimination and a plaintiff's subsequent termination."); *Diaz v. Weill Med. Ctr. of Cornell Univ.,* 2004 WL 285947 at *22 (five month gap not sufficiently close to show causation); *Knight v. City of New York,* 303 F.Supp.2d 485, 497 (S.D.N.Y.2004) ("[T]he temporal sequence [of about fifteen months] fails as a matter of law to establish that [plaintiff's] harassment complaint prompted the negative evaluations."); *Admassu v. Fox/Lorber Assocs., Inc.,* 99 Civ. 2665, 2003 WL 22290226 at *6 (S.D.N.Y. Oct. 6, 2003) (Allegedly retaliatory e-mails sent six months after plaintiff filed her EEOC complaint were "simply too far removed temporally from the filing of the EEOC complaint to raise an inference of retaliation."); *Khan v. Abercrombie & Fitch, Inc.,* 01 Civ. 6163, 2003 WL 22149527 at *9 (S.D.N.Y. Sept. 17, 2003) ("[T]he five-month gap between [plaintiff's] ... addition to her ... NYCCHR complaint and her termination, combined with the absence of other evidence, are too great to infer a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

causal connection.") ( & cases cited therein); *Lewis v. Snow,* 01 Civ. 7785, 2003 WL 22077457 at *8 (S.D.N.Y. Sept. 8, 2003) (Motley, D.J.) ("Plaintiff fails to make a showing of protected activity which was 'followed closely by' the alleged retaliatory treatment" where there was a more than three-month gap between them.) ( & cases cited therein); *Rinsler v. Sony Picture Entm't, Inc.,* 02 Civ. 4096, 2003 WL 22015434 at *9 (S.D.N.Y. Aug. 25, 2003) ("The almost six-month lag between [the protected activity] and the alleged retaliatory termination ... is too temporally remote to support a retaliation claim.") (citing cases); *Stuevecke v. New York Hosp. Med. Ctr.,* No. 01-CV-326, 2003 WL 22019073 at *5 (E.D.N.Y. Aug. 26, 2003) (protected activity and termination "occurred more than five months apart-a period which is too distant to permit a jury to find a causal connection between the two events based on time proximity."); *Sussle v. Sirina Prot. Sys. Corp.,* 269 F.Supp.2d 285, 315-16 (S.D.N.Y.2003) ("The four-month interval between the Plaintiff's [protected activity] in April 1999 and his termination in July 1999 is insufficient evidence of a causal connection.... In fact, courts have repeatedly held that a four-month interval does not establish a causal connection for the purposes of a retaliation claim.") ( & cases cited therein); *Cobian v. New York City,* 99 Civ. 10533, 2000 WL 1782744 at *18 (S.D.N.Y. Dec. 6, 2000) (Peck, M.J.) ("Standing alone, the lapse of more than four months between [plaintiff's] filing of her EEOC charge ... and [the alleged retaliatory action] ..., is insufficient evidence of a causal connection.") (citing cases), *aff'd,* No. 01-7575, 23 Fed. Appx. 82, 2002 WL 4594 (2d Cir. Dec. 21, 2001).[FN29]

> FN29. *But see Hernandez v. Kellwood Co.,* 99 Civ. 10015, 2003 WL 22309326 at *20 (S.D.N.Y. Oct. 8, 2003) (Where plaintiff was fired five months after filing her EEOC charge, court found "a close enough temporal connection to establish the forth prong of the prima facie case.") (citing *Suggs v. Port Auth. of N.Y. & N.J.,* 97 Civ. 4026, 1999 WL 269905 at *6 (S.D.N.Y.

May 4, 1999) (six-month gap between EEOC charge filing and termination close enough to raise inference of retaliation)).

*24 Accordingly, because Nonnenmann has failed to show that any adverse employment actions were caused by his protected speech, defendants are entitled to summary judgment dismissing his First Amendment § 1983 claim.

### III. *DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON NONNENMANN'S SIXTH AMENDMENT CLAIM*

Nonnenmann claims his Sixth Amendment right to counsel was violated when Captain McCluskey "ordered [him] not to speak to potential witnesses" to the stop and frisk and "ordered [Nonnenmann] to turn over information." (Dkt. No. 14: Am. Compl. ¶¶ 20-21, 61; Dkt. No. 28: City 56.1 Stmt. ¶ 39; Dkt. 34: Nonnenmann Br. at 20.) Nonnenmann claims that at the time of Capt. McCluskey's orders, Nonnenmann "knew he would be representing himself in an administrative proceeding, in civil litigation (Notice of Claims were filed) and would be preparing to defend against criminal charges." (Nonnenmann Br. at 20.) [FN30]

> FN30. According to Nonnenmann, discovery materials "verified that the [NYPD] was considering possible criminal charges against" him, including Petit Larceny regarding overtime, Official Misconduct and Obstruction of Governmental Administration for failing to take action the day of the stop and frisk, and Refusing to aid a Peace or Police Officer. (Nonnenmann Br. at 20.) Nonnenmann's affidavit also states that "[o]n April 18, 2003 Corporation Counsel had informed the Court that plaintiff was, in fact, being investigated for possible criminal activity or serious misconduct." (Dkt. No. 36: Nonnenmann Aff. ¶ 41.) Nonnenmann refers only to a transcript from an April 18, 2003 hearing before

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

Judge Cote, and it appears to the Court that Nonnenmann has either misrepresented or misinterpreted the City's statements during that hearing. (Nonnenmann Aff. ¶¶ 38, 41; Ex. D: 4/18/03 Hearing Transcript ["H"]; Dkt. No. 16: 4/18/03 Hearing Transcript.) During the hearing, Corporation Counsel Molfetta stated that Nonnenmann became the subject of an IAB investigation due to his alleged failure to report the stop-and-frisk in a timely manner-Molfetta made no mention of any contemplated charges of criminal activity or criminal misconduct. (H. at 5, 7-10.) Further, in alleging that "Defendants used their disciplinary process to harass and retaliate against plaintiff," Nonnenmann concedes that "[n]o charges were ever brought." (Nonnenmann Aff. ¶ 43.)

It is well-settled that the Sixth Amendment right to counsel does not apply in civil cases. *See, e.g., Thomas v. Lord,* No. 99-345, 234 F.3d 1263 (table), 2000 WL 1551566 at *1 (2d Cir. Oct. 16, 2000) ("The Sixth Amendment's guarantee of the assistance of counsel, however, does not generally apply to civil actions."); *Allah v. Irvin,* No. 94-2678, 89 F.3d 826 (table), 1995 WL 722543 at *1 (2d Cir. Nov. 17, 1995) (rejecting § 1983 plaintiff's "Sixth Amendment argument because a party has no constitutionally guaranteed right to the assistance of counsel in a civil case."); *Smylis v. City of New York,* 983 F.Supp. 478, 481 (S.D.N.Y.1997) (Court rejected City employee's § 1983 claim that the City violated his Sixth Amendment rights because "[t]he Sixth Amendment, however, applies only to criminal prosecutions.").

Moreover, an individuals's Sixth Amendment right to counsel attaches only at the time when adversary criminal proceedings are initiated against him, and since any NYPD disciplinary proceedings against Nonnenmann were not criminal prosecutions, he did not have a Sixth Amendment right to counsel. *See, e.g., McCullough v. City of New York,* 90 Civ.

2276, 1991 WL 130922 at *4 (S.D.N.Y. July 9, 1991) (Court rejected police officer's claim that he was deprived his Sixth Amendment right to counsel during NYPD disciplinary hearings "because the [NYPD] disciplinary proceeding was not a 'criminal prosecution' within the meaning of the Sixth Amendment."); *cf., e. g., Erbacci, Cerrone, & Moriarty, Ltd. v. United States,* 939 F.Supp. 1045, 1056 (S.D.N.Y.1996) ("[P]laintiffs' Sixth Amendment claim is meritless because the United States Constitution does not afford a plaintiff any right to confront witnesses in an internal, union disciplinary investigation.... Because the allegations at issue were not raised as part of a criminal proceeding, plaintiffs had no Sixth Amendment right to confront their accusers, and accordingly plaintiffs' Sixth Amendment claim is meritless.").

**\*25** Most importantly, because the the NYPD never filed any criminal charges against Nonnenmann, his Sixth Amendment right to counsel never attached. The Second Circuit has held that "[t]he Sixth Amendment's right to counsel attaches at the 'initiation of adversary judicial proceedings,' such as the filing of an indictment ." *United States v. Yousef,* 327 F.3d 56, 140 (2d Cir.) (quoting *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 2297 (1984)), *cert. denied,* 124 S.Ct. 353 (2003); *see also, e.g., Deshawn E. v. Safir,* 156 F.3d 340, 349 (2d Cir.1998) ("The Sixth Amendment right to counsel attaches at 'the time that adversary judicial proceedings have been initiated.' "). In New York, "a criminal proceeding, and with it the right to counsel, is initiated by the filing of an accusatory instrument." *Deshawn E. v. Safir,* 156 F.3d at 349. As Nonnenmann admits, the NYPD never filed criminal charges against him. (*See* Nonnenmann Aff. ¶ 43: "No charges were ever brought."). Because adversary proceedings never commenced, Nonnenmann's Sixth Amendment right to counsel never attached. Accordingly, Nonnenmann fails to state a Sixth Amendment violation, and his claim should be dismissed.

*IV. DEFENDANTS ARE NOT ENTITLED TO*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

*SUMMARY JUDGMENT ON NONNENMANN'S FAIR LABOR STANDARDS ACT CLAIM*

Nonnenmann alleges that in violation of the Fair Labor Standards Act and the NYPD's Collective Bargaining Agreement with the LBA, his "salary and pension benefits have been reduced all to his damage in the sum of $750,000.00." (Dkt. No. 14: Am. Compl. ¶ 69.) The City argues that Nonnenmann, as a Lieutenant, is exempt from the FLSA overtime provisions. (Dkt. No. 29: City Br. at 24.) Nonnenmann's response to the City's summary judgment argument reads, in full:

Defendants have violated plaintiffs rights by denying wage, overtime and employment benefits which violate the FLSA and the collective bargaining agreement. Plaintiff's affidavit and Exhibits thereto have discussed this issue. The FLSA has applicability on issues other than overtime.

(Dkt. 34: Nonnenmann Br. at 25.)

"The FLSA requires employers to pay employees overtime wages, at the rate of time and a half, for hours worked in excess of 40 hours in a single week." *Abramo v. City of New York,* Nos. 01-9233, 01-9230, 01-9232, 54 Fed. Appx. 708, 710, 2003 WL 57284 at *1 (2d Cir. Jan. 6, 2003) (citing 29 U.S.C. § 207). However, employees who are " 'employed in a bona fide executive, administrative, or professional capacity" ' are exempt from the FLSA's overtime requirements. *Abramo v. City of New York,* 2003 WL 57284 at *1 (quoting 29 U.S.C. § 213(a)(1)). Lieutenants are among the employees exempt from the FLSA overtime requirements. *Abramo v. City of New York,* 2003 WL 57284 at *2, *aff'g, Kelly v. City of New York,* 91 Civ. 2567, 91 Civ. 7343, 91 Civ. 7755, 2001 WL 1132017 at *8 (S.D.N.Y. Sept. 24, 2001).

The Court interprets Nonnenmann's response to the City's argument "[t]he FLSA has applicability on issues other than overtime" as an admission that, as a Lieutenant, he is exempt from the FLSA overtime

provisions. The parties disagree, however, as to whether Nonnenmann was "working" on or about June 2, 2002, when IAB ordered him to remain home after he filed an IAB complaint against Galatioto on June 1,2002. Nonnenmann states:

> **\*26** On or about June 2, 2002, IAB called plaintiff at his residence, a Sgt. possibly named Laport, *ordered plaintiff to remain at his residence pending further instructions from his Group captain.* Plaintiff submitted an overtime request for 6 hours [and] was paid and defendant Galatioto subsequently ordered pay roll to dock plaintiff the 6 hours he was paid for. Plaintiff has the right to seek 53 hours of overtime. Sgt. Laport *directed plaintiff to stay in his residence pending instructions from his captain.* Plaintiff remained in his residence for 53 hours, until he left to report for his next tour of duty.

(Dkt. No. 36: Nonnenmann Aff. ¶ 85, emphasis added.) On the other hand, the City contends that "[s]ince plaintiff was at home, off-duty, he was not working, despite the fact that he answered his telephone and responded to IAB's questions. Plaintiff has not submitted any evidence to the contrary." (City Br. at 14.)

If Nonnenmann was "working" during the time IAB ordered him to remain home on or about June 2, 2002, he would be entitled to payment for that time under the FLSA.

"[T]he trial judge [is] responsible for determining as a matter of law whether plaintiff's activities could potentially constitute 'work.'.... [W]hat qualifies as compensable work under the FLSA is determined by whether the employee's activity is controlled or required by the employer, is necessarily and primarily for the benefit of the employer, and is an integral and indispensable part of the job." *Holzapfel v. Town of Newburgh,* 145 F.3d 516, 521, 528 (2d Cir.), *cert. denied,* 525 U.S. 1055, 119 S.Ct. 619 (1998); *see, e.g., Monserrate v. City of New York,* 99 Civ. 12173, 2000 WL 1741673 at *1 (S.D.N.Y. Nov. 27, 2000) ("[T]his court is required

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
(Cite as: 2004 WL 1119648 (S.D.N.Y.))

to determine whether Plaintiffs' activities fall within the definition of the term 'work' sufficient for them to maintain their cause of action."). "The first issue to address is whether the alleged activity could potentially constitute 'work' under the FLSA. This is an issue of law to be determined by the trial judge." *Capasso v. Metropolitan Transp. Auth.,* 198 F.Supp.2d 452, 459 (S.D.N.Y.2002). "Once decided, the factfinder must 'decide as a question of fact, not only how much of plaintiff's time ... [falls] within the court's definition of 'work' and would be compensable, but also how much of that time was spent with the employer's actual or constructive knowledge." ' *Id.* (quoting *Holzapfel v. Town of Newburgh,* 145 F.3d at 521).

The Supreme Court has "counseled that the determination of what constitutes work is necessarily factbound." *Reich v. Southern New England Telecomm. Corp.,* 121 F.3d 58, 64 (2d Cir.1997) (quoting *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 168 (1944) ("Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.")); *see also, e.g., Skidmore v. Swift,* 323 U.S. 134, 136-37, 65 S.Ct. 161, 163 (1944) ("Whether in a concrete case such time falls within or without the [Fair Labor Standards] Act is a question of fact to be resolved by appropriate findings of the trial court.... The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was."); *see also, e.g.,* Daniel B. Abrahams, Sandra J. Boyd, Gilbert J. Ginsburg, *Employer's Guide to the FLSA* § 620 (Dec.2002) (The Supreme Court has held that "determination of the compensability of on-call time involves a factspecific, case-by-case analysis.") 2 Compensation & Benefits § 13:4 "Factors Affecting the Determination of Time Worked" (2004) (enumerating factors to be considered).

*27 "Time spent away from the employer's premises under conditions that are so circumscribed that they restrict the employee from effectively us-

ing the time for personal pursuits ... constitutes compensable hours of work." 29 C.F.R. § 553.221(c); *see also, e.g.,* 3 Emp. Coord. Compensation ¶ 23:7, "Compensable Hours of Work" (2004) ("Time spent away from the employer's premises under conditions so circumscribed that they restrict the employee from effectively using the time for personal pursuit ... constitutes compensable hours of work.); Daniel B. Abrahams, Sandra J. Boyd, Gilbert J. Ginsburg, *Employer's Guide to the FLSA* § 620 ("When an employer requires employees to remain in a fixed location while on call, the courts and DOL [Department of Labor] are likely to consider this on-call time to be compensable under the FLSA."); *cf., e.g.,* 29 C.F.R. § 778.223 ("If the employees who are thus on call are not confined to their homes or to any particular place, but may come and go as they please, provided that they leave word where they may be reached, the hours spent 'on call' are not considered as hours worked."); 29 C.F.R. § 785.17 ("An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call.' An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call.").

The City does not dispute Nonnenmann's allegation that he was ordered to remain at home, but the Court cannot resolve Nonnenmann's claim on that fact alone. *See Skidmore v. Swift & Co.,* 323 U .S. at 136-37, 65 S.Ct. at 163. Because factual issues exist as to whether Nonnenmann is entitled to payment for the time IAB ordered him to remain at home, defendants' summary judgment motion as to this claim should be denied and Nonnenmann's FLSA claim against the City should proceed to trial.[FN31] *See, e.g., Brown v. Luk,* No. 95-CV-1780, 1996 WL 280831 at *5 (N.D.N.Y. May 10, 1996) ("After reviewing the record, the Court must deny judgment on the pleadings as to plaintiffs' overtime claims. First, 'on call' time may, depending on the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

circumstances, qualify as 'work' under the FLSA such that it would be overtime compensable.... [T]he Second Circuit does not appear to have spoken definitively on this issue, but two predominant factors that a court probably should consider in its inquiry are (1) the degree to which employees are free to engage in personal activities while on-call; and (2) whether any agreements exist between the employer and employees in regard to whether on-call time would be compensable.") (citations omitted).

> FN31. The FLSA claim is against the City only, and the individual defendants are granted summary judgment dismissing the claim as to them.

**V. CHIEF CANNON IS NOT ENTITLED TO SUMMARY JUDGMENT ON *NONNENMANN'S DEFAMATION CLAIM***

Nonnenmann alleges defamation by defendant Chief Cannon during Chief Cannon's address to the 3d Platoon on February 13, 2002. (Dkt. No. 14: Am. Compl. ¶¶ 62-65; *see* pages 15-17 above.)

**\*28** Chief Cannon admits that during his address he said "something to the effect of I'd rather ride in a radio car with an officer like the captain out on patrol after midnight so he doesn't have to be backing up police officers as they respond to a ra[ ]dio run specifically one involving a gun and getting out and taking police action. I'd rather ride next to an officer like that than some malcontent who hates his job...." (Cannon Dep. at 52; *see* Nonnenmann Aff. ¶ 215; *see also* pages 14-16 above.) According to Chief Cannon, he "made statements in support of [Capt. Galatioto], and ... made statements regarding what [Chief Cannon] believed to be inaccurate statements in the newspaper article that had been published that day." (Cannon Dep. at 17-18; *see also* Nonnenmann Aff. ¶ 215; Nonnenmann 56.1 Stmt. ¶¶ 42-43.) While it is undisputed that Chief Cannon did not name Nonnenmann (*see* page 16 above), the Daily News article that he sought to ad-

dress specifically identified Nonnenmann as one of Capt. Galatioto's accusers. (Nonnenmann 56.1 Stmt. Ex. G: John Marzulli, *3 Cops Accuse Chief of Misconduct v. Latinos,* N.Y. Daily News, Feb. 12, 2002.)

"In deciding whether the jury should be allowed to pass upon statements alleged to be defamatory, the court need only determine that the contested statements are reasonably susceptible of defamatory connotation. If any defamatory construction is possible, it is a question of fact for the jury whether the statements were understood as defamatory." *Albert v. Loksen,* 239 F.3d 256, 267 (2d Cir.2001) (internal quotations omitted); *see, e.g., Lucking v. Maier,* 03 Civ. 1401, 2003 WL 23018787 at *3 (S.D.N.Y. Dec. 23, 2003) ("The Court renders the threshold determination of whether the challenged passage is 'reasonably susceptible of a defamatory meaning.' ") ( & cases cited therein); *Haugh v. Schroder Inv. Mgmt. N.A., Inc.,* 02 Civ. 7955, 2003 WL 21136096 at *2 (S.D.N .Y. May 15, 2003) ("It is for the court to make the threshold determination as to whether the statement at issue is susceptible of one or many meanings, and whether that meaning is defamatory as a matter of law. In making this determination, the court employs an objective standard and considers whether an ordinary person would find the statement reasonably susceptible of a defamatory connotation.") (citations and internal quotations omitted).

The Court finds that Chief Cannon's statement is "reasonably susceptible of defamatory meaning." Material issues of fact exist as to whether Chief Cannon's statement was understood by the platoon members as referring to Nonnenmann. FN32 Accordingly, Nonnenmann's defamation claim against Chief Cannon should proceed to trial.FN33

> FN32. Under New York law, special damages need not be shown where a statement is defamatory per se, and a statement " 'which tends to disparage a person in the way of his office, profession or trade," ' or "which can be interpreted as meaning that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

a person was 'derelict in his professional duties" ' is defamatory per se. *Haugh v. Schroder Inv. Mgmt. N.A., Inc.,* 2003 WL 21136096 at *1 (citing 2d Cir. & N.Y. cases).

FN33. Defendants' sole statement about qualified immunity for Nonnenmann's defamation claim claims that "the record does not establish that the individually named defendants defamed his reputation." (City Br. at 23-24.) Whatever the merits of this argument-without citation-as to defendants other than Chief Cannon, it is laughable as to Chief Cannon and the Court will not address it further.

The Court notes that were the City to pay Nonnenmann for the fifty-three hours that he claims he remained at home, thereby resolving his FLSA claim, it would obviate the need for a trial on that issue and allow the Court to dismiss Nonnenmann's defamation claim without prejudice.[FN34]

FN34. When the federal claims are dismissed before trial, the Supreme Court has stated that the District Court ordinarily should decline the exercise of jurisdiction by dismissing the state claims without prejudice. *E.g., Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7 (1998) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139 (1966) ("if the federal claims are dismissed before trial ... the state claims should be dismissed as well."); *see, e.g., Almonte v. Florio,* 02 Civ. 6722, 2004 WL 60306 at *7 (S.D.N.Y. Jan. 13, 2004) ("Because all of plaintiff's federal

claims have been dismissed, this Court declines to exercise jurisdiction over plaintiff's state law [libel, slander, and defamation] claims.") (citing 28 U.S.C. § 1367(c)(3)); *Hargrow v. Volunteers of America,* 02 Civ. 0880, 2002 WL 31512620 at *2 (S.D.N.Y. Nov. 12, 2002) (After the dismissal of plaintiff's federal claims, exercising pendent jurisdiction over plaintiff's state law claim for defamation would be an abuse of discretion. " 'Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." ') (quoting *United Mine Workers v. Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139); *Crawford v. New York City Bd. of Educ.,* 99 Civ. 925, 1999 WL 1072495 at *3 (S.D.N.Y. Nov. 29, 1999) ("[T]he plaintiff's defamation claim raises only a state law claim. Having dismissed the only federal claim in the case, the Court declines to exercise supplemental jurisdiction over the pendent state law claim which is therefore dismissed without prejudice.") (citing 28 U.S.C. § 1367(c)(3)), *aff'd,* No. 00-7042, 225 F.3d 645 (table), 2000 WL 1230791 at *1 (2d Cir. June 29, 2000).

*CONCLUSION*

**\*29** For the reasons stated above, the City's summary judgment motion should be granted in part and denied in part. The defendants should be granted summary judgment dismissing Nonnenmann's claims under § 1983-the First Amendment and the Sixth Amendment, and otherwise denied. Nonnenmann's Fair Labor Standards Act claim against the City and Nonnenmann's defamation claim under New York state law against Chief Cannon should proceed to trial.

The Joint Pretrial Order is due thirty days from this Report and Recommendation, that is, by June 21,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584
**(Cite as: 2004 WL 1119648 (S.D.N.Y.))**

2004.

*FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff, 500 Pearl Street, Room 1340, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Rakoff. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2004.
Nonnenmann v. City of New York
Not Reported in F.Supp.2d, 2004 WL 1119648 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1584

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.